# IN THE SUPREME COURT OF IOWA

No. 12–1150

Filed July 18, 2014
Amended October 15, 2014

STATE OF IOWA,

> Appellee,

vs.

JUSTIN DEAN SHORT,

> Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Plymouth County, James D. Scott (suppression), and Jeffrey A. Neary (trial), Judges.

A criminal defendant seeks further review of a court of appeals decision affirming a district court's admission of evidence collected by law enforcement officers in probationer defendant's home based upon reasonable suspicion of criminal activity under the Iowa Constitution. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Mark C. Smith, Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Kyle P. Hanson, Assistant Attorney General, Darin J. Raymond, County Attorney, for appellee.

**APPEL, Justice.**

In this case, we consider the validity of a warrantless search of a probationer's home by police officers. The defendant was charged with burglary and theft. The defendant filed a motion to suppress, challenging the admissibility of evidence obtained from the search. The defendant contended the search warrant was invalid because it inaccurately described the house to be searched and because an alteration of the warrant based upon a telephonic conversation with the issuing judge was invalid. The district court overruled the motion to suppress. For the reasons expressed below, we reverse the district court and remand the case for further proceedings.

## I. Factual Background and Proceedings.

On May 18, 2011, a Plymouth County deputy sheriff responded to a report of a burglary of a home. The deputy met with the resident who reported a number of missing items, including two televisions, two jewelry boxes with assorted jewelry, a gift card to Minerva's Restaurant, and a camera. The deputy's investigation revealed that a doorjamb had been broken when the door was apparently forced open. There was a partial shoe print on the outside of the door and partial fingerprints on the door. Tire impressions were found going from the concrete driveway into the grass along the side of the house.

Law enforcement contacted Minerva's Restaurant and advised that a $100 gift card had been stolen. Based on their inquiries, sheriff deputies obtained a receipt from the restaurant that was generated from the gift card's use. Justin Short's signature appeared on the receipt. Deputies also interviewed the waitress and the manager, who identified a photo of Short as the person who used the card.

Deputies received an informant's tip that the car of Short's girlfriend, Leya Lorenzen, was parked at 2721 Jones Street in Sioux City. Law enforcement obtained a search warrant for that address from a district associate judge in Le Mars. The application identified the place to be searched as a "single story wood frame home white and yellow in color" with a "single stall garage." Local police assisting in the search, however, later reported that Lorenzen did not reside at the location identified on the warrant. After law enforcement inquired at the address identified on the warrant, the resident who answered explained that he did not know Lorenzen or Short but stated that there was an apartment next door and "people are coming and going from there all the time." The new location was a two-story house that had been converted into four apartments. Deputies then contacted the owner of the apartment building and learned that Lorenzen had rented an apartment at 2723 ½ Jones Street, which was the upstairs apartment.

At this point, law enforcement called the judge who issued the original search warrant and asked if they should return to Le Mars to get another search warrant. According to the testimony of the law enforcement officer at the hearing on the motion to suppress, the district associate judge gave law enforcement verbal authorization to change the address on the warrant and "to note that this was done telephonically through the authority of" the issuing judge. Law enforcement scratched out the address on the original warrant and wrote in the new address. Law enforcement also scratched through the word "yellow" describing the house, however they left the description of the place to be searched as "a single story wood frame home." No statement was added to the original warrant indicating that it had been altered pursuant to verbal authorization of the court.

Law enforcement then conducted a search of the apartment at 2723 ½ Jones Street. Upon executing the search, police found two flat screen televisions, two jewelry boxes taken in the burglary, the stolen Minerva's Restaurant gift card, and a receipt in Short's wallet. After receiving *Miranda* warnings, Short admitted that he kicked in the door of the residence, took the missing items, and pawned some of the items at a local pawn shop. Short was subsequently charged with burglary and theft.

During the investigation, law enforcement learned that Short was on probation related to other crimes. Although probation officials were contacted in connection with the burglary investigation, they did not participate in the search. It is undisputed that the search was not a probationary search, but was instead an investigatory search by law enforcement related to new crimes.

Short sought to suppress all evidence obtained as a result of the search. In his brief to the trial court, Short claimed he had a constitutionally protected expectation of privacy in the apartment; his probation agreement did not give officers unfettered access to search; the altered search warrant violated Iowa Code section 808.3 (2011), which requires that search warrant applications be in writing; and the statements and evidence gathered during the search should be suppressed as fruit of an illegal search. The State raised a number of issues in its resistance, including claiming that the search warrant was valid even after altered, that exigent circumstances were present to support the search, and that the waiver in Short's probation agreement authorized law enforcement personnel to search the apartment without a warrant. In its brief, however, the State solely argued that the search

was lawful based on reasonable suspicion that Short was involved in the crime.

The district court entered a detailed ruling. It found that the application for the original warrant was not tainted, but that the description of the place to be searched in the original warrant was inadequate. In so ruling, the district court noted that the warrant described a single story house with a garage stall and not a two story house divided into apartment units with a parking lot in back rather than garage stalls. The description in the altered warrant cured some of the problems, according to the district court, but it held that the telephonic authorization to alter the warrant was contrary to Iowa Code section 808.3. The district court further found that no exigent circumstances existed to support an exception to the warrant requirement. On the issue of whether a warrantless search of a probationer could be upheld in this case, however, the district court held in favor of the State. The district court reasoned that the officers had reasonable suspicion to believe that stolen property would be located at the residence, but that in order to be valid, the search must have been within the contemplation of the probation agreement. As a result of the ruling, the evidence obtained during the search was admitted into evidence and Short was convicted.

Short appealed. We transferred the matter to the court of appeals. The court of appeals held that the claim under article I, section 8 of the Iowa Constitution was adequately preserved in the district court. On the merits the court found that the search of a probationer based upon reasonable suspicion of criminal activity and based upon the limited scope of the search was valid under article I, section 8 of the Iowa Constitution.

We granted further review. We now vacate the decision of the court of appeals, reverse the decision of the district court on the motion to suppress, and remand the case to the district court.

## II. Standard of Review.

Claims that the district court failed to suppress evidence obtained in violation of the Federal and Iowa Constitutions are reviewed de novo. *State v. Dewitt*, 811 N.W.2d 460, 467 (Iowa 2012). The same is true of claims of ineffective assistance of counsel. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

## III. Discussion.

### A. Positions of the Parties.

1. *Short.* Short challenges the denial of the motion to suppress on appeal. Short first asserts that he had a constitutionally protected interest in the apartment, the district court correctly determined that the original search warrant lacked specificity, the district court correctly determined that the alteration to the warrant pursuant to telephonic authorization was invalid, and there were no exigent circumstances to support a warrantless search.

After addressing these issues, Short focuses on the fighting issue in this case, namely, whether the warrantless search of a probationer's home by law enforcement officers violates article I, section 8 of the Iowa Constitution. Short claims that in *State v. Ochoa* we emphasized the property rights underpinning the sanctity of the home and highlighted that our cases underscore the high importance of a warrant issued by a neutral and detached magistrate when a home search was involved. 792 N.W.2d 260, 284–85 (Iowa 2010). Short recognizes that the *Ochoa* court did not address "whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a

focused search," *id.* at 291, but argues that the reasoning in *Ochoa* suggests that a warrant requirement for a home invasion by law enforcement is required, *see id.* at 287–91.

Short further relies on *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970). In that case, we invalidated a warrantless search of the home of a parolee. *Id.* at 540–41. According to Short, the holding in *Cullison*, namely, that the search and seizure rights of a parolee are not reduced due to his or her status, *id.* at 538–39, "remained untouched" by *Ochoa* and applies with equal force to probationers. Short also notes that the search in this case was not a probationary search, but was instead a search by general law enforcement officers, a fact that further undermines the validity of the search.

Short maintains that the state constitutional issue was adequately preserved in the district court. In any event, Short argues that if the issue was not preserved under the Iowa Constitution, his counsel was ineffective for not raising the issue. *See Taylor v. State*, 352 N.W.2d 683, 684–85 (Iowa 1984) (describing review of claims of ineffective assistance of counsel).

2. *The State.* The State contends that Short did not preserve his argument below under the Iowa Constitution. It argues that Short did not argue that the Iowa Constitution should be interpreted differently from the Fourth Amendment before the district court, and suggests that the district court's citation of *Ochoa* should not be construed to mean that the Iowa Constitution was duly raised.

The State's sole argument on the merits of the appeal is that because the search of a probationer was supported by reasonable suspicion, the search was constitutionally valid. In support of its argument, the State cites *Griffin v. Wisconsin*, 483 U.S. 868, 107 S. Ct.

3164, 97 L. Ed. 2d 709 (1987), and *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001). In both cases, the United States Supreme Court upheld warrantless searches of the homes of probationers based upon reasonable suspicion under the Fourth Amendment. In *Griffin,* the Supreme Court upheld a warrantless search of a probationer by probation officers that was based upon reasonable suspicion and was performed in compliance with a Wisconsin regulation authorizing such searches. 483 U.S. at 870–71, 880, 107 S. Ct. at 3167, 3172, 97 L. Ed. 2d at 715–16, 722. In *Knights*, *Griffin* was extended to include searches conducted by general law enforcement officers. *Knights*, 534 U.S. at 120–22, 122 S. Ct. at 592–93, 151 L. Ed. 2d at 506–07. Relying upon *Knights* and *Griffin*, the State argues that Short's claim under article I, section 8 of the Iowa Constitution lacks merit.

The State recognizes that in *Ochoa,* we departed from the interpretations of the United States Supreme Court. *See* 792 N.W.2d at 287–91. Yet, the State argues that *Ochoa* did not hold that warrantless searches were invalid, but only that warrantless searches of parolees without at least some individualized suspicion were invalid. *See id.* at 291. The State narrowly interprets *Ochoa* as indicating acquiescence in warrantless searches of parolees and probationers based upon individualized suspicion.

### IV. Issue Preservation.

We first begin our discussion of issue preservation with a review of what issues were *not* presented by the State in this appeal. The State did not advance an argument that the warrant originally obtained was not defective, that the alteration of the warrant did not violate the requirement of Iowa Code section 808.3, or that exigent circumstances existed to justify a warrantless search. We need not consider the extent

to which these arguments may have had merit, as under our rules and our precedents they have been waived in this appeal. *See* Iowa R. App. P. 6.903(2)(*g*)(3) (requiring appellant to present arguments and supportive authority in appeal brief and stating "[f]ailure to cite authority in support of an issue may be deemed waiver of that issue"); *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005) ("In the absence of an argument on these allegations [on appeal], we deem them waived."); *Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) (confining consideration to issues raised on appeal); *Richardson v. Neppl*, 182 N.W.2d 384, 390 (Iowa 1970) ("A proposition neither assigned nor argued presents no question and need not be considered by us on review.").

Further, although the district court cited Short's argument that his probation agreement did not give law enforcement officers unfettered access to conduct a search, the district court specifically only found that "the police had the right to search Short's residence under the terms of his probation" and therefore, "the search was not unlawful." The district court made no finding or holding regarding whether the probation agreement itself constituted valid consent. *Cf. Knights*, 534 U.S. at 118–20 & n.6, 122 S. Ct. at 591–92 & n.6, 151 L. Ed. 2d at 504–05 & n.6 ("We need not decide whether Knights' acceptance of the search condition constituted consent in the . . . sense of a complete waiver of his Fourth Amendment rights . . . because we conclude that the search of Knights was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances' . . . ." (Internal quotation marks omitted.)). On appeal, the State did not argue that Short voluntarily consented to the search. The word "consent" does not appear

in the State's brief,[1] nor did the State cite cases where the issue of consent validated a warrantless search. As a result, the issue of whether the conditions of probation amounted to a voluntary consent is not before us.[2] *See Ochoa*, 792 N.W.2d at 292 (finding the State's failure to argue on appeal that appellant consented to a search at the door would ordinarily waive the issue); *cf. Parkhurst v. White*, 254 Iowa 477, 481, 118 N.W.2d 47, 49 (1962) ("Appellees do not argue the question . . . and we consider it waived."). As noted in *Feld v. Borkowski*, 790 N.W.2d 72, 78 n.4 (Iowa 2010),

> in the absence of the most cogent circumstances, we do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a

---

[1] In its brief, the State contends that Short "acknowledged his 'significantly diminished' expectation of privacy by signing [the] probation agreement," which included a "condition" that Short would " 'submit [his] person . . . [and] place of residence . . . to search at any time, with or without a search warrant . . . by any . . . law enforcement officer having reasonable grounds to believe contraband is present.' "

[2] For instance, a leading treatise explains the majority view is that consent provisions apply only to searches by parole or probation officers and not to searches by police officers, but also cites cases to the contrary. William E. Ringle, *Searches and Seizures, Arrests and Confessions* § 17:8 & n.31, at 17-32 (2d ed. 2004). At least two cases hold that search provisions in probation conditions are coerced and cannot be enforced. *See People v. Peterson*, 233 N.W.2d 250, 255 (Mich. Ct. App. 1975); *Tamez v. State*, 534 S.W.2d 686, 692 (Tex. Crim. App. 1976). Yet another court has ruled that a probation condition may be enforced only to the extent there is reasonable suspicion and when traditionally a search warrant has not been required. *Commonwealth v. LaFrance*, 525 N.E.2d 379, 383 (Mass. 1988). Another approach is that court-ordered probation conditions may permit warrantless searches, but the evidence is admissible only in a probation proceeding. *Grubbs v. State*, 373 So. 2d 905, 909–10 (Fla. 1979). In another case, the court emphasized that search and seizure conditions on probation should be "sparingly imposed and . . . reasonably related to the offense for which the defendant was convicted" and that where this requirement was met, and the condition was clearly explained to him before signing, the provision was enforceable. *State v. Morgan*, 295 N.W.2d 285, 288–89 (Neb. 1980). Another court has suggested that search and seizure provisions in probation agreements may be valid "except when procured by fraud, duress, fear, or intimidation or when it is merely a submission to the supremacy of the law." *Rivera v. State*, 667 N.E.2d 764, 766 (Ind. Ct. App. 1996). There is no factual record and no briefing before us that would allow us to explore these interesting permutations of the consent issue.

> change . . . . [W]e are restrained to apply the controlling law as advocated by the parties . . . .

(Citation omitted.) It is important that our waiver rules be consistently applied in all cases and that we not apply special rules for certain parties without a principled basis for doing so.[3]

We now turn to issue preservation questions related to Short's claims. The State suggests that the constitutionality of the search under article I, section 8 of the Iowa Constitution was not presented to the district court. In his motion to suppress, however, Short specifically cited article I, section 8 of the Iowa Constitution as the basis for his argument that the search was invalid because there was no effective warrant. Further, the district court appears to have recognized the state constitutional argument in its opinion when it extensively discussed *Ochoa*, a case solely involving article I, section 8 of the Iowa Constitution, *see* 792 N.W.2d at 284–86. It is clear that Short was claiming to the district court that a warrant was required for the search under the Iowa Constitution. We therefore agree with the court of appeals that the issue presented on appeal was adequately preserved. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is incomplete or sparse, the issue has been preserved." (Internal quotation marks omitted.)); *State v. Paredes*, 775 N.W.2d 554, 561 (Iowa 2009) ("[W]here a question is obvious and ruled upon by the district court, the issue is adequately preserved.").

---

[3] No party, for instance, asks us to revisit *Racing Ass'n of Central Iowa v. Fitzgerald*, 675 N.W.2d 1 (Iowa 2004), *Ochoa*, 792 N.W.2d 260, *State v. Pals*, 805 N.W.2d 767 (Iowa 2011), or *State v. Baldon*, 829 N.W.2d 785 (Iowa 2013).

**V. Warrantless Searches of the Homes of Probationers by Law Enforcement Officers.**

**A. Introduction**. The larger question of whether law enforcement officers may search a probationer's home without a valid warrant under the facts of this case depends upon resolution of two subsidiary questions. The first question is whether a warrantless search of a probationer's home is permissible when, as here, reasonable suspicion of criminal activity is present. If the answer to this question is yes, a second question emerges—namely, whether law enforcement officers, as distinguished from probation officers, may conduct the search.

In considering these issues under article I, section 8 of the Iowa Constitution, we reach our decisions independently of federal constitutional analysis. We may, of course, consider the persuasiveness of federal precedent, but we are by no means bound by it. *See Ochoa*, 792 N.W.2d at 267 ("The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision."); *see also State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). We may look to the caselaw of other states, to dissenting opinions of state and federal courts, and to secondary materials for their persuasive power. *See State v. Baldon*, 829 N.W.2d 785, 792–800 (Iowa 2013) (considering secondary sources and court decisions from other states); *Ochoa*, 792 N.W.2d at 276–87 (discussing state caselaw, federal dissenting opinions, and academic commentary).

**B. Established Principles of Independent State Constitutional Law**.

1. *Introduction.* Neither party has questioned or sought to limit our responsibility to independently construe the Iowa Constitution.

Neither party, for example, has suggested on appeal that this court's approach to independent state law as outlined in *Ochoa, Pals,* or *Baldon* is incorrect or should be modified. Our approach to reviewing independent state constitutional claims was thoroughly explored in *Baldon, Pals,* and *Ochoa. See Baldon*, 829 N.W.2d at 803–35 (Appel, J., concurring specially); *Pals*, 805 N.W.2d at 771–72; *Ochoa*, 792 N.W.2d at 264–67, 287–91. For the purpose of clarity and emphasis, we review the principles of our independent state constitutional jurisprudence reflected in these cases.

2. *States' constitutions as the original protectors of individual rights; the Federal Constitution as the follower of state tradition.* At the outset, we note that *state* constitutions and not the Federal Constitution were the original sources of written constitutional rights. *See Baldon*, 829 N.W.2d at 803–09 (Appel, J., concurring specially). For example, eight state constitutions had provisions related to search and seizure prior to the adoption of the Federal Constitution. Bernard Schwartz, *The Great Rights of Mankind: A History of the American Bill of Rights* 88 (expanded ed. 1992). John Adams, who attended oral argument by James Otis in *Paxton's Case,* was the drafter of article XIV of the Massachusetts Constitution of 1780, one of the important state constitutional precursors of the Fourth Amendment. *See Baldon*, 829 N.W.2d at 805–06.

At the federal constitutional convention, whenever the issue of individual rights arose, the founders repeatedly expressed the view that they looked to *the states* for the preservation of individual rights. James Wilson declared that the purpose of the states was " 'to preserve the rights of individuals.' " *Baldon*, 829 N.W.2d at 808 (quoting 1 *Records of the Federal Convention of 1787,* at 356 (Max Farrand ed., 1937)). Oliver

Ellsworth, who would later become Chief Justice of the United States Supreme Court, declared at the constitutional convention that " 'he turned his eyes' " to state governments " 'for the preservation of his rights.' " Paul Finkelman & Stephen E. Gottlieb, *Introduction: State Constitutions and American Liberties, in Toward a Usable Past: Liberty Under State Constitutions* 1, 4 (Paul Finkelman & Stephen E. Gottlieb eds., 1991). James Madison, in *The Federalist No. 45*, declared that " '[t]he powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people . . . .' " *Baldon*, 829 N.W.2d at 808 (quoting *The Federalist No. 45*, at 363 (James Madison) (John C. Hamilton 1868)).

Given the primary role of the states in developing individual rights, it is not surprising that, "prior to the adoption of the federal Constitution, each of the rights eventually recognized in the federal Bill of Rights had previously been protected in one or more state constitutions." William J. Brennan Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 501 (1977). As noted by a leading scholar in the area, there is now an emerging consensus that the Federal Bill of Rights originated in state and colonial rights guarantees. *See* Robert F. Williams, *The State Constitutions of the Founding Decade: Pennsylvania's Radical 1776 Constitution and Its Influences on American Constitutionalism*, 62 Temp. L. Rev. 541, 541 (1989) ("Constitutional scholars have long recognized that many of the features of the United States Constitution were modeled on the earlier state constitutions."). The provisions of the Bill of Rights, including the Fourth Amendment, were modeled by state constitutional provisions and not vice versa as is commonly assumed. *See* Steven G. Calabresi et al., *State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in*

*American History and Tradition?*, 85 S. Cal. L. Rev. 1451, 1452–53 (2012) (noting that rights in the Federal Bill of Rights emerge from state and colonial bills of rights).

3. *Strong emphasis on individual rights under the Iowa Constitution.* The bill of rights in the Iowa Constitution was not considered by Iowa constitutional writers as some kind of appendage controlled by federal court interpretations. Unlike the Federal Constitution, the bill of rights was part of the first articles of the Iowa Constitutions of 1846 and 1857.[4] According to George Ells, Chair of the Committee on the Preamble and Bill of Rights, "the Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights." 1 *The Debates of the Constitutional Convention of the State of Iowa* 103 (W. Blair Lord rep., 1857) [hereinafter *The Debates*], *available at* www.statelibraryofiowa.org/services/collections/law-library/iaconst. Article I, section 1, borrowed from the Virginia Declaration of Rights, speaks of "inalienable rights" that are presumably beyond the reach of majoritarian government. *See* Iowa Const. art. I, § 1; Virginia Declaration of Rights (1776), *available at* http://www.archives.gov/exhibits/charters/virginia_declaration_of_rights.html. Article I, section 8 of the Iowa Constitution of 1857 mirrors the language of the Fourth Amendment except for a semicolon that was placed between the reasonableness clause and the warrant clause in the Iowa Constitution. *Compare* U.S. Const. amend. IV, *with* Iowa Const. art. I, § 8. This semicolon suggests the framers believed that there was a relationship between the reasonableness clause and the warrant clause,

---

[4]We will refer to the Iowa Constitution of 1857 as the Iowa Constitution.

much as was the case with the original search and seizure provision of the Massachusetts Constitution of 1780. *See Ochoa*, 792 N.W.2d at 268–69 & n.7.

Indeed, there is powerful evidence that the Iowa constitutional generation did not believe that Iowa law should simply mirror federal court interpretations. While the due process clause of article I, section 9 of the Iowa Constitution was similar to the Due Process Clause of the United States Constitution, Ells noted that the clause was "violated again and again by the dominant party in the land, which rides rough-shod ove[r] the necks of freemen." *The Debates* at 102. Further, Ells noted that

> [i]f the words 'due process of law,' shall in time be recognized by our judicial tribunals to mean what they really do mean . . . [t]hen, sir, that infamous Fugitive Slave Law will become a nu[l]lity, and the American people will trample its odious enactments in the dust.

*Id.* Of course, during this time period the United States Supreme Court upheld the Fugitive Slave Law from constitutional attack. *See, e.g.*, *Ableman v. Booth*, 62 U.S. (21 How.) 506, 526, 16 L. Ed. 169, 177 (1858) ("[T]he act of Congress commonly called the fugitive slave law is, in all of its provisions, fully authorized by the Constitution of the United States . . . .").

As has often been celebrated, the first decision of the Supreme Court of the Territory of Iowa, *In re Ralph*, rejected the claim that a slave present in a free state should be returned to his master, noting that under Iowa law a slave within the free territory of Iowa is not "property" and that the laws regarding illegal restraint apply "to men of all colors and conditions." 1 Morris 1, 7 (Iowa 1839). Counsel for Ralph urged that as a result of the organic law (specifically referring to the territorial

constitutions of Wisconsin and Iowa), Ralph was a free man. *Id.* at 2. Specifically, counsel asserted that under the organic law of Iowa and Wisconsin, " '[n]o man shall be deprived of his liberty, or property, but by the judgment of his peers, or the law of the land.' "[5] *Id.* (quoting the Northwest Ordinance of 1787, art. 2, *in* 32 *Journals of the Continental Congress 1774–1789*, at 340 (Roscoe R. Hill, ed. 1936) [hereinafter *Journals*]). He further argued that under the organic law, "There shall be neither slavery nor involuntary servitude in the said territory . . . ." *Id.* (quoting the Northwest Ordinance of 1787, art. 6, *in Journals* at 343).

The Iowa court held for Ralph. *Id.* at 7. In closing, however, the court emphasized that when a person "illegally restrains a human being of his liberty, it is proper that the laws, which should extend equal protection to men of all colors and conditions, should exert their remedial interposition." *Id.* The decision in *In re Ralph* flatly contradicted the infamous *Dred Scott* decision of the United States Supreme Court in 1857. *See Dred Scott v. Sanford*, 60 U.S. (19 How.) 393, 451, 15 L. Ed. 644, 691 (1856) ("[T]he right of property in a slave is distinctly and expressly affirmed in the Constitution."), *superseded by constitutional amendment*, U.S. Const. amend. XIV; *In re Ralph*, 1 Morris at 7.

While *Dred Scott* was decided after the Iowa Constitutional Convention of 1857 adjourned, the first state legislature convened under

---

[5]As explained by Shambaugh, the bill of rights set forth in the Constitution of the Territory of Iowa was "exceedingly brief" and consisted solely of incorporation of the rights, privileges, and immunities granted to the Territory of Wisconsin. *See* Benjamin F. Shambaugh, *The History of the Constitutions of Iowa* 116 (1902). The Constitution of the Territory of Wisconsin, in turn, incorporated the provisions of the Northwest Ordinance of 1787, which contained a bill of rights. *Id.* at 116–17. As a result, "the provisions of the Ordinance of 1787 are by implication made part of the Constitution of the Territory of Iowa." *Id.* at 117–18.

the new Iowa Constitution expressed its view on the *Dred Scott* decision and its reasoning. The Iowa legislature declared in a resolution that "the case of Dred Scott, is not binding in law or conscience upon the government or people of the United States," and that

> we should be ungrateful to those whose care and foresight provided for us free homes, and derelict in our duty to those who still come after us, did we not promptly and sternly denounce this new doctrine, which if established, degrades the free states.

1858 Iowa Acts Res. 12, at 433. We have not found a record of the debate on the resolution, but there is little doubt that an argument that Iowa courts should defer to *Dred Scott* in the interpretation of the Iowa Constitution as presumptively valid would not have received a favorable reception.

The independent authority of state courts to construe state constitutional provisions free from federal precedent was early recognized in *McClure v. Owen*, 26 Iowa 243, 254–55 (1868). In *McClure*, we stated:

> The same principles that require the federal courts to follow the decisions of the State courts in construing statutes, and to recognize rules of local law, require the federal courts to follow the construction given the [state] Constitution by the highest state tribunal.

*Id.* at 255. As is often celebrated, our subsequent cases dealing with the rights of African Americans adopted an approach much different than the United States Supreme Court ultimately adopted in *Plessy v. Ferguson*, 163 U.S. 537, 540–52, 16 S. Ct. 1138, 1139–44, 41 L. Ed. 256, 257–61 (1896) (upholding state law requiring separate but equal accommodations for white and nonwhite railway passengers as constitutional against challenges under the Thirteenth and Fourteenth Amendments), *overruled by Brown v. Board of Education*, 347 U.S. 483,

494, 74 S. Ct. 686, 692, 98 L. Ed. 873, 880–81 (1954) (rejecting the separate but equal doctrine in the context of public education). *See Coger v. Nw. Union Packet Co.,* 37 Iowa 145, 154–57 (1873) (citing article I, section 1 of the Iowa Constitution in rejecting the notion that African Americans could be subjected to different treatment in public transportation); *Clark v. Bd. of Dirs.,* 24 Iowa 266, 276–77 (1868) (rejecting the argument that a school district could forbid African American children from attending school on the ground of race). In *State v. Tonn,* we emphasized that we were free to depart from federal constitutional analysis in considering the search and seizure provision of the Iowa Constitution. *See* 195 Iowa 94, 104–07, 191 N.W. 530, 535–36 (1923) (recognizing the decided weight of state authority against the rule of a federal case and determining we would forge a different path), *abrogated on other grounds by Mapp v. Ohio,* 367 U.S. 643, 654–55, 81 S. Ct. 1684, 1691, 6 L. Ed. 2d 1081, 1089–90 (1961).

4. *The diminution in substance of federal rights resulting from incorporation triggers renewal of independent state constitutional law.* Beginning with *Gitlow v. New York,* the United States Supreme Court began to incorporate against the states various provisions of the Bill of Rights under the Due Process Clause of the Fourteenth Amendment. 268 U.S. 652, 666, 45 S. Ct. 625, 630, 69 L. Ed. 1138, 1145 (1925) ("[W]e may and do assume that freedom of speech and of the press—which are protected by the First Amendment from abridgment by Congress—are among the fundamental rights . . . protected by the Due Process Clause of the Fourteenth Amendment from impairment by the states."). The incorporation of the Bill of Rights, however, created a tendency for the United States Supreme Court to dilute the substance of the rights themselves. *See Baldon,* 829 N.W.2d at 813 ("In the period

following the incorporation revolution ending with *Mapp*, there is no doubt the strength and scope of the Fourth Amendment's protection has been dramatically reduced by the United States Supreme Court."). Any review of the relationship between state and federal constitutional interpretation that fails to understand or ignores this fundamental and powerful legal riptide is flawed.

In a series of opinions, Justice Harlan presciently predicted that one of the unintended consequences of the extension of federal constitutional rights to the states would be their dilution. *Williams v. Florida*, 399 U.S. 117, 136, 90 S. Ct. 1914, 1925, 26 L. Ed. 2d 446, 474 (1970) (Harlan, J., dissenting) (recognizing the decision to allow a six person jury "simply reflects the lowest common denominator in the scope and function of the right to trial by jury"); *Duncan v. Louisiana*, 391 U.S. 145, 182 n.21, 88 S. Ct. 1444, 1466 n.21, 20 L. Ed. 2d 491, 514 n.21 (1968) (Harlan, J., dissenting) (noting "a major danger of the 'incorporation' approach—that provisions of the Bill of Rights may be watered down in the needless pursuit of uniformity"); *Ker v. California*, 374 U.S. 23, 45, 83 S. Ct. 1623, 1646, 10 L. Ed. 2d 726, 745 (1963) (Harlan, J., concurring in judgment) (pondering whether the United States Supreme Court "[was] prepared to relax Fourth Amendment standards in order to avoid unduly fettering the States").

We have seen the federalism discount predicted by Justice Harlan operate with full force in the search and seizure context. Since incorporation, the relatively clear requirements of the Warrant Clause have been overridden by vague notions of reasonableness, the role of consent has changed from its narrow beginnings to a more protean formulation, and the exclusionary rule has been substantially eroded by a good faith exception. *See California v. Acevedo*, 500 U.S. 565, 582–83,

111 S. Ct. 1982, 1992–93, 114 L. Ed. 2d 619, 636 (1991) (Scalia, J., concurring in judgment) (recognizing development of nearly two dozen exceptions to the warrant requirement); *United States v. Leon*, 468 U.S. 897, 923–24, 104 S. Ct. 3405, 3421, 82 L. Ed. 2d 677, 699 (1984) (announcing the "good faith exception" to the exclusionary rule); *Schneckloth v. Bustamonte*, 412 U.S. 218, 234–46, 93 S. Ct. 2041, 2056–58, 36 L. Ed. 2d 854, 872–74 (1973) (departing from the narrow consent doctrine established in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 1466 (1938)). *See generally Baldon*, 829 N.W.2d at 812–14 ("Nothing in the Supreme Court's incorporation doctrine as it related to the Fourth Amendment altered the independent nature of state constitutional provisions related to search and seizure . . . . Incorporation of the provisions of the Bill of Rights of the United States Constitution against the states through the Due Process Clause of the Fourteenth Amendment established a federal floor related to civil liberties."); George C. Thomas III, *When Constitutional Worlds Collide: Resurrecting the Framers' Bill of Rights and Criminal Procedure*, 100 Mich. L. Rev. 145, 150–51 (2001) (observing that after incorporation of the Bill of Rights, "the dilution of [the Bill of Rights] flowed backward[s]" and that "the process of incorporation took a sledgehammer to the federal criminal procedure guarantees"). According to Professor Williams, decisions of the United States Supreme Court declining to recognize rights "must always be viewed as partially attributable to 'underenforcement' " as a result of federalism and other institutional concerns that explicitly or implicitly pervade Supreme Court decisions. Robert F. Williams, *The Law of American State Constitutions* 137 (2009) [hereinafter Williams]; *cf. State v. Hunt*, 450 A.2d 952, 962 (N.J. 1982) (Pashman, J., concurring) (noting

hesitancy of the United States Supreme Court "to impose on a national level far-reaching constitutional rules binding on each and every state").

As a result of the United States Supreme Court's retreat in the search and seizure area, there has been a sizeable growth in independent state constitutional law. A survey of jurisdictions in 2007 found that a majority of the state supreme courts have departed from United States Supreme Court precedents in the search and seizure area to some degree. *See generally* Michael J. Gorman, *Survey: State Search and Seizure Analogs*, 77 Miss. L.J. 417 (2007). There are now hundreds of independent state constitutional search and seizure cases, and the number grows over time. Because of the tendency of the United States Supreme Court to underenforce or dilute search and seizure principles, it can be argued that these precedents are "entitled to *less* weight than other state decisions interpreting similar state constitutional law provisions." Williams at 137; *cf. State v. Black*, 815 S.W.2d 166, 193 (Tenn. 1991) (Reid, C.J., concurring in part and dissenting in part) ("Tennessee constitutional standards are not destined to walk in lock step with uncertain and fluctuating federal standards and do not relegate Tennessee citizens to the lowest levels of constitutional protection, those guaranteed by the national constitution.").

The growth of independent state constitutional law, however, has not been universally celebrated. As Professor Williams has bemoaned, adoption of independent state constitutional law has occasionally provoked what Williams has called a "bitter, accusatorial" dissent. Williams at 180 (citing *People v. Scott*, 593 N.E.2d 1328, 1348–49 (N.Y. 1992) (Bellacosa, J., dissenting)). Yet, as was noted twenty years ago in connection with independent state constitutional law, "heightened rhetoric adds nothing to the jurisprudence of our State." *State v. Canelo*,

653 A.2d 1097, 1106 (N.H. 1995) (Johnson, J., concurring specially). And, according to a leading authority on state constitutions, writing in 1998, the concern about the legitimacy of relying on state constitutional guarantees "has largely been put to rest."  G. Alan Tarr, *Understanding State Constitutions* 169 (1998).

5.  *The aggressive, maximalist character of lockstep approach as "precommitment device" preventing independent examination of facts and law.*  One question is whether state courts should engage in independent state constitutional analysis when the language of their state constitutional provisions are similar or identical to their federal counterparts.  There is ample precedent for the notion that the mere similarity of language does not prevent state courts from engaging in independent analysis.  *See, e.g.*, *State v. Gershoffer*, 763 N.E.2d 960, 965 (Ind. 2002) ("The Indiana Constitution has unique vitality, even where its words parallel federal language."); *People v. Barber*, 46 N.E.2d 329, 331 (N.Y. 1943) (recognizing the court was bound to exercise independent judgment under the state constitution); *State v. Arrington*, 319 S.E.2d 254, 260 (N.C. 1984) (noting the court was not bound by the United States Supreme Court's construction of identical constitutional provisions); *Commonwealth v. Edmunds*, 586 A.2d 887, 894–95 (Pa. 1991) (stating the court was free to reject United States Supreme Court conclusions if it remained faithful to the Federal Constitution's minimum guarantees).

The notion that parallel language in the Iowa Constitution is not tied to United States Supreme Court interpretations in the search and seizure area was powerfully endorsed by Judge Sutton of the United States Court of Appeals for the Sixth Circuit, who wrote in a published article:

> There is no reason to think, as an interpretive matter, that constitutional guarantees of independent sovereigns, even guarantees with the same or similar words, must be construed the same. Still less is there reason to think that a highly generalized guarantee, such as prohibition on "unreasonable" searches, would have just one meaning for a range of differently situated sovereigns.

Jeffrey S. Sutton, *What Does—and Does Not—Ail State Constitutional Law*, 59 U. Kan. L. Rev. 687, 707 (2011). Judge Sutton further asks why we should live in a "top-down constitutional world," when allowing states to decide whether to embrace or accept innovative legal claims can inform the United States Supreme Court when considering whether to federalize the rule. *Id.* at 712–13 (internal quotation marks omitted).

Indeed, according to Professor Williams, lockstepping state law to federal precedents is not a humble or minimalist approach, but is an aggressive and maximalist approach to the law. *See* Williams at 224–29 (discussing several problems to the lockstepping approach). It amounts to what Professor Adrian Vermeule refers to as a "precommitment device" that prevents a state supreme court from considering each case based on an independent examination of facts and law. *See* Adrian Vermeule, *The Judicial Power in the State (and Federal) Courts*, 2000 Sup. Ct. Rev. 357, 366 (2000).

6. *The double irony in the appeal to uniformity.* The independent state law cases also address the question of the value of uniformity. First, it is doubtful that uniformity is a constitutional value in a federal system. Indeed, diversity of constitutional analysis is baked into the constitutional cake where states retain sovereign authority over questions not delegated to the federal government by the United States Constitution. As noted by Professor Williams, reliance on decisions of the United States Supreme Court to interpret state constitutional provisions is "misplaced" and an "unwarranted delegation of state power

to the Supreme Court." Robert F. Williams, *In the Supreme Court's Shadow: Legitimacy of State Rejection of Supreme Court Reasoning and Result*, 35 S.C. L. Rev. 353, 403–04 (1984). In an era when societies advocate renewal of federalism by returning power to the state, it is ironic that an exception is made for state judicial power.

There is a second irony. Although the claim is sometimes made that adoption of the United States Supreme Court's approach in the search and seizure area will promote uniformity or ease of administration, the opposite is in fact true. Consider this. The jurisprudence of the United States Supreme Court in the search and seizure area has been characterized by scholars as "not merely complex and contradictory, but often perverse." Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 758 (1994).[6] These descriptions have resulted, in part, because the United States Supreme

---

[6] Other commentators have expressed similar criticism of Federal Fourth Amendment jurisprudence. *See, e.g.*, Ronald J. Allen & Ross M. Rosenberg, *The Fourth Amendment and the Limits of Theory: Local Versus General Theoretical Knowledge*, 72 St. John's L. Rev. 1149, 1149 (1998) ("a mess"); Craig M. Bradley, *Two Models of the Fourth Amendment*, 83 Mich. L. Rev. 1468, 1468 (1985) ("a mass of contradictions and obscurities"); Thomas K. Clancy, *The Fourth Amendment's Concept of Reasonableness*, 2004 Utah L. Rev. 977, 978 (2004) ("irreconcilable"); Jennifer Friesen, *State Courts as Sources of Constitutional Law: How to Become Independently Wealthy*, 72 Notre Dame L. Rev. 1065, 1092 (1997) ("illogical and unwieldy"); Orin S. Kerr, *Four Models of Fourth Amendment Protection*, 60 Stan. L. Rev. 503, 504–05 (2007) ("remains remarkably opaque"); Erik G. Luna, *Sovereignity and Suspicion*, 48 Duke L.J. 787, 787–88 (1999) ("more duct tape on the Amendment's frame and a step closer to the junkyard"); Donald R.C. Pongrace, *Stereotypification of the Fourth Amendment's Public/Private Distinction: An Opportunity for Clarity*, 34 Am. U. L. Rev. 1191, 1208 (1985) ("in a state of theoretical chaos"); Daniel J. Solove, *Fourth Amendment Pragmatism*, 51 B.C. L. Rev. 1511, 1511 (2010) ("riddled with inconsistency and incoherence"); David E. Steinberg, *The Uses and Misuses of Fourth Amendment History*, 10 U. Pa. J. Const. L. 581, 581 (2008) ("doctrinal incoherence of Fourth Amendment law" "disturbs many judges and scholars"); Silas J. Wasserstrom & Louis Michael Seidman, *The Fourth Amendment as Constitutional Theory*, 77 Geo. L.J. 19, 29 (1988) ("inconsistent and bizarre results"); and Richard G. Wilkins, *Defining the "Reasonable Expectation of Privacy": An Emerging Tripartite Analysis*, 40 Vand. L. Rev. 1077, 1107 (1987) ("distressingly unmanageable").

Court has applied at least five different analytical models to search and seizure cases, based upon the warrant requirement, individualized suspicion, case-by-case analysis, a balancing test, and an approach relying on common law plus balancing. *See* Thomas K. Clancy, *The Fourth Amendment: Its History and Interpretation* 470–511 (2008). Even members of the Supreme Court have characterized its Fourth Amendment jurisprudence as "an inconsistent jurisprudence that has been with us for years." *Acevedo*, 500 U.S. at 583, 111 S. Ct. at 1993, 114 L. Ed. at 636 (Scalia, J., concurring in judgment).

If these authorities are only half right, incorporation of the body of federal law under the Iowa Constitution will incorporate confusion, not certainty. *Cf. State v. Caraher*, 653 P.2d 942, 946 (Or. 1982) ("Eight years of uniformity with U.S. Supreme Court decisions has not, however, brought simplification to the law of search and seizure in this state."); *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 14–15 (Tenn. 2000) (noting Tennessee constitutional standards not designed to walk in lockstep with "uncertain and fluctuating federal standards"); *State v. Jackson*, 937 P.2d 545, 550 (Utah Ct. App. 1997) (noting two Utah Supreme Court departures from United States Supreme Court search and seizure precedent, done for purpose of establishing more workable rule for police and trial courts). *See generally* 1 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims, and Defenses* § 1:03[4][b], at 1-16 (4th ed. 2006) [hereinafter Friesen] ("Independent holdings in the states can, and do, bring stability and simplicity to constitutional law in the face of frequent, baffling inconsistencies and changes in Supreme Court doctrines."). Indeed, a stronger, clearer warrant requirement, such as advocated by Short in this case, will create greater, not less, uniformity and certainty.

7. *The burdens on law enforcement and lawyers.* The lack of uniformity does not create a substantial burden on professional law enforcement who now receive professional training and are assisted by well-educated county attorneys in their law enforcement functions. Further, law enforcement officers need to be acquainted only with one standard, namely, whatever standard is most restrictive. *See* 1 Friesen § 1.03[4][b], at 1-15. There is simply no reason to believe that Iowa law enforcement is less capable than its counterparts in states such as New York, New Jersey, Washington, or Oregon, where independent state constitutional law has been embraced by the state courts. *See Baldon*, 829 N.W.2d at 814–15.

It could be asserted that independent state constitutional law creates a burden for lawyers. For instance, teaching opinions written decades ago suggesting that lawyers might commit malpractice by failing to pursue state constitutional theories may provoke criticism. *See, e.g., State v. Lowry*, 667 P.2d 996, 1013 (Or. 1983) (Jones, J., concurring specially) ("Oregon . . . lawyers . . . should recognize that under the majority's philosophy and the most recent reflections by the United States Supreme Court . . . they should not rely upon the substantial changes in federal constitutional cases recently decided by the United States Supreme Court. . . . Any defense lawyer who fails to raise an Oregon Constitution violation and relies solely on parallel provisions under the federal constitution, except to exert federal limitations, should be guilty of legal malpractice."), *disapproved on other grounds by State v. Owens*, 729 P.2d 524, 531 (Or. 1986). Yet, over two decades ago, an experienced Iowa appellate lawyer, writing in the pages of the *Drake Law Review*, declared that "ignorance should be no excuse in the third century of American law" for the failure of lawyers to develop state

constitutional arguments different from federal precedents, noting that between 1971 and 1986 there were over three hundred cases where state courts departed from federal precedents in the interpretation of state constitutional law. *See* Bruce Kempkes, *The Natural Rights Clause of the Iowa Constitution: When the Law Sits Too Tight*, 42 Drake L. Rev. 593, 656–57 (1993). The number of independent state constitutional cases has grown exponentially since then. In 2010, the Conference of Chief Justices passed a resolution urging law schools to teach state constitutional law, noting, among other things, that state constitutional guarantees of rights " 'are often greater than federally guaranteed individual rights and liberties' " and that " 'being a competent and effective lawyer requires an understanding of both the Federal Constitution and state constitutional law.' " Robert F. Williams, *Why State Constitutions Matter*, 45 New Eng. L. Rev. 901, 912 (2011) (citation omitted).

The work required to be a "competent and effective" lawyer as envisioned by the Conference of Chief Justices is not overwhelming. As noted by Jennifer Friesen in her important treatise on state constitutional law, lawyers may find cases rejecting federal precedents by simply checking relevant citations. *See* 2 Friesen § 11.01 n.5, at 11-4. In addition to readily searchable caselaw, there is now a very large volume of readily accessible secondary materials discussing just about every aspect of state constitutional law. A diligent lawyer thus has ready access to the materials necessary to develop state constitutional law arguments.

8. *"Criteria" as a solution in search of a problem.* The independent state constitutional cases also address the issue of whether there should be some kind of "criteria" before a state court engages in independent

legal analysis. As Professor Williams has pointed out, "[t]he often unstated premise that U.S. Supreme court interpretations of the federal Bill of Rights are presumptively correct for interpreting analogous state provisions is simply wrong." Williams at 135. Williams notes that John Paul Stevens referred to the "misplaced sense of duty" which occurs when a state court believes the boundaries of its state constitution are marked by the Supreme Court in its interpretation of the Federal Constitution. *See id.* at 170 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 699, 106 S. Ct. 1431, 1445, 89 L. Ed. 2d 674, 696 (1986) (Stevens, J., dissenting)). As noted by Utah Chief Justice Christine Durham:

> Independent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process. There is no presumption that federal construction of similar language is correct.

*State v. Tiedemann*, 162 P.3d 1106, 1114 (Utah 2007); *see State v. Kennedy*, 666 P.2d 1316, 1322 (Or. 1983) (noting "the non sequitur that the United States Supreme Court's decisions under [the Federal Bill of Rights] not only deserve respect but presumptively fix its correct meaning also in state constitutions").

While it has been observed that "[c]itation to a federal opinion . . . too often serves as a substitute for the considered reasoning that should accompany a particular interpretation of a state's constitution," Lawrence Friedman & Charles H. Baron, Baker v. State *and the Promise of the New Judicial Federalism,* 43 B.C. L. Rev. 125, 127 (2001), our independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions. For example, in *State v. Breuer*, we rejected the approach of another state court that required the physical presence of a warrant at the location of a judicially authorized search or seizure. 808 N.W.2d

195, 199–201 (Iowa 2012). We determined that the approach of the United States Supreme Court provided the most persuasive reasoning. *See id.* at 197–201. Certainly adoption of appropriate federal precedents that "illuminate open textured provisions" of a state constitution is not a compromise of the court's obligation to independently construe the provision. *See State v. Lamme*, 579 A.2d 484, 490 (Conn. 1990). We should feel free to adopt the approach of persuasive federal precedent but should "never feel compelled to parrot" federal interpretations. *Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992). What is required under the Iowa Constitution, in each and every case that comes before us, is not mere identification of a potentially analogous federal precedent, but exercise of our best, independent judgment of the proper parameters of state constitutional commands.

In addition to arising from a substantively flawed premise, criteria approaches further have the potential to complicate and distort the nature of judicial decisions by encouraging elaborate discussion on the nature of the arcane criteria itself rather than the broad values underlying the constitutional provision. *Cf.* Williams at 162, 167–68. As a result, one of the states that first developed a criteria approach, Washington, has now emphasized that the criteria are only "nonexclusive." *Sofie v. Fibreboard Corp.*, 771 P.2d 711, 725 (Wash. 1989) (citing *State v. Wethered*, 755 P.2d 797, 800 (Wash. 1988)).

9. *Limitations of advocacy and preservation.* Notwithstanding the development of independent state constitutional law, in many cases lawyers do not advocate an Iowa constitutional standard different from the generally accepted federal standard. As a matter of prudence, we have adopted the approach in these cases that we will utilize the general standard urged by the parties, but reserve the right to apply the

standard in a fashion different than the federal caselaw. *See Baldon*, 829 N.W.2d at 822–23. As a majority of this court noted in *State v. Edouard*, such an approach is sound practice. *See State v. Edouard*, ___ N.W.2d ___ (2014). There can often be considerable difference among judges and courts in the application of open textured constitutional principles such as "reasonableness," "rational basis," "reasonable expectation of privacy," "totality of circumstances," and many others.[7] Where no party questions the general framework applicable in a case, we may disagree with federal courts in the application of that principle. *See State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009). As noted by Judge Judith Kaye of the New York Court of Appeals, when the court disagrees with the application of precedents, "our considered judgment hardly justifies attack for lack of principle." *People v. Scott*, 593 N.E.2d 1328, 1347 (N.Y. 1992) (Kaye, J., concurring). The only way to avoid the possibility of differences in judgment over the application of open textured general principles to the facts at hand where there are a number of plausible alternatives is to have a one-person court whose declarations are binding in all cases. Further, we have emphasized that we may apply open textual standards more stringently than the federal caselaw under the Iowa Constitution. *See Bruegger*, 773 N.W.2d at 883; *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 5 (Iowa 2004). *See generally Fair Cadillac-Oldsmobile Isuzu P'ship v. Bailey*, 640 A.2d 101, 104 (Conn. 1994) ("[I]t is clear that our adoption, for purposes of state constitutional analysis, of an analytical framework used under the

---

[7] For instance, many state courts, including Iowa, have on remand from a reversal by the United States Supreme Court on federal constitutional issues, followed their previous reasoning under the state constitution. *See, e.g., Racing Ass'n of Cent. Iowa*, 675 N.W.2d at 4–7; *Sitz v. Dep't of State Police*, 506 N.W.2d 209, 216–17 (Mich. 1993); *State v. Opperman*, 247 N.W.2d 673, 674–75 (S.D. 1976).

federal constitution does not preclude us from concluding that a statute that would be valid under the federal constitution is nevertheless invalid under our state constitution."); *Edouard*, ___ N.W.2d at ___ (Appel, J., concurring specially); *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984) (although state and federal equal protection provisions incorporate the same general framework, our construction and application of the Utah equal protection provision is not controlled by federal courts); Robert F. Williams, *Equality Guarantees in State Constitutional Law*, 63 Tex. L. Rev. 1195, 1219 (1985) (noting methodology of state courts applying federal constructs independently but reaching results that conflict with federal courts).

In some cases, we have vindicated claims based on search and seizure violations under the United States Constitution and not the Iowa Constitution. *See State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013); *State v. Tyler*, 830 N.W.2d 288, 292 (Iowa 2013). In these cases, we found it unnecessary to address whether there were any violations under the Iowa Constitution. *Kooima*, 833 N.W.2d at 206; *Tyler*, 830 N.W.2d at 292. In *Kooima*, we expressly stated that "even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal caselaw." 833 N.W.2d at 206. A similar statement was presented in *Tyler*. 830 N.W.2d at 291–92. We do not think the resolution of these cases under federal law should be construed as qualifying or overruling what *Tyler* characterized as what "we have consistently stated," namely, that we " 'jealously protect this court's authority to follow an independent approach' " to claims made under the Iowa Constitution and that we reserve the right even in cases where parties do not advocate a different standard to apply the standard differently than federal precedents. *Id.* at

291 (quoting *Pals*, 805 N.W.2d at 771). To the extent there are any lingering notions to the contrary, we explicitly reject them today.

10. *Reaffirmation and application of precedents to Iowa constitutional issue presented in this case.* Our recent cases of *Cline, Ochoa, Pals, Baldon,* and the special concurrence in *Edouard* outline our approach to independent state constitutional law under article I, section 8 of the Iowa Constitution as summarized above. Today, we again reaffirm these principles. To the extent our cases can be read as having implications contrary to the above approach, they are specifically overruled.

Turning now to the question before us, the Iowa constitutional precedent under article I, section 8 on the question of whether a warrant is required before law enforcement may search a person's home based on the person's status is *Cullison.* *See* 173 N.W.2d at 535. In *Cullison,* we held that a parolee did not suffer a diminution of constitutional protections from warrantless search and seizures simply because of his status as a parolee. *See id.* at 538–39. Although *Cullison* involved a parolee rather than a probationer, *see id.* at 534, the analytic structure of *Cullison* applies with equal force to both. The fundamental question before the court today is whether the holding and analysis in *Cullison* under the Iowa Constitution continue to be good law or whether we should abandon it in favor of the innovations resulting from the United States Supreme Court's reconstruction of search and seizure doctrine in recent years.

**C. Pre-*Cullison* Caselaw.** Prior to our decision in *Cullison,* the caselaw regarding whether a warrant was required before searching the home of a probationer or parolee was inconclusive. Some cases from other jurisdictions held that a probationer or parolee had lesser

constitutional rights than citizens generally. *See U.S. ex rel. Randazzo v. Follette*, 282 F. Supp. 10, 13 (S.D.N.Y. 1968) (finding parole to be a powerful factor in determining the validity of the search); *People v. Hernandez*, 40 Cal. Rptr. 100, 104 (Dist. Ct. App. 1964) (determining the reasonableness or probable cause requirement did not apply when parole supervisors searched parolees). On the other hand, there was contrary authority. *See, e.g.*, *Brown v. Kearney*, 355 F.2d 199, 200 (5th Cir. 1966) (finding a parolee is entitled to constitutional protection from illegal search and seizure); *People v. Overall*, 151 N.W.2d 225, 226–27 (Mich. Ct. App. 1967) (invalidating warrantless search of parolee). For example, in *United States v. Lewis*, a federal district court held that a search of a parolee's apartment without a warrant was invalid, absent consent of the parolee. 274 F. Supp. 184, 187 (S.D.N.Y. 1967).

At about the time of *Cullison*, however, there were two prominent features of search and seizure law in both the federal and state courts. First, the United States Supreme Court, and this court, expressed strong preference for validly obtained warrants. The existing caselaw was summarized in *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564, 576 (1971), where the court noted:

> [T]he most basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval of a judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions. The exceptions are jealously and narrowly drawn, and there must be a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.

*Id.* (footnotes omitted) (internal quotation marks omitted).

Second, the cases emphasized the importance of the sanctity of the home in search and seizure jurisprudence. For instance, in *United States v. United States District Court*, the Supreme Court summarized the

state of the law by noting that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972). Similarly, we long ago emphasized that in connection with constitutional liberties, there is "no higher or stronger guaranty than that of his home, his papers, and [personal] effects." *State v. Sheridan*, 121 Iowa 164, 167, 96 N.W. 730, 731 (1903). We have declared that the asserted right of officers to "thrust themselves into a home" is a matter of "grave concern." *State v. Brant*, 260 Iowa 758, 763, 150 N.W.2d 621, 625 (1967).

In *Agnello v. United States*, the two concepts of the warrant requirement and the importance of the home merged. 269 U.S. 20, 33, 46 S. Ct. 4, 6–7, 70 L. Ed. 145, 149 (1925). The *Agnello* Court emphasized that

> [b]elief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.

*Id.* at 33, 46 S. Ct. at 6, 70 L. Ed. at 149; *accord Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 369, 92 L. Ed. 436, 440 (1948) (emphasizing the role of a warrant in search and seizures involving the home).

In addition, many years ago, we stated that the protections in search and seizure law were to be given "a broad and liberal interpretation for the purpose of preserving . . . liberty." *State v. Height*, 117 Iowa 650, 661, 91 N.W. 935, 938 (1902). A broad and liberal interpretation to search and seizure was reflected in *Sheridan,* where this court was one of the first courts in the nation to embrace the exclusionary rule in connection with search and seizure violations. *See*

121 Iowa at 165–69, 96 N.W. at 731–32; *see also State v. Cline*, 617 N.W.2d 277, 285 (Iowa 2000) ("An example of this court's attempts to preserve the spirit of Iowa's constitutional guarantee is reflected in the fact that Iowa was one of the first states to embrace the exclusionary rule as an integral part of its state constitution's protection against unreasonable searches and seizures, and, in fact, did so several years before the United States Supreme Court's decision in *Weeks* [*v. United States*, 232 U.S. 383, 34 S. Ct. 341, 58 L. Ed. 652 (1914)]. The genesis of Iowa's exclusionary rule was a civil case, *Reifsnyder v. Lee*, 44 Iowa 101 (1876)."), *abrogated in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (2001).

**D. Overview of *State v. Cullison.*** We have not specifically confronted the question of whether a probationer may be subjected to a warrantless home search, but we have considered whether a parolee may be subject to a warrantless search. In *Cullison*, a parolee was subject to a warrantless search of his living quarters by a parole supervisor. *See* 173 N.W.2d at 534–35. On appeal, the petitioner argued the search violated article I, section 8 of the Iowa Constitution. *See* Defendant's brief and argument at 20, *Cullison*, 173 N.W.2d 533 (Iowa 1970) (No. 53491) [hereinafter Defendant's Brief]. We held that the warrantless search of the parolee's residence was invalid. *Cullison*, 173 N.W.2d at 540–41.

In doing so, we first canvassed the then-existing federal and state caselaw involving rulings under the Fourth Amendment. *Id.* at 535–36. We noted that the caselaw generally divided into two camps: those courts that either "[s]trip" or "[d]ilute" a parolee of Fourth Amendment rights and those that afford full validity and recognition of these rights to parolees. *Id.* at 536.

In *Cullison,* we strongly disapproved of the strip and dilute cases. *See id.* We stated that the strip and dilute cases were based upon "what may best be described as a socio-juristic rationalization, i.e., protection of the public and constructive custody" and were not "constitutionally sound, reasonable, fair or necessary." *Id.* We stated that the "dilution theory begins and ends nowhere, being at best illusory and evasive." *Id.* We quoted with approval a statement in *Hernandez,* where the court declared that the notion that parolees lose their constitutional rights by accepting parole "makes constitutional rights dependent upon a kind of 'contract' in which one side has all the bargaining power" and that "[a] better doctrine is that the state may not attach unconstitutional conditions to the grant of state privileges." *Id.* at 536–37 (quoting *Hernandez,* 40 Cal. Rptr. at 103).

We then turned to the Iowa Constitution. *Id.* at 537. We noted that article II, section 5 of the Iowa Constitution provides that no " 'person convicted of any infamous crime, shall be entitled to the privileges of an elector.' " *Id.* (quoting Iowa Const. art. II, § 5). We recognized that the plain language of article II, section 5 meant that, upon conviction of an infamous offense, the defendant lost his right to vote or hold public office. *Id.* We then declared: "And certainly, with the exception of lawful conditions governing conduct while on parole or probation, *no more onerous burden could be cast upon him by any subsequent conditional release from a penal institution.*" *Id.* at 537–38 (emphasis added). We further noted that "the fact that a criminal accused is also a parolee should not, as to a new and separate crime, destroy *or diminish* constitutional safeguards afforded all people." *Id.* at 538 (emphasis added).

There can be no question that *Cullison* involves a holding under the Iowa Constitution. The briefing before the *Cullison* court reveals that the petitioner emphasized article I, section 8 of the Iowa Constitution. According to the appellant's brief in *Cullison,* the "Law applicable to this area is found in Iowa Constitution, Art. I, Sec. 8." Defendant's Brief at 20. The appellant further argued that "[u]nlike the U.S. Constitution, the Iowa Constitution specifically spells out the result or penalty of felony conviction as far as diminution of constitutional rights are concerned, in . . . Article II, Sec. 5." *Id.* at 21. Although it is true that the *Cullison* opinion does not expressly refer to article I, section 8, the *Cullison* court adopted the appellant's analysis that article II, section 5 of the Iowa Constitution provides the only sanctions for persons convicted of a crime. 173 N.W.2d at 537–38. A provision of the state constitution has no bearing on the interpretation of the scope of federal constitutional rights. As a result, we stated in *Baldon,* "[w]ithout expressly saying so, we decided *Cullison* based on the Iowa Constitution." *Baldon,* 829 N.W.2d at 796 n.2 (majority opinion).

Though brief, the language in *Cullison* is exceptionally strong and unequivocal. It represents a clear precedent drawing a bright line regarding searches of the home. "[S]ocio-jurisidic" rationales to evade the warrant requirement were unacceptable; the "dilution" theory was "illusory." *See Cullison,* 173 N.W.2d at 536. The warrant requirement applied with full force to parolees and, at least in dicta, to probationers as well. *See id.* at 537–39.

One dissent in *Cullison* focused on the fact that the search was conducted by a parole officer, and not a law enforcement officer. *See id.* at 541 (Larson, J., dissenting) (framing the initial question as whether the parole agent or assisting officer can seize stolen property and

considering the purposes of the parole system). The dissent believed that a search by a parole officer qualified as one of the exceptions to the warrant requirement. *Id.* at 543–44 (concluding a parolee has a special status under search and seizure law). The second dissent further emphasized that "[a]n unlawful warrantless search by peace officers does not become legal because they are accompanied by a parole officer." *Id.* at 545 (Stuart, J., dissenting). In short, even under the dissents in *Cullison*, the search in this case by a police officer, and not by a probation officer, would have been invalid.[8]

The holding in *Cullison*, giving maximum constitutional protection to the home, was consistent with existing federal and state caselaw. *See, e.g., Boyd v. United States*, 116 U.S. 616, 630, 6 S. Ct. 524, 532, 29 L. Ed. 746, 751 (1886) (noting the purpose of the Fourth Amendment is to protect against invasions of "the sanctity of a man's home and the privacies of life" from "government and its employes"), *rejected on other grounds by Warden v. Hayden*, 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967); *Weeks*, 232 U.S. at 390–92, 34 S. Ct. at 343–44, 58 L. Ed. at 654–55 ("[T]he 4th Amendment . . . put the courts of the United States and Federal officials, in the exercise of their power and authority, under limitations and restraints [and] . . . forever secure[d] the people, their persons, houses, papers, and effects, against all unreasonable searches and seizures under the guise of law."); *Agnello*, 269 U.S. at 32–33, 46 S. Ct. at 6, 70 L. Ed. at 147–48 (same). In these cases, the United

---

[8]This case, of course, involves a probationer and not a parolee. Even under the United States Supreme Court's Fourth Amendment cases, however, a probationer has more protection from searches and seizures than does a parolee. *See Samson v. California*, 547 U.S. 843, 850, 126 S. Ct. 2193, 2198, 165 L. Ed. 2d 250, 258 (2006) (recognizing parole is more akin to imprisonment thus parolees have fewer expectations of privacy). *Cullison* thus cannot be distinguished on the basis that it involved a parolee who, if anything, had lesser search and seizure rights than a probationer.

States Supreme Court repeatedly emphasized the historic importance of protecting the home as at the core of Fourth Amendment principles. Indeed, many state and federal courts have favorably cited William Pitt's famous speech in the House of Commons:

> "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement[.]"

*See, e.g., Miller v. United States*, 357 U.S. 301, 307, 78 S. Ct. 1190, 1194–95, 2 L. Ed. 2d 1332, 1337 (1958); Jonathan L. Jafetz, *"A Man's Home is His Castle?": Reflections on the Home, the Family, and Privacy During the Late Nineteenth and Early Twentieth Centuries*, 8 Wm. & Mary J. Women & L. 175, 175 n.2 (2002).

Our caselaw contains similar language. As we emphasized in *McClurg v. Brenton*:

> The mere fact that a man is an officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to break in upon the privacy of a home and subject its occupants to the indignity of a search for the evidences of crime, without a legal warrant procured for that purpose. No amount of incriminating evidence, whatever its source, will supply the place of such warrant. At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open.

123 Iowa 368, 371–72, 98 N.W. 881, 882 (1904). In modern society, probationers and parolees are more likely to live in impoverished neighborhoods. *See* David J. Harding et al., *Home is Hard to Find: Neighborhoods, Institutions, and the Residential Trajectories of Returning Prisoners*, 647 Annals Am. Acad. Pol. & Soc. Sci. 214, 216–17, 222 (2013) (finding sixty-six percent of African Americans who lived in high-poverty areas prior to prison moved back to high-poverty areas after

prison, and that generally "poor urban communities bear a disproportionate share of the burden" of reintegrating former prisoners). Under the language of *McClurg* and the holding in *Cullison*, the poor cottage or ruined tenement of a parolee (and by implication a probationer) may be unkempt, with lousy heat, running toilets, screens with holes, noisy electric fans for summer relief, and low wattage lighting, but such an abode is still protected by the awesome majesty of the Iowa Constitution from unwarranted searches by government authorities.

*Cullison* stands for the proposition that the protective arm of article I, section 8 "extends to all alike, worthy and unworthy, without distinction." *State v. Gansz*, 297 So. 2d 614, 616 (Fla. Dist. Ct. App. 1974). As noted by Justice Murphy many years ago,

> Rights intended to protect all must be extended to all, lest they so fall into desuetude in the course of denying them to the worst of men as to afford no aid to the best of men in time of need.

*Goldman v. United States*, 316 U.S. 129, 142, 62 S. Ct. 993, 999, 86 L. Ed. 1322, 1331–32 (1942) (Murphy, J., dissenting), *overruled in part by Katz v. United States*, 389 U.S. 347, 353, 88 S. Ct. 507, 512, 19 L. Ed. 2d 576, 583 (1967).

**E. Post-*Cullison* Caselaw.** After *Cullison*, a number of other state courts and federal courts considered this question under the Federal Constitution or state constitutions. Some agreed with our approach in *Cullison*. For instance, in *United States v. Rea*, the Court of Appeals for the Second Circuit came to the conclusion that a probation officer is required to obtain a warrant prior to conducting a search of the probationer's home unless the search fell within one of the judicially recognized exceptions to the warrant requirement. 678 F.2d 382, 386–

88 (2d Cir. 1982). The *Rea* court emphasized that there had been "no showing that upholding the warrant requirements for searches of probationers' homes will seriously impede the accomplishment of the dual law enforcement and rehabilitative goals of probation." *Id.* at 387. Similarly, in *United States v. Workman,* the Court of Appeals for the Fourth Circuit came to the same conclusion, noting that the approach was "consistent with the Supreme Court's admonition that exceptions to the warrant requirement 'are few in number and carefully delineated . . . .' " 585 F.2d 1205, 1207 (4th Cir. 1978) (quoting *U.S. Dist. Ct.*, 407 U.S. at 318, 92 S. Ct. at 2137, 32 L. Ed. 2d at 767), *abrogated by Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998), *as recognized in United States v. Armstrong,* 187 F.3d 392, 394–95 (4th Cir. 1999). Other courts, such as the Court of Appeals for the Ninth Circuit, came to a different conclusion. *See, e.g., Latta v. Fitzharris*, 521 F.2d 246, 252 (9th Cir. 1975). Yet, transient political winds blew that emphasized the need for a war on crime and discounted the founder's principle search and seizure concern: fear of overreaching government.

For many years, the United States Supreme Court in a number of cases has expressed a strong reliance on the Warrant Clause in the Fourth Amendment. What has been called the "warrant preference approach" was closely associated with Justice Felix Frankfurter and Justice Potter Stewart. *See generally* William W. Greenhalgh & Mark J. Yost, *In Defense of the "Per Se" Rule: Justice Stewart's Struggle to Preserve the Fourth Amendment's Warrant Clause*, 31 Am. Crim. L. Rev. 1013 (1994). Under the warrant preference approach, a warrant was generally required, particularly for a home search, except under narrowly defined circumstances, such as searches incident to arrest, or where

exigent circumstances make it impossible to obtain a warrant. *See id.* at 1016–17 ("[A] search is *per se* unreasonable unless it falls within one of the limited exceptions to the warrant requirement."). In recent decades, however, the United States Supreme Court has embarked on a series of innovations and reengineerings of established Fourth Amendment law that has tended to minimize the role of warrants and emphasize the role of the Reasonableness Clause. *See id.* at 1084 ("This [ideological] shift has resulted at times in an outright hostility to the 'per se' rule in favor of the more flexible standard of 'reasonableness.' "). The newly fashioned Fourth Amendment doctrine provides a framework for the United States Supreme Court to avoid the warrant requirement whenever a majority of the Court determines that it is "reasonable" to do so. *See id.* ("The Court's enthusiasm to embrace the flexible 'reasonableness' approach is most noticeable in the numerical score: of the fifty-five Fourth Amendment decisions since 1982, the Court has found only twelve searches that violated the Fourth Amendment . . . . Even more telling, the Court has relied upon the 'per se' rule as the framework for resolving only nineteen of those fifty-five Fourth Amendment cases."). As a result, the warrant requirement under existing United States Supreme Court precedent offers less protection for citizens against arbitrary government intrusions than it did fifty years ago. *See id.* at 1091 (recognizing the balancing approach has undermined the per se warrant requirement).

The reengineering of Fourth Amendment law is illustrated by the highly divided opinion in *Griffin*. In *Griffin*, a five-member majority of the United States Supreme Court concluded that a warrantless search of a probationer's home by probation officers pursuant to a Wisconsin regulation was "reasonable" under the Fourth Amendment. *Griffin*, 483 U.S. at 870–71, 880, 107 S. Ct. at 3167, 3172, 97 L. Ed. 2d at 715–16,

721–22.  The *Griffin* majority avoided the Warrant Clause by application of a "special needs" doctrine that justified departures from the usual warrant and probable cause requirements.  *See id.* at 873–74, 107 S. Ct. at 3168, 97 L. Ed. 2d at 717.  The *Griffin* majority based its conclusions, at least in part, on the factual premise that requiring a probation officer to obtain a warrant would be "impracticable."  *See id.* at 876, 107 S. Ct. at 3169–70, 97 L. Ed. 2d at 719.

In its analysis, the *Griffin* majority emphasized the difference between a probation officer and general law enforcement conducting the search.  *See id.* at 879–80, 107 S. Ct. at 3171–72, 97 L. Ed. 2d at 721–22.  A search based upon reasonable suspicion instead of ordinary probable cause was permissible, according to the *Griffin* majority, because the risk of overreaching by a probation officer is less than that when the search is conducted by a police officer whose only mission is to ferret out crime.  *See id.* at 876–79, 107 S. Ct. at 3170–71, 97 L. Ed. 2d at 719–20.

The *Griffin* majority thus moved the search and seizure goalposts twice: first by announcing that, in some instances, a warrant was no longer required for a home search, and second, that a warrantless search could be supported by less than traditional probable cause.  *See id.* at 873–80, 107 S. Ct. at 3168–72, 97 L. Ed. 2d at 717–22.

Seemingly recognizing the potential instability of its "reasonableness" approach, the *Griffin* majority drew a firm line between a search by a probation officer and a search by a general law enforcement officer.  *See id.* at 879–80, 107 S. Ct. at 3171–72, 97 L. Ed. 2d at 721–22.  As is apparent, the reasoning of the majority in *Griffin* is consistent with the minority opinion in *Cullison*, which emphasized that the search was conducted by a probation officer.

Writing for three members of the Court, Justice Blackmun wrote:

> I do not think . . . that special law enforcement needs justify a modification of the protection afforded a probationer's privacy by the warrant requirement. The search in this case was conducted in petitioner's *home*, the place that traditionally has been regarded as the center of a person's private life, the bastion in which one has a legitimate expectation of privacy protected by the Fourth Amendment.

*Id.* at 883, 107 S. Ct. at 3173, 97 L. Ed. 2d at 724 (Blackmun, J., dissenting).

Justice Stevens, joined by Justice Marshall, was even more pointed:

> Mere speculation by a police officer that a probationer "may have had" contraband in his possession is not a constitutionally sufficient basis for a warrantless, nonconsensual search of a private home. I simply do not understand how five Members of this Court can reach a contrary conclusion.

*Id.* at 890, 107 S. Ct. at 3177, 97 L. Ed. 2d at 728 (Stevens, J., dissenting).

The United States Supreme Court revisited the general area of search and seizure rights of probationers in *Knights*. In *Knights*, the search was conducted by *a police officer*, not by probation officers as in *Griffin*. 534 U.S. at 115, 122 S. Ct. at 589, 151 L. Ed. 2d at 502–03. The question was whether the line drawn in *Griffin* would hold. *Id.* at 117–18, 122 S. Ct. at 590–91, 151 L. Ed. 2d at 503–05. It did not. Tossing aside the limiting language in the 5–4 *Griffin* decision, the *Knights* Court held that a probationer who signed a probation agreement containing a search condition which stated that he would be subject to a search, which included his residence, at any time and any place, had a "significantly diminished . . . expectation of privacy." *Id.* at 119–20, 122 S. Ct. at 592, 151 L. Ed. 2d at 505. Instead of a limited "special needs"

analysis that focused on the value of a warrantless search in promoting the rehabilitation of persons subject to probation, the Supreme Court permitted a search by law enforcement based upon the "totality of the circumstances." *See id.* at 118, 122 S. Ct. at 591, 151 L. Ed. 2d at 505. As a result, a warrantless search conducted by law enforcement officers as well as probation officers, at least where police had reasonable suspicion that evidence of a crime would be uncovered, was now permissible under the Fourth Amendment.

While *Griffin* announced the limiting principle that warrantless home searches were permissible if conducted by a probation officer pursuant to ordinary supervisory activities, 483 U.S. at 879, 107 S. Ct. at 3171, 97 L. Ed. 2d at 721, the search and seizure goalposts for warrantless home searches were moved once again in *Knights*, 534 U.S. at 115, 119–20, 122 S. Ct. at 589, 592, 151 L. Ed. 2d at 502–03, 505. The old limiting principle of *Griffin* based upon "special needs" was simply eliminated. *See Knights*, 534 U.S. at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 506–07 (finding a warrantless search "supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment"). The ruling in *Knights* is thus not only inconsistent with the *Cullison* majority on multiple grounds (no search warrant, no probable cause), but it is also inconsistent with the *Cullison* minority, which emphasized the fact that the search was conducted by a probation officer.

Finally, the Supreme Court considered *Samson v. California*, a case addressing the warrantless search of a parolee. 547 U.S. 843, 846, 126 S. Ct. 2193, 2196, 165 L. Ed. 2d 250, 255–56 (2006). In this case, a parolee was stopped while walking down a street and subjected to a search, revealing a plastic bag filled with methamphetamine. *Id.* at 846–

47, 126 S. Ct. at 2196, 165 L. Ed. 2d at 255–56. In *Samson,* the Supreme Court again rejected its prior limiting principle of "reasonable suspicion." *See id.* at 857, 126 S. Ct. at 2202, 165 L. Ed. 2d at 262 (permitting a suspicionless search of a parolee under the Fourth Amendment). In order to reach the desired pragmatic result, the *Samson* Court declared that the Fourth Amendment involves a continuum of rights. *See id.* at 850, 126 S. Ct. at 2198, 165 L. Ed. 2d at 258. According to the *Samson* majority, the protections afforded by the Fourth Amendment depend upon a continuum, where parolees have some expectations of privacy; however, these expectations are greatly diminished because parole is the equivalent of imprisonment, while a probationer has a greater interest because probation is ordinarily in lieu of and not in addition to imprisonment. *See id.* For a parolee who was subject to a search condition like *Samson,* "reasonable suspicion" was no longer required. *See id.* at 857, 126 S. Ct. at 2202, 165 L. Ed. 2d at 262 (finding a police officer could conduct a suspicionless search of a parolee without violating the Fourth Amendment).

Justice Stevens dissented, writing that the majority's decision embraced "a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, [and] by law enforcement personnel who have no special interest in the welfare of the parolee or probationer." *Id.* at 857, 126 S. Ct. at 2202, 165 L. Ed. 2d at 262–63 (Stevens, J., dissenting). According to Justice Stevens, the new regime announced by the majority was "an unprecedented curtailment of liberty." *Id.* Clearly, by departing from even a "reasonable suspicion" requirement, the Supreme Court moved the search and seizure goalposts for a fourth time.

Two propositions are clear from *Griffin*, *Knights*, and *Samson*. First, the United States Supreme Court, beginning in 1981, has developed new Fourth Amendment doctrine that dramatically and substantially undercuts the traditional warrant requirement, probable cause, and particularity requirements of search and seizure law. Second, the new doctrine announced in *Griffin*, *Knights*, and *Samson* is unquestionably, flatly contrary to the approach of this court in *Cullison* twenty years earlier. In *Griffin*, *Knights*, and *Samson*, the Supreme Court engaged in exactly the kind of "socio-juristic" analysis and "dilution" that the *Cullison* majority expressly and firmly rejected. Further, even the dissent in *Cullison* emphasized the fact that a parole officer conducted the search. *See* 173 N.W.2d at 543–44 (Larson, J., dissenting). The contrast between *Cullison* and the *Griffin-Knights-Samson* line of cases is sharp and unmistakable.

Notwithstanding the Supreme Court's approach in *Griffin*, *Knights*, and *Samson*, we have not revisited the holding in *Cullison*. In *Ochoa*, we rejected the eviscerating innovation of the Supreme Court in *Samson*. *See Ochoa*, 792 N.W.2d at 291. In doing so, we emphasized, among other things, the historic basis of search and seizure law, the sanctity of the home, and the important role of warrants under article I, section 8 of the Iowa Constitution. *Id.* at 287–91. In *Ochoa*, we rejected the latest movement of the search and seizure goalposts by the United States Supreme Court.

In *Ochoa*, the State, with honesty and integrity, declined to claim that the search was supported by reasonable suspicion. *See id.* at 262–64. As a result, it was not necessary for the *Ochoa* court to consider whether *Griffin* or *Knights* was good law or to reconsider *Cullison*. *See id.* at 287 (noting the court could simply affirm *Cullison,* but it was not

necessary to address the warrant and probable cause requirements when the search was invalid under a reasonableness analysis).  It was enough for one day's work, to simply reject the doctrine of *Samson* under article I, section 8 of the Iowa Constitution.

In the case before us today, however, there is no question that law enforcement authorities had reasonable suspicion to search Short's home.  The State's sole claim on appeal is that reasonable suspicion is enough, case closed.  Thus, the issue on appeal is squarely presented: is *Cullison* good law?  Or, do we accept instruction from the United States Supreme Court and engage in an innovative reconfiguration of traditional search and seizure law under the Iowa Constitution?

**F. Analysis: Should *Cullison* Be Overruled?**  The question before us now is whether we should overrule *Cullison.*  Of course, stare decisis is a factor to consider.  At the same time, we recognize that stare decisis is not always determinative.  *See State v. Bruce*, 795 N.W.2d 1, 3 (Iowa 2011).  Otherwise, the law would be like a fly imprisoned in volcanic rock.

We begin with a textual look at article I, section 8 of the Iowa Constitution, which provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.  The text is, of course, *nearly* identical to the Fourth Amendment to the United States Constitution, which was, in turn, largely modeled after the Massachusetts Constitution of 1780.  *See Ochoa*, 792 N.W.2d at 268 n.7.  In-depth modern scholarship has demonstrated that the contemporaneous meaning of the term

"unreasonable" in search and seizure law was not the flexible, pragmatic interpretation that we often assign to the term today, but instead a synonym for "unlawful." *See* Thomas Y. Davies, *Correcting Search-And-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law,"* 77 Miss. L.J. 1, 118 (2007) [hereinafter Davies] (recognizing the term "unreasonable" meant to say a warrant was "so illegal that even legislation could not authorize [it]"). Sir Edward Coke opposed general warrants as " 'against reason,' " again, a reference to their unlawful character. *Ochoa,* 792 N.W.2d at 269 (quoting Andrew E. Taslitz, *Reconstructing the Fourth Amendment: A History of Search & Seizure, 1789–1868,* at 37 (2006)). Further, contemporary legal treatises and dictionaries indicated that categories of searches, arrests, and seizures were "unreasonable" and therefore abolished by the Fourth Amendment. *See* William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791,* at 734–35 (2009) [hereinafter Cuddihy]; s*ee also* Davies, 77 Miss. L. Rev. at 13 (characterizing the approach of the United States Supreme Court as to "reasonableness" as a modern invention that engages in relativistic balancing of individual rights and reflects relatively recent, ideologically driven judicial choices, not a rendition of original understanding, and urging state courts to engage in authentic search and seizure history).

But textualists will also note that unlike accepted versions of the Fourth Amendment, article I, section 8 utilizes a semicolon between the reasonableness clause and the warrant clause. As pointed out in *Ochoa,* a semicolon ordinarily is used to show that the language that follows the semicolon illustrates the basic principle, namely, that in order to avoid

being declared "unreasonable" or unlawful, under article I, section 8, a warrant is ordinarily required. *See* 792 N.W.2d at 268–69.

Indeed, the notion that in order for a search to be reasonable, it must be pursuant to a warrant has considerable historical support. James Otis, in his brief in *Paxton's Case*, asserted that only specific warrants were reasonable and that " 'the freedom of one's house' was among 'the most essential branches of English liberty.' " Cuddihy at 377–78 (citation omitted). Similarly, shortly before Iowa obtained statehood, a state court held that in order for a search to be reasonable, it had to be executed pursuant to a warrant. *See Banks v. Farwell*, 38 Mass. (21 Pick.) 156, 159 (1838). While these historical lines of inquiry do not necessarily provide the rule of decision in concrete cases involving unforeseen circumstances, the historical record does offer insight into the meaning of constitutional values that must be applied to modern circumstances.

There are also structural reasons for defending the warrant requirement. As we indicated in *Ochoa*, an interpretation that focuses on the reasonableness clause as the touchstone of search and seizure law sets up the intellectual machinery to engulf the warrant clause and make its mandatory provision ephemeral. *See* 792 N.W.2d at 269. The search and seizure protections of article I, section 8 would be subject to reasonability determinations by shifting four-member majorities of this court, based upon pragmatic considerations. Members of this court— indeed any court—can come up with ingenious explanations of how just about any search is reasonable. *Cf. Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 637, 109 S. Ct. 1402, 1424, 103 L. Ed. 2d 639, 672–73 (1989) (Marshall, J., dissenting) (noting that absent warrant and probable cause standards, concept of reasonableness is "virtually devoid

of meaning, subject to whatever content shifting judicial majorities, concerned about the problems of the day, choose to give to that supple term"). The cautionary words of Anthony Amsterdam in his classic study on the Fourth Amendment that reliance on reasonability threatens to convert "the [F]ourth [A]mendment into one immense Rorschach blot" has even greater urgency today than it did forty years ago. *See* Anthony Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 393 (1974) [hereinafter Amsterdam].

Indeed, rejection of this kind of slippery reasoning was at the very heart of *Cullison,* which declared that socio-jurisdic requirements to evade the constitutional command of the need for a search warrant were unacceptable. 173 N.W.2d at 536; *see also Griffin,* 483 U.S. at 890, 107 S. Ct. at 3177, 97 L. Ed. 2d at 728 (Stevens, J., dissenting) (expressing surprise that five members of the Supreme Court would overrule the probable cause and warrant requirements in the context of a search of a probationer by probation officers). As a result, we have little interest in allowing the reasonableness clause to be a generalized trump card to override the warrant clause in the context of home searches and reject the cases suggesting otherwise.

It is of course true that in this case, law enforcement officers had reasonable suspicion, at least as established at the hearing on the motion to suppress. Short does not suggest otherwise. A requirement of individualized suspicion, as indicated in *Ochoa,* can be an important factor in preventing arbitrary searches and seizures by law enforcement, and our refusal to accept the *Samson* approach under article I, section 8 of the Iowa Constitution was an important development in our law.

It is tempting, perhaps, to say that in this case, where the record shows that law enforcement had good reason to conduct the search, that

the constitutional requirements have been satisfied. But article I, section 8 does not speak solely in terms of probable cause. Irrevocably welded into article I, section 8 are requirements that a warrant be issued by a neutral magistrate that limits the scope of the search both with respect to places to be searched and items to be seized. The warrant and particularity requirements of article I, section 8 are not weak siblings of the probable cause requirement. By requiring approval of a neutral magistrate and a description with particularity, important constitutional values are promoted. By involving a neutral magistrate, the warrant requirement ensures that probable cause is evaluated not by overzealous law enforcement officers. The traditional view has been that " 'the procedure of antecedent justification . . . is central to the Fourth Amendment.' " *See Katz,* 389 U.S. at 359, 88 S. Ct. at 515, 19 L. Ed. 2d at 586 (footnote omitted). As noted by Justice Jackson in *Johnson*:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable [people] draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

333 U.S. at 13–14, 68 S. Ct. at 369, 92 L. Ed. at 440 (footnote omitted).

In addition, the particularity requirement limits the scope of the search, which is often as important to the protection of constitutional rights as the authorization of the search itself. As noted in *Arkansas v. Sanders*:

> In the ordinary case . . . a search of private property must be both reasonable and pursuant to a properly issued search warrant. The mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant [requirement] . . . .

442 U.S. 753, 758, 99 S. Ct. 2586, 2590, 61 L. Ed. 2d 235, 241 (1979), *overruled on other grounds by Acevedo*, 500 U.S. at 579, 111 S. Ct. at 1991, 114 L. Ed. 2d at 633–34. In addition, the process of obtaining a warrant prevents the possibility of posthoc rationales. With a written application and a warrant issued by a magistrate, we can look to the documented record in evaluating the lawfulness of a search, thereby steaming out many credibility issues associated with inquiries about who said what to whom and when.

Our recognition of the importance of all of the requirements of the warrant clause is demonstrated in *Cline*. *See* 617 N.W.2d at 281–82. A majority of state courts that have considered the question under search and seizure clauses of their state constitutions, refused to recognize the new good faith exception to the exclusionary rule in the search and seizure context created by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 922–25, 104 S. Ct. 3405, 3420–22, 82 L. Ed. 2d 677, 698–700 (1984). *See, e.g., State v. Marsala*, 579 A.2d 58, 65 (Conn. 1990); *State v. Guzman*, 842 P.2d 660, 667–68 (Idaho 1992); *State v. Novembrino*, 519 A.2d 820, 856–57 (N.J. 1987); *State v. Gutierrez*, 863 P.2d 1052, 1068 (N.M. 1993); *People v. Bigelow*, 488 N.E.2d 451, 457–58 (N.Y. 1985); *Edmunds*, 586 A.2d at 895 (Pa. 1991); *State v. Oakes*, 598 A.2d 119, 126–27 (Vt. 1991). Our court refused as well. *Cline*, 617 N.W.2d at 292–93. We refused to allow evidence obtained as a result of purportedly minor defects in searches and seizures. *See id.* The constitutional protections of article I, section 8 were simply too important for a "close enough" mentality. *See id.* at 290. As noted by Justice

Frankfurter many years ago, "[t]he history of liberty has largely been the history of observance of procedural safeguards." *McNabb v. United States*, 318 U.S. 332, 347, 63 S. Ct. 608, 616, 87 L. Ed. 819, 827–28 (1943).

Even if we were inclined to fuzzy up the warrant requirement, a home invasion by law enforcement officers is the last place we would begin the process. The canard that a person's home is their castle has always been subject to some limitations, but the basic principle remains a sound one. We are not talking about a routine encounter at airport security where the announced and understood purpose of the examination is safety of passengers unrelated to the goals of general law enforcement, or an investigative stop on the street where a quick pat down is conducted to ensure the safety of police officers, or an exigent circumstance where the acquisition of a warrant was simply not possible. Here, police officers are penetrating a home, the place of final refuge, the focal point of intimate relationships, and what is constitutionally thought of as a place of safety, security, and repose. Of course, no one says such an invasion can never occur, but only that a warrant, supported by probable cause, describing the place to be searched and the things to be obtained with particularity, is required.

Sometimes, eviscerations of constitutional protections are based upon claims that a probationer has a lesser expectation of privacy. Such reasoning is generally based upon a misreading of Justice Harlan's concurring opinion in *Katz*. *See* 389 U.S. at 360–62, 88 S. Ct. at 516–17, 19 L. Ed. 2d at 587–88 (Harlan, J., concurring). However, the expectation of privacy test in Justice Harlan's concurrence in *Katz* was designed to expand, and not contract, constitutional protections. *Id.* at 361, 88 S. Ct. at 516, 19 L. Ed. 2d at 587–88. Even Justice Harlan as

the author of the concurring opinion objected to its later applications. *See United States v. White*, 401 U.S. 745, 786–87, 91 S. Ct. 1122, 1143, 28 L. Ed. 2d 453, 478 (1971) (Harlan, J., dissenting) (stating intrusions significantly jeopardizing Fourth Amendment liberties should require a warrant). And it simply cannot be said that the government, by simply announcing that warrantless searches may occur, can eviscerate the right to be left alone inherent in article I, section 8. *Cf. State v. Campbell*, 759 P.2d 1040, 1044 (Or. 1988) (noting that the phrase "expectation of privacy" expresses a conclusion rather than a starting point and that Oregon search and seizure law protects not the privacy one reasonably expects but the privacy to which one has a right); *State v. Tanner*, 745 P.2d 757, 762 n.7 (Or. 1987) (citing Amsterdam, 58 Minn. L. Rev. at 384). If a government announcement that a citizen is no longer free from unwarranted home search overrode the requirements of article I, section 8, citizen protections would be dramatically undermined. Further, the expectation of privacy analysis was not designed to supplant other constitutional values protected by search and seizure law, including the right to be secure in one's home from trespass by law enforcement. *See Ochoa*, 792 N.W.2d at 277 (recognizing a continued notion of property and security in Fourth Amendment protections). While we recognize that the probation agreement provided Short with notice that the State asserted the right to execute warrantless searches, we do not think notice eviscerates the warrant requirement for home searches. *Cf. Samson*, 547 U.S. at 863, 126 S. Ct. at 2206, 165 L. Ed. 2d at 266 (Stevens, J., concurring) (rejecting reliance on a condition or notice in parole agreement because otherwise, the government could " 'suddenly . . . announce on nationwide television that all homes henceforth would be subject to warrantless entry' "); *Campbell*, 759 P.2d

at 1044 (noting that the majority opinion in *Katz* does not use the phrase "reasonable expectation of privacy" and under the Oregon Constitution emphasizing privacy to which one has a right).   *Cullison* rejected reasoning designed to strip or dilute constitutional protections for probationers home searches.  *See* 173 N.W.2d at 536.  So should we.

We further note that the requirements imposed by article I, section 8 and enforced by us, namely, that a warrant is required for an unconsented search of the home, even of a parolee or probationer, is not terribly onerous.   Indeed, the balancing of interests between the individual and law enforcement has already occurred in article I, section 8 in the probable cause requirement.  As we have noted in the past:

> The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officer's whim or caprice.

*State v. Raymond*, 258 Iowa 1339, 1345, 142 N.W.2d 444, 447 (1966) (internal quotation marks omitted).

That leaves the additional constitutional requirements of obtaining a warrant from a neutral magistrate describing the place to be searched and the things to be sought with particularity.  Whatever else may have been true in the past, obtaining a warrant from a judicial officer is not particularly onerous.  As was noted by a leading commentator almost twenty years ago, there is now no reason why warrants cannot be obtained twenty-four hours a day using modern technologies.  Craig M. Bradley, *Two Models of the Fourth Amendment*, 83 Mich. L. Rev. 1468, 1492–93 (1985).

The factual assertion in *Griffin* that it was impracticable for a probation officer to obtain a warrant was wrong then and it is even more

wrong today. *See* Howard P. Schneiderman, *Conflicting Perspectives from the Bench and the Field on Probationer Home Searches*—Griffin v. Wisconsin *Reconsidered,* 1989 Wisc. L. Rev. 607, 664 (1989) (noting survey results demonstrating that a warrant requirement would not unduly burden Wisconsin probation department). And, the impracticable assertion has even less validity in the context of a search by law enforcement. As demonstrated by this case, the problem was not that it was impractical to obtain a warrant. It was very practical to obtain a warrant. The problem was that the warrant actually obtained was invalid and the State failed, through an apparent misunderstanding of the law, to properly obtain a new warrant. In this case, a valid, amended warrant could have been acquired with only modest additional effort by law enforcement.

In addition, we do not address the validity of home visits and other measures utilized by probation or parole officers as part of their ordinary duties. Although *Cullison* plainly indicates that even a search by a parole officer may give rise to a violation of article I, section 8, 173 N.W.2d at 539–40, we reserve this interesting question for another day. We prefer to consider the law step by step rather than by leaps and bounds. There is substantial authority, for instance, for the proposition that while evidence obtained through home visits, or searches by probation officers, may not be used in new criminal prosecutions, it may be used for purposes of establishing a violation of probation or parole. Indeed, this was the point of the *Cullison* dissent. 173 N.W.2d at 543–44 (Larson, J., dissenting) (stating a parole agent should have a duty to conduct the search when he or she believes the parolee is violating parole). Because this case does not involve the activities of a probation

officer conducting ordinary supervision of a probationer, we need not consider issues that arise from such a factual setting.

It is an undeniable fact that in search and seizure cases, the people who bring the cases are generally those "whose unlawfully searched premises contained actual evidence of the actual crime they actually committed." Frederick Schauer, *The Heroes of the First Amendment*, 101 Mich. L. Rev. 2118, 2118 (2003). But the law must be that a search of a home "is not to be made legal by what it turns up. In law, it is good or bad when it starts and does not change character from its success." *United States v. Di Re*, 332 U.S. 581, 595, 68 S. Ct. 222, 229, 92 L. Ed. 210, 220–21 (1948) (footnote omitted).

As noted by Justice Frankfurter many years ago, "[i]t is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States v. Rabinowitz*, 339 U.S. 56, 66, 70 S. Ct. 430, 436, 94 L. Ed. 653, 660–61 (1950) (Frankfurter, J., dissenting), *overruled in part by Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). In reflecting on Justice Frankfurter's observation, Alfred Carlton, a past president of the American Bar Association, noted that "Judges inevitably must bear the brunt of this, and judicial independence is the cloak that allows them to do it." Alfred P. Carlton Jr., *Preserving Judicial Independence—An Exegesis*, 29 Fordham Urb. L.J. 835, 841 (2002). Carlton further warned against "[i]ntemperate, inaccurate, and emotional criticism" arising from such cases that "undermines public confidence in the impartiality of the judiciary and hence its independence." *Id.*

We also pause to reflect on the observation in *Kopf v. Skyrm*:

> But Casella was a criminal. He deserved to be arrested and punished; his story stirs little sympathy, much less outrage, in the crowd. The courts cannot be so impassive. We must

always remember that unreasonable searches and seizures helped drive our forefathers to revolution. One who would defend [search and seizure law] must share his foxhole with scoundrels of every sort, but to abandon the post because of the poor company is to sell freedom cheaply.

993 F.2d 374, 379–80 (4th Cir. 1993).

For the above reasons, we think *Cullison* remains good law. We decline to overrule it.[9] The United States Supreme Court in *Griffin*, *Knights*, and *Samson* has engaged in innovations that significantly reduce the protections of the Warrant Clause of the Fourth Amendment. We decline to join the retreat under the Iowa Constitution. We hold that under article I, section 8, the warrant requirement has full applicability to home searches of both probationers and parolees by law enforcement. As a result, because evidence seized in this case was obtained unlawfully, the motion to suppress should have been granted. We again note that we do not address the legality of home visits or other types of supervision by probation officers pursuant to their ordinary functions, nor do we address the question of whether a probationer may validly consent to warrantless home searches.

## VI. Conclusion.

More than forty years ago in *Cullison*, this court held that under the search and seizure provision of article I, section 8 of the Iowa Constitution, a valid warrant is required for law enforcement's search of a parolee's home. In this case, the State does not claim there was a valid warrant. In the subsequent decades, the United States Supreme Court

---

[9]We note, according to the Bureau of Justice Statistics, in 2012 there were 29,333 Iowans on probation. *See* Bureau of Justice Statistics, U.S. Department of Justice, NCJ243826, *Probation and Parole in the United States, 2012*, app. tbl. 2 (revised Apr. 22, 2014), *available at* www.bjs.gov/content/pub/pdf/ppus12.pdf. The consequences of a contrary result in this case would be that the homes of those persons could be subject to warrantless searches by law enforcement.

has moved away from its reliance on warrants toward and emphasis on standalone reasonability in its interpretation of the search and seizure provisions of the Fourth Amendment. We decline to adopt this innovative reasoning. We find *Cullison* remains good law and decline to disturb it. As a result, the search by general law enforcement authorities of the home in this case was unlawful under article I, section 8 of the Iowa Constitution. We conclude the district court erred in denying the motion to suppress.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Cady, C.J., who concurs specially, and Waterman, Mansfield, and Zager, JJ., who dissent, each writing separately.

**CADY**, **Chief Justice (concurring specially).**

The majority opinion capably resolves the issue before the court, and I join it in full.  I write separately to emphasize the importance of independently interpreting our Iowa Constitution.

As Iowans, we are deservingly proud of a long history of rejecting incursions upon the liberty of Iowans, particularly because we have so often arrived to the just result well ahead of the national curve.  Yet, we cannot ignore that our history of robust protection of human rights owes in no small part to our authority within America's federalist system to independently interpret our constitution.  Similarly, we must not forget that the virtue of federalism lies not in the means of permitting state experimentation but in the ends of expanded liberty, equality, and human dignity.  *See State v. Baldon*, 829 N.W.2d 785, 790–91 (Iowa 2013).  A court that categorically ignores these distinctly human ends can only accomplish injustice.  Thus, we have recognized that "[w]hen individuals invoke the Iowa Constitution's guarantees of freedom and equality, courts are bound to interpret those guarantees."  *Varnum v. Brien*, 763 N.W.2d 862, 876 (Iowa 2009); *cf.* Robert F. Williams, *Equality Guarantees in State Constitutional Law*, 63 Tex. L. Rev. 1195, 1197 (1985) ("When faced with state constitutional equality claims, state courts should recognize their obligation to take these provisions seriously.").

It goes without saying our decisions have not always been without their detractors.  As we pointed out in *State v. Lyle*, also decided today, "[o]ur court history has been one that stands up to preserve and protect individual rights regardless of the consequences."  ___ N.W.2d ___, ___ (Iowa 2014).  Yet, history has repeatedly vindicated, and the people of

Iowa have repeatedly embraced, the bold expansions of civil, constitutional, and human rights we have undertaken throughout the 175 years of our existence as a court.  In other words, time has shown that those decisions, not unlike our recent parolee search cases, are unequivocally the law of this state.

Today's decision is another step in the steady march towards the highest liberty and equality that is the birthright of all Iowans; it will not be the last.

Accordingly, I concur.

**WATERMAN, Justice (dissenting).**

I respectfully dissent. I would follow the unanimous decision in *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001), to affirm our court of appeals and district court decisions upholding the search of Short's residence. The majority's opinion today is wrongly decided for the reasons set forth in Justice Zager's dissent, which I join in part. I write separately to reemphasize my disagreement with our court's departure from well-settled Fourth Amendment precedent and to reiterate my view that *State v. Baldon* and *State v. Ochoa* are plainly erroneous for the reasons explained by Justice Mansfield in his *Baldon* dissent, which I joined. *See State v. Baldon*, 829 N.W.2d 785, 835–47 (Iowa 2013) (Mansfield, J., dissenting).[10] But, I agree with Justice Zager's conclusion that the search of Short's residence can be upheld under those decisions. And, I join in Justice Mansfield's separate dissent in this case, which addresses the majority's ten "established principles of independent state constitutional law."

The majority neglects to mention that Short had a lengthy criminal record, including multiple felony convictions. He had served time in prison for robbery. On March 31, 2011, he pled guilty to his fourth theft-related offense and, in lieu of incarceration, received a generous sentence of probation on the condition that his residence could be searched without a warrant any time a law enforcement officer had reasonable grounds to believe contraband was present. Consent-to-search clauses have commonly been used in parole and probation agreements to deter

---

[10]The majority opinion today and in *Baldon* reviewed the use of evidence to prove new crimes. *See Baldon*, 829 N.W.2d at 788–89. Both opinions leave open the question whether the State may invoke an offender's violation of the consent-to-search term in a parole or probation agreement in revocation proceedings.

misconduct and facilitate detection of wrongdoing. Less than two months later, while still on probation, Short committed the crime at issue in this case by burglarizing a home, taking two flat-screen televisions, jewelry, and a $100 gift card to Minerva's Restaurant. He used the gift card there and signed the reciept. The waitress and manager later identified Short from a photograph. A magistrate found probable cause to search his residence and issued a search warrant, which all parties acknowledge was invalid due to an out-of-date address. The deputies, based on inaccurate advice during a phone call with the magistrate, wrote in the new address, executed the amended warrant, and found the stolen property at Short's residence. The district court, following *Knights,* correctly upheld the search based on Short's probation agreement and diminished expectations of privacy as a felon under supervision. I disagree with the majority's conclusion that Short has the same expectations of privacy as ordinary Iowans. It is unfortunate the majority, as it did in *Baldon,* has again failed to enforce an offender's consent-to-search provision, depriving our state's corrections program of an important tool to encourage parolees and probationers to obey the law.

As in several other recent decisions erroneously decided by this majority, "[t]he validity of this consent search is solidly grounded on Fourth Amendment search and seizure caselaw, and there is no good reason to hold otherwise under article I, section 8 of the Iowa Constitution." *State v. Pals,* 805 N.W.2d 767, 784 (Iowa 2011) (Waterman, J., dissenting). Today's majority, as in *Pals, Baldon,* and *Ochoa,* once again uses the Iowa Constitution to evade well-settled Fourth Amendment precedent without setting forth any principled basis for construing Iowa's nearly identically worded search and seizure

provision to require greater restrictions on the law enforcement community and elected branches. The majority fails to articulate any standards for interpreting the same constitutional protections differently under federal and state law. The majority is willing to reach a different result based simply on its own conclusion that particular decisions of the United States Supreme Court are not "persuasive." Persuasion is in the eye of the beholder. More restraint is warranted when interpreting our state constitution, which by design is so difficult for the people to amend.[11]

To reach its result, the majority takes an inconsistent approach to error preservation[12] and rests its analysis on a false premise—that *State*

---

[11]The people of Florida amended their state constitution's search and seizure provision in 1982 to require conformity with Supreme Court decisions interpreting the Fourth Amendment. Fla. Const. art. I, § 12 ("This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court."). This amendment was in response to decisions of the Florida Supreme Court that suppressed evidence of crimes admissible under federal interpretations of the Fourth Amendment. *See id.* § 12, cmt. to 1982 amend.; *State v. Hume*, 512 So. 2d 185, 187 (Fla. 1987) (noting "the amendment to section 12 was intended, in part, to overrule our decision in [*State v.*] *Sarmiento*[, 397 So. 2d 643 (Fla. 1981)]").

[12]The majority wrongly concludes the State failed to preserve error on the consent issue because the State used the term "waiver" in arguing the consent-to-search provision in Short's probation agreement should be enforced. The majority faults the State for not developing the record on consent in the district court. The probation agreement is part of the record. What further factual development is needed to decide the issue here? And, why fault the State for not developing a better record on consent in district court when Short did not argue at that time for broader rights under the Iowa Constitution? As Justice Zager's dissent further explains, the consent-to-search provision is in play in this appeal and supports affirmance of the rulings upholding the search. But, let us take the majority at its word. The saving grace is that, if the consent issue was waived by the State in this case, then the majority does not decide it, and the State remains free in future cases to argue for enforcement of probation consent-to-search agreements.

The majority asserts no party "asks us to revisit" *Baldon*. The majority fails to mention that the State indeed argued at oral argument that *Baldon* was wrongly decided and Fourth Amendment precedent—*Knights*—should be followed. Yet, the majority has no hesitation finding broader restrictions on police searches under the Iowa Constitution, even though Short made no such argument in the district court. To reach that issue, the majority must find that Short's trial counsel was ineffective. I

*v. Cullison*, a parolee-search case, was decided four decades ago under the search and seizure provision in article I, section 8 of the Iowa Constitution. 173 N.W.2d 533, 534–35 (Iowa 1970). That provision is mentioned nowhere within the four corners of the majority or dissenting opinions in that case. Rather, as further explained in Justice Zager's dissent today, *Cullison* was decided under the Fourth Amendment and is no longer good law after *Knights.* Pull on the loose thread of *Cullison*, and the majority's analysis unravels.[13]

References to "the sanctity of the home" do not justify the majority's departure from settled Fourth Amendment precedent.[14] *Cf. Baldon*, 829 N.W.2d at 841 (Mansfield, J., dissenting) ("If the 'sanctity of the home' trumps an offender's status, as we held in *Ochoa*, why has this court repeatedly upheld sex offender residency restrictions?"). The home has sanctity in all fifty states. This case is not an example of state courts of last resort acting as laboratories developing constitutional doctrine in unsettled areas, such as same-sex marriage, before the issue is squarely decided by the Supreme Court. Rather, our court today departs from a unanimous decision of that Court, *Knights*, 534 U.S. at 122, 122 S. Ct.

---

disagree that his trial counsel was ineffective for failing to foresee our court would depart from *Knights,* a unanimous decision of the United States Supreme Court directly on point and widely followed by other state supreme courts without any academic criticism. We do not require criminal defense counsel to be clairvoyant. *See Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008).

[13] Today's majority claims *Cullison* was decided under the Iowa search and seizure clause because article I, section 8 is mentioned in the defendant's brief in that case. That brief was not appended to the opinion. Do we now expect lawyers to discover hidden rulings in our opinions published a generation ago based on a citation in an archived brief, akin to archeologists finding a long-lost temple in the jungle?

[14] Would today's majority prohibit a warrantless search of the home of an offender serving a sentence under house arrest with an ankle bracelet monitor as an alternative to incarceration in a state penitentiary or county jail? If so, will that discourage use of home confinement and encourage incarceration, at greater loss of liberty and taxpayer expense?

at 593, 151 L. Ed. 2d at 507, that is widely followed by our sister states under their state constitutions.[15] The majority cites no decision of any other state supreme court declining to follow *Knights* under its state constitution. Nor does the majority marshal any academic criticism of *Knights.*

The majority's departure from settled Fourth Amendment caselaw inevitably leads to unpredictability, confusion, and instability in the law, with multiple sets of rules applying to the same conduct. In my view, we should return to our traditional practice of interpreting article I, section 8 of the Iowa Constitution to have the same meaning as the Fourth Amendment, as the framers of our state constitution intended. *See Pals*, 805 N.W.2d at 786–87 (Waterman, J., dissenting). And, we should

---

[15]*See, e.g.*, *State v. Raines*, 857 A.2d 19, 21, 27–34 (Md. 2004) (applying *Knight* framework and concluding Maryland DNA Collection Act is constitutional under both the United States and Maryland Constitutions); *State v. Anderson*, 733 N.W.2d 128, 140 (Minn. 2007) ("The Supreme Court's decision in *Knights* does not appear to be a sharp or radical departure from its previous decisions or a retrenchment on its Fourth Amendment jurisprudence with respect to probation searches. Moreover, we are not convinced that federal precedent inadequately protects our citizens' basic rights and liberties."); *State v. Moody*, 148 P.3d 662, 667, 668 (Mont. 2006) (citing *Knights* favorably and concluding, under Montana Constitution, "home visits, as a routine and reasonable element of supervising a convicted person serving a term of supervised release, are not searches and are thus not subject to the reasonable cause standard"); *State v. Baca*, 90 P.3d 509, 519, 520 (N.M. Ct. App. 2004) (stating "our review of *Griffin* and *Knights* reveals no flaws" and noting "[i]n New Mexico, as well, whether a search is unreasonable is determined by balancing the degree of intrusion into a probationer's privacy against the interest of the government in promoting rehabilitation and protecting society"); *State v. Maurstad*, 647 N.W.2d 688, 691, 697 (N.D. 2002) (following *Knights* and commenting "[w]hen reviewing the constitutionality of probationary searches, we have interpreted the North Dakota Constitution to provide the same protections for probationers as provided by the United States Constitution"); *State v. Kottman*, 707 N.W.2d 114, 120 (S.D. 2005) (rejecting argument under state constitution and following *Knights*); *State ex rel. A.C.C.*, 44 P.3d 708, 712 (Utah 2002) ("[L]ike the United States Supreme Court, we too have stated that whether an individual convicted of a crime has any reasonable expectation of privacy requires a balancing of the government's interest in operating its institutions and the individual's privacy interest.").

return to our long-standing tradition of following the decisions of the highest court in the land when, as here, no departure is warranted by any difference in the text, structure, or history of the Iowa provision.

I dissent to fire another warning shot across the bow of the ship the majority steers in the wrong direction without a navigation system.

## I. We Should Construe Article I, Section 8 of the Iowa Constitution to Have the Same Meaning as the Fourth Amendment.

The Fourth Amendment to the United States Constitution[16] and article I, section 8 of the Iowa Constitution[17] are worded virtually identically and provide the *same* protection against unreasonable searches and seizures. *Compare* U.S. Const. Amend. IV, *with* Iowa Const. art. I, § 8. Our court, like most state supreme courts, has traditionally followed federal precedent in construing the same language in the state constitution. *See* Robert F. Williams, *The Law of American State Constitutions*, 194–95 (2009) (noting a "clear majority" of cases "decide to *follow*, rather than *diverge from*, federal constitutional doctrine"). Decisions of the United States Supreme Court resolve issues that are briefed and argued by the best lawyers in the country, after those issues have first been thoroughly vetted in the federal courts of

---

[16]The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[17]The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.

appeals. Our nation's Supreme Court decisions are binding on all federal and state courts applying the Fourth Amendment and, unless plainly erroneous, should be followed to interpret nearly identical language in the state constitution. The Illinois Supreme Court reaffirmed its adherence to federal cases to interpret its state's constitution, stating:

> This limited lockstep approach is not a surrender of state sovereignty or an abandonment of the judicial function. It is, instead, based on the premise that the drafters of the [state] constitution and the delegates to the constitutional convention intended the phrase "search and seizure" in the state document to mean, in general, what the same phrase means in the federal constitution.

*People v. Caballes*, 851 N.E.2d 26, 45 (Ill. 2006). This is equally true in Iowa.

The timing of the adoption of the Iowa Constitution[18] and the use of nearly identical wording confirm the framers intended article I, section 8 to duplicate the same constitutional protection against unreasonable searches and seizures found in the Fourth Amendment. *Pals*, 805 N.W.2d at 786 (Waterman, J., dissenting) (noting "article I, section 8 was the Fourth Amendment 'reenacted' in Iowa to apply to the state" (quoting *State v. Nelson*, 231 Iowa 177, 185, 300 N.W. 685, 689 (1941) (Mitchell, J., dissenting))); *see also People v. Pickens*, 521 N.W.2d 797, 806 (Mich.

---

[18] At the time the Iowa Constitution was enacted in 1857, the Fourth Amendment limited only the federal government. *See Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341, 346, 58 L. Ed. 652, 657–58 (1914) (applying Fourth Amendment and exclusionary rule to federal officials, but not to municipal police officers), *overruled by Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961). A state constitutional bill of rights patterned after the Federal Bill of Rights was therefore necessary to provide the same limitations against state governmental intrusion on individual civil liberties. The Fourth Amendment was not applied to the states until 1949, when the Supreme Court held the Amendment was incorporated in the Due Process Clause of the Fourteenth Amendment, enacted after the Civil War. *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361, 93 L. Ed. 1782, 1785–86 (1949), *overruled on other grounds by Mapp*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081.

1994) (commenting "[i]f the convention or ratifiers had intended to alter the meaning of this provision, we can presume they would have done so by *express* words" (internal quotation marks omitted)).    Other state supreme courts have reached the same conclusion.[19]

Today's majority cites no historical evidence that Iowa's founders intended the Iowa search and seizure provision to impose greater restrictions on law enforcement.  It is, therefore, no surprise that our state's search and seizure caselaw has long tracked with Fourth Amendment caselaw because we have consistently construed article I, section 8 to have the same meaning.  *See, e.g., State v. Breuer*, 577 N.W.2d 41, 44 (Iowa 1998) (" '[T]he language of those clauses is substantially identical and we have consistently interpreted the scope and purpose of article I, section 8, of the Iowa Constitution to track with

---

[19] *See, e.g., Caballes*, 851 N.E.2d at 32 (highlighting that the Illinois Constitution's search and seizure provision "was clearly modeled upon the [F]ourth [A]mendment to the United States Constitution"); *State v. Johnson,* 259 P.3d 719, 722 (Kan. 2011) ("Section 15 of the Kansas Constitution Bill of Rights provides lockstep protection to the Fourth Amendment."); *State v. Johnson*, 856 P.2d 134, 138 (Kan. 1993) ("Both the Fourth Amendment and § 15 [of Kansas Bill of Rights] prohibit unreasonable searches and seizures.  We have held that the wording and scope of the two sections are identical for all practical purposes."); *People v. Nash*, 341 N.W.2d 439, 445 (Mich. 1983) ("There is no indication that . . . the people of this state wished to place restrictions on law enforcement activities greater than those required by the federal constitution. In fact, the contrary intent is expressed."); *State v. Wiegand*, 645 N.W.2d 125, 132 (Minn. 2002) (recognizing the Fourth Amendment is "textually identical to a provision of the Minnesota Constitution" and therefore United States Supreme Court opinions interpreting the Fourth Amendment are "inherently persuasive"); *State v. Havlat*, 385 N.W.2d 436, 440 (Neb. 1986) ("Nowhere in our independent research of the state constitutional conventions do we find evidence that the framers intended the explicit language of article I, § 7, to encompass more than what it says."); *State v. Felix*, 811 N.W.2d 775, 787 (Wis. 2012) (noting the court is "particularly reluctant" to interpret the state search and seizure provision more broadly than the Fourth Amendment "given the nearly identical language in both provisions").

federal interpretations of the Fourth Amendment.' " (quoting *State v. Showalter*, 427 N.W.2d 166, 168 (Iowa 1988))).[20]

Only recently has our court diverged from this precedent. This court first overtly diverged from the modern-day search and seizure decisions of the United States Supreme Court in *State v. Cline*, 617 N.W.2d 277, 293 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). The *Cline* court stated,

---

[20]*See also Baldon*, 829 N.W.2d at 837 (Mansfield, J., dissenting) (collecting "a long line of Iowa Supreme Court cases, many of them rather recent, [that] giv[e] deference to federal interpretations of the Fourth Amendment"); *State v. Lowe*, 812 N.W.2d 554, 582 (Iowa 2012) (Waterman, J., concurring specially) ("I would be very hesitant to throw aside decades of precedent and create another discrepancy between Fourth Amendment law and how the identically worded article I, section 8 of the Iowa Constitution is interpreted."); *State v. McCoy*, 692 N.W.2d 6, 15 (Iowa 2005) ("Because we find no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the federal constitution under the facts of this case, our discussion of the defendant's claimed seizure violation applies equally under both constitutional provisions."); *State v. Reinders*, 690 N.W.2d 78, 81–82 (Iowa 2004) ("Because the federal and state search-and-seizure clauses are nearly identical, the construction of the federal constitution is persuasive in our interpretation of the state provision."); *State v. Loyd*, 530 N.W.2d 708, 711 (Iowa 1995) ("[W]e interpret the scope and purpose of the state constitutional clause to be coextensive with federal interpretations of the Fourth Amendment."); *State v. Strong*, 493 N.W.2d 834, 835–36 (Iowa 1992) (" '[T]he language of those clauses is substantially identical and we have consistently interpreted the scope and purpose of article I, section 8, of the Iowa Constitution to track with federal interpretations of the Fourth Amendment.' " (quoting *Showalter*, 427 N.W.2d at 168)); *Kain v. State*, 378 N.W.2d 900, 902 (Iowa 1985) ("[O]ur interpretation of article I, section 8 has quite consistently tracked with prevailing federal interpretations of the fourteenth amendment in deciding similar issues."); *State v. Groff,* 323 N.W.2d 204, 207–08 (Iowa 1982) ("We have often said that where state and federal constitutional clauses contain a similar guarantee they are deemed to be identical in scope, import, and purpose."); *State v. Roth*, 305 N.W.2d 501, 507 (Iowa 1981) ("Defendant challenges the search under the Iowa Constitution as well as the United States Constitution, but we see no reason to impose a different rule under the state constitution."); *State v. Davis*, 304 N.W.2d 432, 434 (Iowa 1981) ("The Supreme Court of Iowa is the final arbiter of the meaning of the Iowa Constitution, but when the federal and state constitutions contain similar provisions, they are usually deemed to be identical in scope, import, and purpose."); *State v. Olsen,* 293 N.W.2d 216, 219 (Iowa 1980) (noting the United State Supreme Court's interpretation of the Fourth Amendment is persuasive in construing this state's analogous state constitutional provision). The *Ochoa* court simply ignored this long line of cases.

"[W]e strive to be consistent with federal constitutional law in our interpretation of the Iowa Constitution, but we 'jealously guard our right and duty to differ in appropriate cases.'" 617 N.W.2d at 285 (quoting *State v. Olsen*, 293 N.W.2d 216, 220 (Iowa 1980)). *Cline* held the good-faith exception to the exclusionary rule recognized by the United States Supreme Court did not exist under the Iowa Constitution. *Id.* at 293. *Cline*, however, rejected a federal exception to a judge-made *remedy* for constitutional violations; *Cline* did not impose greater restrictions on the power of police to conduct warrantless searches. *See Davis v. United States*, 564 U.S. ___, ___, 131 S. Ct. 2419, 2426, 180 L. Ed. 2d 285, 293 (2011) (noting exclusion of evidence "is not a personal constitutional right," but rather is a court-created prudential remedy (internal quotation marks omitted)).[21]

Our court's next retreat from Fourth Amendment precedent was *State v. Ochoa*, 792 N.W.2d 260, 287–91 (Iowa 2010). The *Ochoa* court held that a warrantless search of a parolee's motel room violated the search and seizure provision of the Iowa Constitution, even though it was permitted under the Fourth Amendment based on United States Supreme Court precedent. *Id.* at 291. The *Ochoa* court proclaimed:

> In order to resolve any inconsistency in our prior cases, we now hold that, while United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions. A Fourth Amendment opinion of the United States Supreme Court, the Eighth Circuit Court of Appeals, or any other federal court is no more binding upon our interpretation of article I, section 8 of the Iowa

---

[21]As noted, the deputies obtained a warrant to search Short's residence and telephoned a magistrate upon discovering Short's new address. The magistrate mistakenly advised that the officer could write the new address on the warrant. The State does not ask us to revisit *Cline* to find a narrow, good-faith exception to the exclusionary rule under the facts of this case.

Constitution than is a case decided by another state supreme court under a search and seizure provision of that state's constitution. *The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.*

*Id.* at 267 (emphasis added). The *Ochoa* court's chest-thumping assertion of judicial power marked a dramatic departure from our court's long-standing adherence to settled Fourth Amendment precedent on the validity of searches. This new mindset metastasized into *Pals*,[22] *Baldon*, and today's decision.[23]

Contrary to *Ochoa*, I consider a United States Supreme Court decision on the Fourth Amendment to be of significantly greater precedential weight than a decision by another state supreme court. Why? Because, to restate the obvious, the United States Supreme Court's holdings are binding on all state and federal courts applying the Fourth Amendment, and our state constitution's search and seizure provision has the same meaning as the federal provision.

---

[22]In *Pals*, the majority held a consent search was involuntary under article I, section 8 of the Iowa Constitution because the officer failed to tell the motorist he had a right to say no to his request to look in his vehicle. 805 N.W.2d at 783. No such disclosure was required under Fourth Amendment precedent or prior Iowa cases. *See id.* at 788 (Waterman, J., dissenting). We were taught in grade school that the policeman is our friend. But, the police officer is not the lawyer for a motorist pulled over for suspicion of a crime.

[23]The same mindset produced today's juvenile sentencing decisions in which our court stands alone at the fringe of Eighth Amendment jurisprudence. *See State v. Lyle*, ___ N.W.2d ___, ___ (Iowa 2014) (Waterman, J., dissenting); *id.* at ___ (Zager, J., dissenting); *State v. Taylor*, ___ N.W.2d ___, ___ (Iowa 2014) (noting Justices Waterman, Mansfield, and Zager, JJ., dissent without opinion). And, the same mindset earlier allowed this court in a sharply divided opinion to misapply the rational-basis test under the Iowa Constitution to strike down a legislative tax differential that the unanimous Supreme Court, applying the same highly deferential test in the very same case, upheld as constitutional under the Federal Equal Protection Clause. *See Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6 (Iowa 2004); *id.* at 16–17 (Carter, J., dissenting); *id.* at 17–28 (Cady, J., dissenting).

It is indeed our court's role to interpret the Iowa Constitution, but I part company with the majority's stated willingness to impose greater restrictions on police and our legislature under the Iowa Constitution's search and seizure provision merely by deeming the Supreme Court's Fourth Amendment precedent unpersuasive.

> A bare disagreement with the United States Supreme Court's interpretation of the Federal Constitution "imparts no sound doctrinal basis to impose a contrary view under the pretext of separately interpreting our State Constitution. Our Constitution is more than just a device to reject or evade federal decisions . . . ."

*State v. Kottman*, 707 N.W.2d 114, 119–20 (S.D. 2005) (quoting *State v. Schwartz*, 689 N.W.2d 430, 438 (S.D. 2004) (Konenkamp, J., concurring in judgment)).

The majority, citing two law professors, perjoratively labels our court's long-standing practice of following Fourth Amemdment precedent to be an "aggressive maximalist" approach and a "precommitment device preventing independent examination of the facts and law." No court until now has used those labels to describe the approach followed by most state supreme courts. I doubt any of the justices of our court who retired before *Ochoa*, including jurists such as C. Edwin Moore, Clay LeGrand, or Harvey Uhlenhopp, would have agreed those labels accurately describe their approach to search and seizure law. Stare decisis is a "precommitment device," is it not?[24] By contrast, the majority expressly disavows following any specific standards or criteria

---

[24]We invariably scrutinize the evidentiary record to determine whether precedent is factually distinguishable. Federal courts may be divided, or certain issues may be unsettled. And, we may decline to follow precedent found to be plainly erroneous. Precedent may be reexamined in response to intervening changes in the law or other circumstances. Our case-by-case adjudication is never unthinking or predetermined in a way that forecloses such analysis. Neither should our decision-making be untethered from precedent.

for determining when to depart from settled Fourth Amendment precedent. What label best describes the majority's approach today?

The majority's recent departures from our court's numerous decisions following settled federal constitutional precedent undermine the predictability and stability of our law. Revisiting settled precedent whenever four justices of this court find prior cases "unpersuasive" leads to serious and troubling repercussions. Too many long-settled rules are put back into play. This subverts the goals served by the doctrine of stare decisis. A recent admonition by the Supreme Court is worth repeating.

> [T]his Court does not overturn its precedents lightly. *Stare decisis,* we have stated, "is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Although "not an inexorable command," *stare decisis* is a foundation stone of the rule of law, necessary to ensure that legal rules develop "in a principled and intelligible fashion." For that reason, this Court has always held that "any departure" from the doctrine "demands special justification."

*Michigan v. Bay Mills Indian Cmty.*, ___ U.S. ___, ___, 134 S. Ct. 2024, 2036, 188 L. Ed. 2d 1071, 1086 (2014) (citations omitted); *see also State v. Walker*, 804 N.W.2d 284, 296 (Iowa 2011) ("Stare decisis is a valuable legal doctrine which lends stability to the law . . . ." (Internal quotation marks omitted.)); *Kiesau v. Bantz*, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting) ("It nearly goes without saying that the doctrine of stare decisis is one of the bedrock principles on which this court is built. It is an important restraint on judicial authority and provides needed stability in and respect for the law."); *cf. State v. Brown*, 156 S.W.3d 722, 735–36 (Ark. 2004) (Glaze, J., dissenting) (concluding majority violated

Arkansas precedent by giving state search and seizure provision different meaning than Fourth Amendment).

The majority injects further instability into our law through its mantra that our court "reserve[s] the right to apply the standard in a [different] fashion." I am not sure what that means. Does this approach make predicting the law a guessing game?

The legitimacy of our court's decisions rests in part on the perception and reality that we are applying the rule of law, not our personal preferences for what the law should be. As Justice Frankfurter admonished, we are not "justified in writing [our] private notions of policy into the Constitution, no matter how deeply [we] may cherish them or how mischievous [we] may deem their disregard." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 647, 63 S. Ct. 1178, 1189, 87 L. Ed. 1628, 1642 (1943) (Frankfurter, J., dissenting). We are on solid ground interpreting our state constitution consistently with United States Supreme Court decisions construing the parallel provision in the Federal Constitution. We are on shaky ground when we take a different path simply because we find the federal interpretations "unpersuasive."

> "If these principles of constitutional construction were to be ignored critics not unreasonably would declare it judicial arrogance for courts to say that their power to construe constitutions was limited only by the restraints courts might impose upon themselves. Courts are not legislatures, and neither are they constitutional framers and adopters of constitutions. What Justice Powell said in another context is not without relevance: 'We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch.' "

*Caballes*, 851 N.E.2d at 36 (quoting *People v. Tisler*, 469 N.E.2d 147, 161 (Ill. 1984) (Ward, J., concurring)). Returning to our traditional approach will restore legitimacy to our constitutional adjudication in this area.

The majority, by diverging from settled federal precedent, contributes to a Tower of Babel-like cacophony of varying state court interpretations of nearly identically worded search and seizure provisions. Our court is now part of the problem, not the solution. As one commentator observed, "state constitutional law today is a vast wasteland of confusing, conflicting, and essentially unintelligible pronouncements." James A. Gardner, *The Failed Discourse of State Constitutionalism*, 90 Mich. L. Rev. 761, 763 (1992) [hereinafter Gardner]. Adherence to well-settled Fourth Amendment precedent promotes uniformity between state and federal search and seizure law. Our sister states have recognized the importance of uniformity in state and federal interpretations of the same constitutional language.[25] Diverging from

---

[25]*See, e.g.*, *State v. Hunt*, 450 A.2d 952, 955 (N.J. 1982) (noting "enforcement of criminal laws in federal and state courts, sometimes involving the identical episodes, encourages application of uniform rules governing search and seizure"); *State v. Gomez*, 932 P.2d 1, 7–8 (N.M. 1997) ("[W]e recognize the responsibility of state courts to preserve national uniformity in development and application of fundamental rights guaranteed by our state and federal constitutions." (Internal quotation marks omitted.)); *State v. Flores*, 570 P.2d 965, 968 (Or. 1977) (considering "the need for a uniform standard in the area of law under discussion" as a factor in its state constitutional analysis); *State v. Anderson*, 910 P.2d 1229, 1235 (Utah 1996) ("[A]n independent [state constitutional] analysis is not necessarily a *different* analysis. Indeed, we have endeavored toward uniformity in the application of the search and seizure requirements of the state and federal constitutions, particularly since the respective provisions are practically identical. . . . 'One untoward consequence of [the opposite] approach is to impose two different and possibly conflicting constitutional standards on law enforcement officers.' " (Citation omitted.) (quoting *State v. Poole*, 871 P.2d 531, 536 (Utah 1994) (Stewart, J., concurring)); *see also* Lawrence Friedman, *The Constitutional Value of Dialogue and the New Judicial Federalism*, 28 Hastings Const. L.Q. 93, 103 (2000) (following federal precedent "is justified, at least in regard to the enforcement of the criminal law, by an interest in uniformity, which urges the development of identical state and federal rules to control government conduct in regard to procedural issues").

settled federal precedent results in two sets of rules and confusion among the bench and bar and law enforcement over which rules to follow. It also leads to inconsistent results, whereby evidence from the same arrest or crime could be admissible in federal court, but not state court. *See Baldon*, 829 N.W.2d at 842 (Mansfield, J., dissenting) ("[W]e now have two different sets of search and seizure rules in Iowa.").

The Iowa bench and bar and the law enforcement community are whipsawed by our court's end runs around well-settled Iowa and Federal Fourth Amendment precedent. Federal Fourth Amendment law has been comparatively stable. *See Davis*, ___ U.S. at ___, 131 S. Ct. at 2433, 180 L. Ed. 2d at 301 ("Decisions overruling this Court's Fourth Amendment precedents are rare.").[26] The Iowa bench and bar should be able to rely on settled federal precedent directly on point in construing the parallel provisions of the Iowa Constitution. Will Iowa criminal defense attorneys now feel compelled to argue divergence from Fourth Amendment precedent on any issue to avoid a claim of ineffective assistance of counsel, malpractice, or disciplinary charges for neglect or incompetence—even if the position taken is contrary to long-settled caselaw—merely because a majority of our court might find the precedent unpersuasive? *See Baldon*, 829 N.W.2d at 816 (Appel, J., concurring specially) (citing cases finding defense counsel ineffective or guilty of "malpractice" for failing to argue state constitutional claims). Must Iowa lawyers do a fifty-state survey and review of the academic

---

[26]I disagree with the majority's contention that federal courts have "diluted" Fourth Amendment protections. The majority relies on dissenting opinions and commentators for that view, which is belied by the unanimous decision this term holding police generally must obtain a warrant before searching a smart phone seized incident to a lawful arrest. *See Riley v. California*, ___ U.S. ___, ___, 134 S. Ct. 2473, 2495, 189 L. Ed. 2d 430 (2014).

literature in every case to brief why we should reject a decision of the highest court in the land? Or, why bother if a majority of our court can disregard any precedent?

**II. We Should Articulate Standards for Departing from Settled Federal Precedent When Construing the Same Provisions in the Iowa Constitution.**

We, of course, have the interpretive power under our state constitution to depart from federal precedent. Just because we can depart does not mean we should. I disagree with the majority's assertion that our court should not establish "criteria" for determining when to diverge from federal interpretations. In my view, our departures should be based on articulated standards that mean something more than a salute to Iowa "values" or a bald conclusion the federal precedent is "unpersuasive." *See Schwartz*, 689 N.W.2d at 444 (recognizing that the "values" rationale "has a high potential for misuse"); Gardner, 90 Mich. L. Rev. at 818 ("[T]he notion of significant local variations in character and identity is just too implausible to take seriously as the basis for a distinct constitutional discourse.").

The battle lines for this debate are drawn in the divided decision of the South Dakota Supreme Court in *Schwartz*. *See generally* 689 N.W.2d at 437–45; *id.* at 445–49 (Sabers, J., dissenting). In *Schwartz*, defendants were convicted of methamphetamine possession based on evidence obtained in a warrantless search of their curbside trash. *Id.* at 433. The defendants argued the South Dakota Constitution prohibited the warrantless search and seizure of their trash. *Id.* at 432. As in Iowa, the search and seizure provision of the South Dakota Constitution was worded nearly identically to the Fourth Amendment. *See id.* at 435 n.1.

The United States Supreme Court squarely addressed the question of the applicability of Fourth Amendment protections to curbside trash in *California v. Greenwood*, 486 U.S. 35, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988). *Greenwood* held that persons who place their garbage for public collection do not have a reasonable expectation of privacy over its contents. *Greenwood*, 486 U.S. at 40–41, 108 S. Ct. at 1629, 100 L. Ed. 2d at 36–37. The *Schwartz* defendants argued the South Dakota Constitution should be construed to provide broader protection. 689 N.W.2d at 435. The *Schwartz* plurality noted a majority of state courts follow *Greenwood* and applied essentially the same test as *Greenwood* to reach the same result under the South Dakota Constitution. *Id.* The *Schwartz* plurality observed, "Those jurisdictions who have decided to part company with the *Greenwood* decision have generally relied upon unique language in their state constitution to extend protection to trash intended for collection." *Id.* Two dissenting justices found *Greenwood* unpersuasive and advocated for greater protection under the South Dakota Constitution. *Id.* at 446 (Sabers, J., dissenting).

Two concurring opinions called for the type of analysis lacking in today's majority opinion and in *Baldon, Pals*, and *Ochoa*. *See Schwartz*, 689 N.W.2d at 437 (Zinter, J., concurring); *id.* at 437–45 (Konenkamp, J., concurring in judgment). Justice Zinter admonished counsel in future cases "to present some interpretive methodology that leads to principled constitutional interpretation when they assert that essentially identical language in our Constitution means something different than the United States Constitution." *Id.* at 437 (Zinter, J., concurring). A concurring opinion by Justice Konenkamp elaborated, stating: "Whether we can more broadly interpret our similarly worded state constitutional provisions should be decided on a neutral set of divergence standards."

*Id.* at 438 (Konenkamp, J., concurring in result). This concurrence warned that "[w]idely divergent interpretations of similar provisions create unpredictability and confusion in the law." *Id.* at 439. His concurrence went on to propose:

> In deciding whether a state constitutional provision should receive a divergent interpretation, we should examine (1) the text of the provision at issue; (2) the territorial, legal, and constitutional history surrounding the provision; (3) the structural differences in the State and Federal Constitutions; and (4) the matters of unique state tradition or concern that bear on the meaning of the provision.

*Id.* at 440.[27] Justice Konenkamp, after discussing these "divergence standards," joined the majority opinion following *Greenwood. Id.* at 441–44.

Justice Konenkamp's thorough analysis provides a useful roadmap for determining whether an independent state constitutional adjudication should lead to a different result than federal precedent. "Constitutional analysis always begins with the text." *Id.* at 441. His concurrence noted, when the South Dakota Constitution was adopted in 1889, "the Federal Bill of Rights had no binding effect on state courts," suggesting that "the adoption of many of the provisions [in the] State Bill of Rights . . . may have reflected an intention primarily to duplicate corresponding federal

---

[27] *See also Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 421 (Conn. 2008) (detailing six factors "to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning"); *Hunt*, 450 A.2d at 965–67 (Handler, J., concurring) (using seven divergence criteria to analyze state constitutional provisions); *Flores*, 570 P.2d at 968 (utilizing four criteria from Johansen's New Federalism note and adding a fifth: "the need for a uniform standard in the area of law under discussion"); *Commonwealth v. Russo*, 934 A.2d 1199, 1205 (Pa. 2007) (listing four criteria for "a principled consideration of state constitutional doctrine"); *State v. Jewett*, 500 A.2d 233, 236–38 (Vt. 1985) (reviewing various approaches to independent state constitutional adjudication); *State v. Gunwall*, 720 P.2d 808, 812–13 (Wash. 1986) (articulating six divergence criteria); Robin B. Johansen, Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution*, 29 Stan. L. Rev. 297, 298 (1977) (identifying "four factors a state supreme court should consider in making a principled interpretation of the state constitution").

provisions." *Id.* He observed that a difference in wording would provide the best argument for a difference in interpretation. *Id.* Faced with a "substantively identical" provision, he concluded that "[n]othing in the language itself indicates that the framers intended the state prohibition against unreasonable searches and seizures to be broader than the federal prohibition in the Fourth Amendment." *Id.* at 442. He ended with an appropriate cautionary admonition regarding independent state constitutional adjudication:

> In summary, to ensure that our constitutional jurisprudence develops in a methodical and authentic way, we must be guided by a set of interpretive principles. Authoritative and neutral analysis of South Dakota's Constitution cannot advance from episodic and reactionary borrowing of results from other state courts. Litigants must demonstrate that the text, history, or purpose of a South Dakota constitutional provision supports a different interpretation from the corresponding federal provision. If there is any place where the principle of judicial restraint ought to deter us, it is in the area of constitutional divergence. As Professors Whitebread and Slobogin warn, "*wide-open state [court] activism runs counter to judicial decisionmaking goals of clarity, efficiency, and principled reasoning. . . . [Such activism] is bad policy because it promotes uncertainty, questionable duplication of review, and result-oriented jurisprudence.*" These words offer valid cautions, but, in the right case, they should not discourage us from a vigorous analysis of South Dakota's Constitution.

*Id.* at 445 (emphasis added) (citation omitted). The foregoing admonition applies with equal force here.

Our court likewise should not depart from well-settled federal precedent without good reason. Justice Konenkamp's "neutral set of divergence standards" provides guidance to those who would advocate construing an Iowa constitutional provision differently than its federal counterpart. Such standards are missing in the majority's analysis today and in *Ochoa*, *Pals*, and *Baldon*. Those standards warrant no departure from *Knights* and its Fourth Amendment progeny in this case.

**III.  Conclusion.**

For generations, in countless other decisions, our court has construed the search and seizure provision in the Iowa Bill of Rights to be of the same purpose, scope, and effect as the Fourth Amendment.  It is this long-standing tradition of adherence to settled federal precedent from which our court has diverged, sporadically, since *Ochoa* was decided in December 2010.  We do our job best as a state supreme court by applying our own pre-*Ochoa* jurisprudence, which holds article I, section 8 of the Iowa Constitution has the same meaning as the Fourth Amendment.    We should return to relying on well-settled federal precedent on search and seizure issues.

For these reasons, and the reasons set forth in the dissents of Justices Mansfield and Zager, I would affirm the decision of the court of appeals and judgment of the district court upholding the search of Short's residence.

Mansfield, J., joins this dissent.

**MANSFIELD, Justice (dissenting).**

I join in the dissents of Justice Waterman and Justice Zager, but write separately to respond to the majority's ten "[e]stablished [p]rinciples of [i]ndependent [s]tate [c]onstitutional [l]aw." As I will attempt to show, these are not established principles. I will respond to the majority's ten points in order.

1. The majority begins its list of ten principles by asserting that its constitutional approach announced in 2010 has been "thoroughly explored" in a majority opinion released in 2011 and a special concurrence released in 2013. *See State v. Baldon*, 829 N.W.2d 785, 803 (Iowa 2013) (Appel, J., concurring specially); *State v. Pals*, 805 N.W.2d 767 (Iowa 2011); *State v. Ochoa*, 792 N.W.2d 260 (Iowa 2010). That should end the debate, the majority suggests, notwithstanding the clear disconnect between this court's 2010–2014 approach to search and seizure and the approach it took for decades before 2010.

I respectfully disagree. Actual decisions are binding and can have stare decisis effect, but is a philosophical approach binding? Is a statement by the Iowa Supreme Court in one case that it gives no weight to United States Supreme Court interpretations of the same constitutional language binding for all future cases? I think not. Could four Justices of the Supreme Court bind this court in the future to follow "original intent," "legal realism," or "economic analysis of the law"? I doubt it.

Furthermore, the State of Iowa has directly put at issue the approach to be taken in this state constitutional search and seizure case. While the State is not seeking to overturn the *Ochoa, Pals,* or *Baldon* decisions today, it has asked this court to give deference to United States

Supreme Court precedent. In particular, the State asks this court to follow *United States v. Knights*, 534 U.S. 112, 122, 122 S. Ct. 587, 593, 151 L. Ed. 2d 497, 507 (2001), in which that Court unanimously upheld a probation search similar to the one here. The State concludes in its brief, "Short has failed to produce sufficient justification for this Court to swim upstream against the well-accepted decision in *Knights*."

Thus, we need to decide whether we give deference to *Knights* or not. I believe we should.

2. The majority's second principle is that state constitutions were "the original protectors of individual rights." Here, all the majority is really saying is that America had states before it had a national government. Of course that is true. But what is the relevance of that point when it comes to interpreting the Iowa Constitution of 1857?

Our state did not come before the United States. We became a state over fifty years after the Federal Bill of Rights was ratified. Our framers adopted article I, section 8, not because it resembled something in some other state's colonial era constitution, but *because it was already the federal constitutional provision.* So if timing and sources matter, we should be guided by interpretations of the Fourth Amendment.

3. Principle three is that there was a strong emphasis on individual rights in the Iowa Constitution. To support this contention, the majority cites us to the statements made by George Ells during the debates over the Iowa Constitution. We should look at Ells's actual words, not the majority's paraphrasing.

After offering an amendment that was adopted by the convention to include a counterpart to the Due Process Clause in the Iowa Constitution, Ells said:

> I am one of that class of men who believe that that clause in the Constitution of the United States, has been violated by the Congress of this nation in such a manner that we would be justified at this time, either by legal enactment or by incorporating provisions into our constitution, in protecting ourselves from its operation. I regard the Fugitive Slave Law as unconstitutional, because it does not give to man the right to defend his life and liberty by "due process of law." In this opinion, I expect to be at variance with my friend from Lee, [Mr. Johnston,] and those who act with him. Now, the committee who have offered the amendment to this second section, did so from a desire that the Bill of Rights in the Constitution of this State, should be *as strong, in this respect, as the Constitution of the United States*. We have seen, Mr. Chairman, that Constitution violated again and again by the dominant party in the land, which rides rough-shod over the necks of freemen. In common with a large majority of the people of this State, I desire to see our constitution contain every guarantee for freedom that words can express. If the words "due process of law," shall in time be recognized by our judicial tribunals to mean what they really do mean, "*that no person shall be deprived of life, liberty or property, without a legal proceeding based upon the principles of the common law, and the constitution of the United States*"—that every man, when his life or liberty are imperilled, shall have the right to be tried by a jury of his countrymen. Then, sir, that infamous Fugitive Slave Law will become a nullity, and the American people will trample its odious enactments in the dust.

1 *The Debates of the Constitutional Convention of the State of Iowa* 101–02 (W. Blair Lord rep., 1857) (emphasis added), *available at* http://www.statelibraryofiowa.org/services/collections/law-library/ia const/iaconstdebates.

Reading Ells's statement in its entirety, rather than the majority's shorthand version, he was clearly urging his colleagues to include a due process clause in the Iowa Constitution so that it would have the same degree of protections against a rampant majority as the United States Constitution provided. He was not proposing a due process clause so

that Iowa's courts could go on future solo missions to find new interpretations of constitutional provisions with established meanings.[28]

*McClure v. Owen* is another example of the majority's overenthusiastic reading of nineteenth-century sources. *See* 26 Iowa 243 (1868). The majority cites *McClure* as an early recognition that Iowa can "construe state constitutional provisions free from federal precedent." But *McClure* had nothing to do with the proposition we are discussing today. The constitutional provisions being interpreted in *McClure* were Iowa constitutional provisions with no counterpart in the United States Constitution. *See id.* at 244.

Thus, in *McClure*, the court noted the United States Supreme Court had refused to follow our court's most recent interpretation on a question of the authority of municipal corporations under the Iowa Constitution. *Id.* at 253 (citing *Gelpcke v. City of Dubuque*, 68 U.S. 175, 206, 17 L. Ed. 520, 524 (1863)). This involved Iowa-specific provisions with *no* parallel in the United States Constitution. *See generally Gelpcke*, 68 U.S. at 204, 17 L. Ed. at 525 (setting forth provisions of the Iowa Constitution).

Along the same lines, Iowans should justly be proud of several landmark decisions of our court, including *Clark v. Board of Directors*, 24 Iowa 266 (1868), and *Coger v. Northwestern Union Packet Co.*, 37 Iowa 145 (1873). This court did not decide *Clark* and *Coger*, however, by

---

[28]The majority notes that "during this time period the United States Supreme Court upheld the Fugitive Slave Law from constitutional attack." I do not follow where the majority is heading with this point because the United States Supreme Court did not uphold the Fugitive Slave Law until two years *after* Ells's statement. *See Ableman v. Booth*, 62 U.S. 506, 526, 16 L. Ed. 169, 177 (1859) ("[T]he act of Congress commonly called the fugitive slave law is . . . fully authorized by the Constitution of the United States."). Ells would not have known what the United States Supreme Court was going to do two years after he spoke.

disregarding contemporaneous federal interpretations of counterpart provisions of the United States Constitution. In *Clark,* this court held a provision of the 1857 Iowa Constitution providing " 'for the education of *all of the youths of the State* through a system of common schools' " required a local school board to integrate its schools. 24 Iowa at 271 (quoting Iowa Const. art. IX, div. 1, § 12 (emphasis added)). The *Clark* court reached this conclusion without citing or discussing any federal precedent or the United States Constitution. *See generally id.* at 269–77. Nor is our court's decision in *Coger* an example of divergence from United States Supreme Court precedent in interpreting a parallel provision of the Iowa Constitution. *Coger* presciently held that a "woman of color" was entitled to equal accommodations under the Equal Protection Clause of the United States Constitution without finding any broader rights under the Iowa Constitution. *See* 37 Iowa at 153, 155–57. These decisions are rightly hailed today, but they should not be cited as justification for what this court is doing now in search and seizure law.

Also somewhat extravagant, in my view, is the majority's claim that our framers' use of a semicolon rather than a comma in article I, section 8 indicates "the framers [of the Iowa Constitution] believed that there was a relationship between the reasonableness clause and the warrant clause." Let's review the federal and the Iowa provisions. First, the Fourth Amendment:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Now article I, section 8:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.

I do not think one can use this inconsequential punctuation difference to justify a different interpretation of article I, section 8.

Notably, in *Ochoa* the court merely noted this difference. *See* 792 N.W.2d at 268–69. Now it elevates this difference into a statement of the 1857 framers' intent.

4. The majority's next principle is that the incorporation of federal constitutional guarantees against the states has led to "a tendency for the United States Supreme Court to dilute the substance of the rights." The Fourth Amendment, in the view of the majority, was watered down once it became incorporated against the states under the Fourteenth Amendment. The majority decries the United States Supreme Court having replaced clear requirements with "vague notions of reasonableness."

People can decide for themselves whether this court's recent article I, section 8 decisions have led to greater clarity and predictability. In my view, a rule that would sustain searches based on reasonable suspicion of probationers who consented to such searches as a condition of probation is straightforward and easy to apply. It was sustained unanimously by the United States Supreme Court in *Knights*. *See* 534 U.S. at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 507. If *Knights* resulted in a watering down of constitutional protections, that observation

escaped every member of the Supreme Court, including Justices Stevens, Souter, Ginsburg, and Breyer.

And if *Knights* really involved some deviation from historic Fourth Amendment principles, one would expect some other state court, somewhere, to have voiced disagreement. But the majority cites no example of a state court that has declined to follow *Knights* under its own constitution. To the contrary, just next door, in *State v. Anderson,* the Minnesota Supreme Court unanimously declined an invitation to depart from *Knights* under the Minnesota Constitution. 733 N.W.2d 128, 140 (Minn. 2007).

In this unanimous decision, the Minnesota Supreme Court observed:

> The Supreme Court's decision in *Knights* does not appear to be a sharp or radical departure from its previous decisions or a retrenchment on its Fourth Amendment jurisprudence with respect to probation searches. Moreover, we are not convinced that federal precedent inadequately protects our citizens' basic rights and liberties. Accordingly, we decline Anderson's invitation to deem the search of his residence unreasonable under the Minnesota Constitution.

*Id.*

Notably, Minnesota's counterpart to the Fourth Amendment is worded quite similarly to Iowa's article I, section 8, including the presence of a semicolon between "violated" and "and." *Compare* Minn. Const. art. I, § 10, *with* Iowa Const. art. I, § 8.

5. In principle number five, the majority contends that "lockstepping state law to federal precedents is not a humble or minimalist approach, but is an aggressive and maximalist approach to the law." This is a straw man attack because no member of this court has questioned its authority to independently interpret Iowa's Constitution. The issue is one of deference—do we exercise our

substantial authority "in the search and seizure area with a degree of self-imposed modesty and restraint"? *See Baldon*, 829 N.W.2d at 843 (Mansfield, J., dissenting).

I do not understand the basis for the viewpoint that we are being "humble" when we reject precedents from the United States Supreme Court and state supreme courts around the country and conclude, by ourselves, that a warrant is always necessary to search a home absent exigent circumstances (or maybe consent).

The logic of the majority's opinion would also require a warrant before searching the home of a person who is under house arrest. Does that make sense?

The implication of the majority's position is that one is being "humble" when one finds new constitutional rights and "maximalist" when one does not. This is certainly open to question. In fact, if we look at what transpired, tragically, between *In re Ralph*, 1 Morris 1 (Iowa 1839), and *Dred Scott v. Sanford*, 60 U.S. (19 How.) 393, 15 L. Ed. 691 (1857), we have a statutory interpretation of an act of Congress (*In re Ralph*) being overridden when the act was declared unconstitutional on the ground that it violated some previously undiscovered constitutional interpretation (*Dred Scott*).

Both cases involved a slave who entered free territory. In *In re Ralph*, the slave had entered Iowa with the consent of his master, albeit on condition that he pay a certain amount to his master "as the price of his freedom." 1 Morris at 6. The Supreme Court of the Territory of Iowa, interpreting the Missouri Compromise of 1820, held that because Iowa was a free territory, Ralph became free once he entered Iowa with "the understanding of all parties that the slave was going to become a permanent resident of the free state or territory." *Id.*

In *Dred Scott*, the United States Supreme Court held that Dred Scott could not obtain his freedom, despite the fact that he had been brought by his master into free territory voluntarily and had spent considerable time there. 60 U.S. (19 How.) at 454, 15 L. Ed. at 721. In so ruling, the Court struck down as unconstitutional the same Missouri Compromise on which *In re Ralph* had relied:

> [A]n act of Congress which deprives a citizen of the United States of his liberty or property, merely because he came himself or brought his property into a particular Territory of the United States, and who had committed no offence against the laws, could hardly be dignified with the name of due process of law.
>
> . . . .
>
> Upon these considerations, it is the opinion of the court that the act of Congress which prohibited a citizen from holding and owning property of this kind in the territory of the United States north of the line therein mentioned, is not warranted by the Constitution, and is therefore void; and that neither Dred Scott himself, nor any of his family, were made free by being carried into this territory; even if they had been carried there by the owner, with the intention of becoming a permanent resident.

*Id.* at 450–52, 15 L. Ed. at 719–20.

In my view, you can only draw the lesson from *In re Ralph* and *Dred Scott* that courts should be constitutional innovators if you disregard what those decisions actually say.

Since the majority accuses the dissenters of utilizing "what Professor Adrian Vermeule refers to as a 'precommitment device,'" it is worth reading the relevant section of Professor Vermeule's article. Here it is:

> On this picture, free-speech doctrine is partly a judicial precommitment device and partly a prophylactic rule. It is a precommitment device insofar as judges devising free-speech doctrine at time 1 worry that at time 2 their own cognition or decision-making processes will be affected by some overpowering influence. (In the free-speech context, the

influence might be the social exigency that provoked the political suppression of speech, or the offensiveness of the speech itself.) So the judges restrict their choices at time 2 by announcing, at time 1, a rule that will prevent their future selves from surrendering to the passions of the moment. It is a prophylactic device insofar as judges choosing free-speech rules at time 1 worry, not about their own future cognition, but about the cognition of other judges deciding future cases, either judges of subordinate courts or future members of the very court that devised the rule at time 1. Here the judges formulate legal doctrine in order to restrict other judges' future choices.

Adrian Vermeule, *The Judicial Power in the State (and Federal) Courts,* 2000 Sup. Ct. Rev. 357, 366–67 (2000) (footnotes omitted). I do not know what this verbiage means but I am confident it will not help me in deciding whether the search of Mr. Short's residence in this case was lawful.

6. Next, the majority contends that there is a "double irony" in giving deference to United States Supreme Court interpretations of the Fourth Amendment. I will begin with the majority's first irony. The first irony is that at a time when "societies advocate renewal of federalism by returning power to the state, it is ironic that an exception is made for state judicial power."

I am not aware of any clamoring by society to give judges more power to strike down laws. The federalism movement generally focuses on two goals: (1) restraining the power of the federal government; and (2) giving states a greater ability to decide their own destiny. Expansive, idiosyncratic interpretation of article I, section 8 serves neither goal. As I pointed out in *Baldon,* federal officials are not bound by article I, section 8, and if the evidence from Short's house in this case had been used to prosecute Short on a federal charge, he would have no recourse. *See Baldon,* 829 N.W.2d at 842 (Mansfield, J., dissenting). So, whatever one

may say about the majority's search and seizure jurisprudence, it is not a bulwark against federal power.

Nor is the majority giving Iowans a greater opportunity to choose their own destiny. Rather, it is overriding a determination by Iowa's elected branches that searches, upon reasonable suspicion of persons who have been sentenced to probation, are an appropriate way to rehabilitate the defendant and protect the community. *See, e.g.*, Iowa Code § 907.6 (2011) ("Probationers are subject to the conditions established by the judicial district department of correctional services subject to the approval of the court, and any additional reasonable conditions which the court or district department may impose to promote rehabilitation of the defendant or protection of the community.").

The majority's second irony runs something like this: (1) the United States Supreme Court's jurisprudence is confusing and not uniform, and (2) the Iowa Supreme Court will be able to straighten things out and provide uniformity. I think this overestimates the wisdom of this court. Justice Scalia, whose observation about "inconsistent jurisprudence" is quoted with approval by the majority, advances the view that we should go back to 1791. *See California v. Acevedo*, 500 U.S. 565, 583, 111 S. Ct. 1982, 1993, 114 L. Ed. 2d 619, 636 (1991) (Scalia, J., concurring in judgment). If a warrant was required for a kind of search then, it should be required for the same kind of search now. One can quibble with that approach, but it is a coherent doctrine. What is the majority's guiding principle other than a general hostility to warrantless searches?

7. The majority then goes on to say that any lack of uniformity between federal and Iowa search and seizure law "does not create a

substantial burden on professional law enforcement." I question this statement.

I do not agree that all court decisions are perfect and equal. Some court decisions create needless burdens because they have incomplete reasoning, leave questions unanswered, contain unneeded dicta, or threaten to go in a direction without actually going there. No judge should ever assume that applying her or his decision will be an easy task, even for professionals.

But this gets back to my original point. When we choose to follow Federal Fourth Amendment precedent, we are following standards that have already been put into practice around the country. Those decisions have been vetted and not only by their authors. So the unanticipated consequences of those decisions, to a large degree, have already emerged and been addressed by subsequent decisions. This is the whole idea of precedent.[29]

---

[29]The majority claims to be following this court's own precedent of *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970). At the risk of repeating what my colleagues Justice Waterman and Justice Zager have said in their dissents in the present case and what I said in my *Baldon* dissent, *Cullison* was a Fourth Amendment case. It was criticized at the time for being a misapplication of the Fourth Amendment, *see* J. Richard Bland, Case Note, 19 Drake L. Rev. 481, 481 (1970), and is no longer good law because its view of the Fourth Amendment has been superseded by subsequent United States Supreme Court decisions.

In *Ochoa*, this court twice acknowledged that *Cullison* was a Fourth Amendment decision before claiming otherwise at the end of the opinion. First the court said, "[T]his court's decision in [*Cullison*] . . . held that a parolee did not surrender his Fourth Amendment rights by virtue of his status as a parolee." *Ochoa*, 792 N.W.2d at 264. And then the court said, "Rejecting the stripping and diluting approaches, the [*Cullison*] majority held that a parolee is afforded the same rights as any other person under the Fourth Amendment." *Id.* at 286. Toward the end of its opinion the court recharacterized *Cullison* as having "held that the warrant and probable cause requirements of article I, section 8 are fully applicable to searches of parolees' homes." *Id.* at 287.

As noted by Justice Zager, those who would view *Cullison* as a decision based on article I, section 8 face the considerable obstacle that the decision *never mentioned* article I, section 8.

When we embark on our own path, we do not know what the consequences will be. For example, will the majority's ruling in this case lead to fewer grants of probation and a higher rate of incarceration? I do not think the majority knows.

The majority also asserts that its approach will not burden attorneys because the work required to develop state constitutional law arguments is "not overwhelming." Here, I agree with the majority. Even when the briefs do not contain arguments under the Iowa Constitution, this court has been repeatedly willing to make the arguments for the litigants and decide them. In fact, it almost seems as if a lawyer in this court would be wiser *not* to develop an Iowa constitutional argument. A litigant who actually writes up an argument generally has to stand or fall on that argument, but a litigant who merely refers to the Iowa Constitution in passing gets the benefit of whatever theory this court decides to develop.

8. The majority's eighth principle is that it is better not to develop a set of "criteria" for when this court will deviate from federal precedent. The majority says we will simply exercise "our best, independent judgment of the proper parameters of state constitutional commands."

I respectfully suggest we owe the citizens of the state a bit more than this. We owe them our best independent judgment, to be sure, but that independent judgment should be tempered with respect for those who came before us and grappled with the same issues.

9. The majority's ninth principle is that when we are dealing with parallel state and federal constitutional provisions and parties do not advocate a separate Iowa constitutional standard, this court will generally apply the standard set forth in federal constitutional caselaw, but reserve the right to do so more stringently. *See, e.g., State v. Kooima,*

833 N.W.2d 202, 206 (Iowa 2013); *State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013). I am puzzled why the majority mentions this alleged principle here because it is not following it today.

Needless to say, this approach, amorphous though it may be, involves at least *some* degree of deference to federal precedent.

The majority's *Ochoa-Pals-Baldon* approach, however, is different. It gives *no* weight to federal precedent. According to the majority today, "we reach our decisions independently of federal constitutional analysis."

Thus, in *Ochoa*, this court said, "The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision." 792 N.W.2d at 267. We said so even though the defendant had not urged a separate interpretation of article I, section 8. *See Baldon*, 829 N.W.2d at 837 (Mansfield, J., dissenting) (noting that Ochoa had not asserted that the state constitutional provision should be interpreted differently than the Fourth Amendment). In *Pals*, we again said that United States Supreme Court precedent was entitled to no deference, even though the defendant had not urged a different standard. *See* 805 N.W.2d at 771 (stating the issue presented); *see also id.* at 784–85 (Waterman, J., dissenting) (noting Pals never argued the Iowa Constitution provided broader protection than the Fourth Amendment).

In summary, if you read *Ochoa, Pals, Baldon*, and today's opinion, federal constitutional precedent gets no deference regardless of what the defendant argues. But at other times, even when the case involves article I, section 8, this court generally follows the federal framework in the absence of separate argument. *See, e.g., Kooima*, 833 N.W.2d at 206; *Tyler*, 830 N.W.2d at 291–92. Hence, in my view, the majority's ninth principle undermines the overall concept it is intended to support.

10. In its tenth and final principle, the majority again claims the mantle of precedent for itself. It says that it is simply reaffirming *State v. Cline*, 617 N.W.2d 277 (Iowa 2000), *Ochoa, Pals,* and *Baldon.* I disagree that *Cline* should be categorized with *Ochoa, Pals,* and *Baldon* for reasons I have previously discussed. *Baldon*, 829 N.W.2d at 838–39 (Mansfield, J., dissenting) ("[*Cline*] was about remedy, not right."). *Cline* observed that the Fourth Amendment and article I, section 8 "are generally deemed to be identical, in scope, import, and purpose" and applied the same analysis under both provisions to the question of whether a violation had occurred. 617 N.W.2d at 281–82 (citation and internal quotation marks omitted).

The tenth principle is really just the first principle making an encore. The majority believes it is settled law (since December 2010) that United States Supreme Court search and seizure decisions are entitled to no more deference than a law review article. I continue to question that proposition and therefore file this dissent.

Waterman and Zager, JJ., join this dissent.

**ZAGER, Justice (dissenting).**

I respectfully dissent. I believe the search in this case was constitutional under both the State and Federal Constitutions. I disagree with the majority's framing of the issue and the majority's reliance on *State v. Cullison*, 173 N.W.2d 533 (Iowa 1970), as controlling precedent on this issue. Though *Cullison* has some minimal relevance to the issue presented, I would interpret our constitution according to developments in search and seizure jurisprudence since that time and according to the particular circumstances of this case. Under that analysis, I would hold the search in this case was constitutional.

The majority curiously sidesteps the true issue in this case, which was unanswered in *Ochoa* and *Baldon*. In doing so, the majority departs from the incrementalist approach we have recently taken in search and seizure cases under the Iowa Constitution. *See State v. Kern*, 831 N.W.2d 149, 170 (Iowa 2013) (declining to consider whether the special-needs doctrine was viable under article I, section 8 in the absence of facts "to support an application of the doctrine in a way that reveals its purpose and rationale"); *State v. Baldon*, 829 N.W.2d 785, 800 (Iowa 2013) ("The narrow question before us is whether the government can conduct the search based solely on consent required to be given by parolees as a condition of release from prison."); *State v. Ochoa*, 792 N.W.2d 260, 291 (Iowa 2010) (emphasizing the broader questions being left unanswered). Under this approach, we have decided search and seizure cases according to the facts presented, not according to a selective reformulation of those facts. *See Kern*, 831 N.W.2d at 170; *see also Baldon*, 829 N.W.2d at 801 ("We have no occasion in this case to consider other grounds available to the State to justify such a search.").

The steps taken in these cases may have been small, but at least they have been based on the unique circumstances of the cases before the court.

When he was placed on probation, Short executed a probation agreement under which he consented to a search of his person, property, place of residence, vehicle, and personal effects at anytime, with or without a search warrant, "by any probation officer or law enforcement officer *having reasonable grounds to believe* contraband is present." (Emphasis added.) The district court in its order referred to this language as a "waiver." There is no dispute that the probation agreement contained consent-to-search language.

In addition, the district court found the search of Lorenzen's apartment was based upon probable cause, even after acknowledging the search warrant itself was defective. Short never challenged this probable-cause finding for the search. Nevertheless, the majority characterizes the officers' individualized suspicion as only "reasonable suspicion." I believe, in light of the district court's undisputed finding of probable cause, coupled with the consent language of the probation agreement and our caselaw, we should address whether under the Federal and Iowa Constitutions, general law enforcement authorities may constitutionally conduct a warrantless search of a probationer based on the individual's waiver of his search and seizure rights and *probable cause.* [30] The majority elects to avoid the consent issue altogether, critically diminishing its persuasiveness and effect.

---

[30]The majority is correct that the State did not use the word "consent" in its brief. The State did, however, devote significant discussion to Short's "waiver" of his search and seizure rights executed as part of his probation agreement. The district court did the same, as did the county attorney and Short's trial attorney. As the Seventh Circuit Court of Appeals has noted in a similar case, "Constitutional rights like

The flaws of the majority's analysis do not end with the framing of the issue. In relying on *Cullison*, the majority asserts "[t]here can be no question that *Cullison* involves a holding under the Iowa Constitution." While this is true, *Cullison* does not mention article I, section 8, and it clearly was not decided on this basis. A tradition carrying through this court's history, and continuing down to the present, is for this court, when interpreting a provision of the Iowa Constitution, to quote the provision, *see, e.g., Ochoa*, 792 N.W.2d at 268 (quoting article I, section 8); *State v. Cline*, 617 N.W.2d 277, 281 n.2 (Iowa 2000) (same), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001); *Lee Enters., Inc. v. Iowa State Tax Comm'n*, 162 N.W.2d 730, 736 (Iowa 1968) (quoting article III, section 29); *Sperry & Hutchinson Co. v. Hoegh*, 246 Iowa 9, 18–19, 65 N.W.2d 410, 416 (1954) (quoting article I, section 6), or to state the rule of the provision, *see, e.g., Cline*, 617 N.W.2d at 281 (paraphrasing article I, section 8); *State v. Carter*, 161 N.W.2d 722, 724 (Iowa 1968) (paraphrasing article I, section 8); *State v. Cameron*, 254 Iowa 505, 511, 117 N.W.2d 816, 819 (1962) (paraphrasing article I, section 10), *overruled on other grounds by State v. Bowers*, 661 N.W.2d 536, 543 (Iowa 2003). If not directly quoting or paraphrasing the provision, at least it has been mentioned. *See, e.g., State v. Tonn*, 195 Iowa 94, 103, 191 N.W. 530, 534 (1923) (mentioning the identity between

_____

other rights can be waived, provided that the waiver is knowing and intelligent, as it was here." *United States v. Barnett*, 415 F.3d 690, 691 (7th Cir. 2005). Thus, despite the absence of the word "consent," the issue of Short's waiver of his search and seizure rights is highly relevant and properly considered as part of the issue before this court. It is clearly erroneous not to discuss consent and waiver in deciding this case.

Also, as is discussed later in this opinion, almost the entirety of the majority opinion in *Baldon* analyzes the parole agreement from the viewpoint of consent and the voluntariness of the consent-to-search agreement. The State also argued at oral argument that it was relying on the consent provision of the probation agreement itself in support of the search.

the wording of article I, section 8 and the wording of the Fourth Amendment), *abrogated by Cline*, 617 N.W.2d at 291.[31] If *Cullison* was interpreting article I, section 8, as the majority claims, then the case is a distinct and inexplicable oddity. For *Cullison* does not quote article I, section 8, and neither does it state the provision's rule. Nowhere does *Cullison* even mention article I, section 8 in either the majority opinion or dissents.

Most conspicuous in *Cullison* is the analogous federal constitutional provision, the Fourth Amendment. That constitutional provision is quoted once in its entirety. *See Cullison,* 173 N.W.2d at 538 (quoting *Camara v. Mun. Ct.,* 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930, 935 (1967)). Additional references to the Fourth Amendment are also scattered throughout. *See, e.g., id.* (noting that, "in the field of administrative processes involving health and safety of the people, Fourth Amendment rights are now fully respected"). Indeed, the court mentioned the Fourth Amendment more than ten times in an analysis that spans fewer than seven pages in the North Western Reporter. *See, e.g., id.* at 536 ("The foregoing discloses some tribunals . . . , Strip a parolee of all Fourth Amendment rights while others Dilute them."). In addition to those references to the Fourth Amendment, the court referred to the Fourteenth Amendment. The court noted that "the Fourth Amendment is enforceable against the States through the Fourteenth Amendment." *Id.* at 538. Were the court interpreting the Iowa Constitution, this statement would have been superfluous. Both

---

[31]In keeping with this tradition, the majority today quotes article I, section 8 in full. In addition, the majority also mentions article I, section 8 more than thirty times. There can be no doubt the court in this case is interpreting article I, section 8.

the incorporation doctrine and the Fourteenth Amendment are irrelevant to the enforceability of the Iowa Constitution's repository of protections.[32]

Also, while the resolution of the issue in *Cullison* caused dissension among the court's members, it seems they were able to agree on one important point: the constitutional provision the court was interpreting. Both dissents, like the majority opinion, mentioned the Fourth Amendment. *See id.* at 542 (Larson, J., dissenting) ("[T]he protection afforded by the Fourth Amendment to the United States Constitution is only against unreasonable searches . . . ."); *id.* at 544 (Snell, J., dissenting) (discussing Fourth Amendment search and seizure protections). And, like the majority opinion, neither dissent mentioned article I, section 8. Thus, *Cullison* was a 5–4 decision that, in addition to a majority opinion, consisted of two dissenting opinions, and no justice even mentioned article I, section 8 of the Iowa Constitution.

Yet, in spite of the invisibility of article I, section 8 in *Cullison*, the majority in this case unequivocally asserts the case's holding is under that provision. I would draw the opposite conclusion in the face of the unmistakable, explicit indications to the contrary. *Cullison* is without question not a holding under article I, section 8 of the Iowa Constitution. That being so, I would conclude *Cullison* is not substantive authority

---

[32]As the majority notes, the Iowa Constitution does not go unmentioned in *Cullison*. *See* 173 N.W.2d at 537 (setting forth the text of article II, section 5 of the Iowa Constitution). The Iowa constitutional provision to which the *Cullison* court refers is, however, not article I, section 8, but rather article II, section 5, *see id.*, which strips voting rights from individuals convicted of infamous crimes, *see generally Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845 (Iowa 2014). Thus, *Cullison* discusses three constitutional provisions: the Fourth Amendment, its necessary constitutional companion, the Fourteenth Amendment, and article II, section 5 of the Iowa Constitution. According to the majority, *Cullison*'s holding is not under any of these provisions, odd as it may seem.

under article I, section 8, and we are not bound to follow *Cullison* in this case.

Even if one were to concede somehow that *Cullison* was interpreting article I, section 8 of the Iowa Constitution, there are numerous reasons not to apply *Cullison*'s holding to this case. *See State v. Bruce*, 795 N.W.2d 1, 3 (Iowa 2011) (noting despite the principle of stare decisis we must reconsider unsound previous decisions). First, we have since *Cullison* held that when interpreting this state's constitution we rely on federal cases interpreting the Federal Constitution only to the extent that the reasoning of those cases persuades us. *See Ochoa*, 792 N.W.2d at 267. *Cullison* not only relied almost completely on federal cases while doing little analysis to establish their persuasiveness, but also hinted that, if the United States Supreme Court had addressed the issue presented in the case, it would have deferred to that tribunal's interpretation. *See* 173 N.W.2d at 535. Neither approach is a permissible method of resolving cases under our state's organic document. *See Ochoa*, 792 N.W.2d at 267; *Cline*, 617 N.W.2d at 285. An earlier case's inconsistency with our established current decisional methods almost compels us to reconsider the case's continued viability.

There are also factual and legal distinctions in *Cullison* that compel us to reconsider its continued validity. *Cullison*'s conclusion was based in part on reasoning that is now questionable in light of subsequent developments. *Cullison* cited a bevy of federal cases and secondary authorities for the proposition a parolee's right to equal protection might be violated by admitting evidence obtained in a warrantless search. *See* 173 N.W.2d at 538. Afterward, *Griffin v. Wisconsin, Samson v. California*, and *United States v. Knights* upheld warrantless searches of probationers and parolees. *See Samson*, 547 U.S. 843, 857, 126 S. Ct. 2193, 2202,

165 L. Ed. 2d 250, 262 (2006); *Knights*, 534 U.S. 112, 122, 122 S. Ct. 587, 593, 151 L. Ed. 2d 497, 507 (2001); *Griffin*, 483 U.S. 868, 876, 107 S. Ct. 3164, 3169–70, 97 L. Ed. 2d 709, 719 (1987). Clearly, the development of this area of the law shows this concern no longer serves as a basis for according offenders and law-abiding citizens equal search protections.

What makes *Cullison* most factually distinct is its lack of a consent-to-search provision in the parole agreement. This is a significant reason why *Cullison* is distinguishable from *Baldon*, in which such provisions became the focus of our analysis of consent and waiver. *See Baldon*, 829 N.W.2d at 800–01 (explaining the issue before the court). The majority chooses to ignore this important distinction without further analysis, which makes the opinion suspect. How can the majority decide this case without discussing the consent-to-search provision contained in Short's probation agreement?

Also, a parole officer performed the search in *Cullison*. *See* 173 N.W.2d at 539–40. We have previously drawn a distinction between searches performed by general law enforcement officers and searches performed by corrections authorities; the justifications for the two searches are different. *See Kern*, 831 N.W.2d at 171 (explaining a search of a parolee could not fit "the special-needs rubric" because "the search was significantly entangled with a larger law enforcement operation"); *Ochoa*, 792 N.W.2d at 289 (distinguishing searches performed by parole officers and searches performed by general law enforcement). In this case, general law enforcement performed the search. Thus, the reasons used to reject the parole search in *Cullison* are not importable to this case. This further diminishes the precedential versatility of *Cullison*.

Finally, the search in *Cullison*, as in *Ochoa*, was not supported by any level of individualized suspicion. *See Ochoa*, 792 N.W.2d at 288 (noting police officer performed search without any cause); *Cullison*, 173 N.W.2d at 540 (concluding the presearch reasonable or probable cause, essential to its validity, was not present there or established to support the search). Because there was not even an argument of reasonable suspicion or probable cause, the court did not have to consider whether some level of individualized suspicion might have constrained officer discretion to the point of making the warrantless search constitutionally permissible. Here, there was undisputed probable cause to support the search of Short's residence. *Cullison* thus presented a clearly distinguishable legal and factual scenario for the decision. For all these reasons, the broad principle espoused in *Cullison* is not appropriately applicable to the concrete facts presented by this case. *Cf. Kern*, 831 N.W.2d at 170 ("[T]he need for new legal doctrines is best considered when facts exist in a case to support an application of the doctrine in a way that reveals its purpose and rationale."). Therefore, I would conclude the broad holding adopted by the majority, relying on *Cullison*, that a search warrant is required under all circumstances for the search of any person's home, does not prevent us from treating probationers differently from law-abiding citizens for purposes of article I, section 8.

The determination that *Cullison*'s holding does not control the outcome of this case is just the starting point of the analysis. As the majority recognizes, we have repeatedly declined to dogmatically interpret article I, section 8 in the manner the United States Supreme Court interprets the Fourth Amendment, despite the obvious textual similarities between the two provisions. *See, e.g.*, *id.* at 170 (explaining the Fourth Amendment special-needs doctrine and concluding the

doctrine cannot be used "to make an end-run" around parolees' rights under the Iowa Constitution); *Ochoa*, 792 N.W.2d at 267 (holding searches and seizures are to be analyzed independently under the Iowa Constitution); *Cline*, 617 N.W.2d at 283 (declining "to adopt a good faith exception to Iowa's exclusionary rule under the Iowa Constitution"). Indeed, were we "to blindly follow federal precedent," we would be abdicating our "constitutional role in state government." *Cline*, 617 N.W.2d at 285.

That said, we have not discarded federal precedents from the panoply of available persuasive sources. In *Ochoa*, we declined to follow the Supreme Court's interpretation of the Fourth Amendment in *Samson*, taking instead a constitutional path under our own constitution that rejected warrantless searches of parolees "without any particularized suspicion or limitations to the scope of the search." *Ochoa*, 792 N.W.2d at 291; *see also Samson*, 547 U.S. at 857, 126 S. Ct. at 2202, 165 L. Ed. 2d at 262 (holding "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee"). In doing so, however, we emphasized the "respectful consideration" to which Supreme Court precedents are entitled. *See Ochoa*, 792 N.W.2d at 267; *cf. Baldon*, 829 N.W.2d at 790 ("In the final analysis, our right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law."). Keeping that in mind, I turn now to those precedents.

The Supreme Court has twice upheld warrantless searches of probationers under the Fourth Amendment. In *Griffin*, probation officers conducted a warrantless search of a probationer's home under a Wisconsin probation regulation that allowed warrantless searches based on "reasonable grounds." 483 U.S. at 871, 107 S. Ct. at 3167, 97

L. Ed. 2d at 715 (internal quotation marks omitted). The Supreme Court upheld the search, finding it justified by the special needs of Wisconsin's probation system. *See id.* at 876, 107 S. Ct. at 3169–70, 97 L. Ed. 2d at 719. Though representative of the Supreme Court's overall search and seizure jurisprudence, *Griffin*'s reasoning is distinguishable because police and sheriff's deputies, not probation officers, searched Short. *See* 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.10(c), at 542 (2012) [hereinafter Lafave, *Search and Seizure*] (observing a search performed by police officers could not pass muster under *Griffin*'s special-needs rationale).

Later, in *Knights*, the Supreme Court confronted an issue very similar to one before us in this case. 534 U.S. at 118, 122 S. Ct. at 591, 151 L. Ed. 2d at 504. There, a probationer, who was subject to a probation-search condition similar to that contained in Short's probation agreement, was suspected of vandalizing a business dozens of times. *See id.* at 114–15, 122 S. Ct. at 589, 151 L. Ed. 2d at 502–03. After a police detective observed suspicious activity outside the probationer's apartment and viewed suspicious objects in the vehicle of the probationer's accomplice, the detective, who knew of the probation-search condition, searched the probationer's apartment. *See id.* at 115, 122 S. Ct. at 589, 151 L. Ed. 2d at 503. The search uncovered evidence suggesting the probationer was the vandal, and he was arrested on federal criminal charges. *See id.* at 115–16, 122 S. Ct. at 589, 151 L. Ed. 2d at 503.

Knights moved to suppress the evidence obtained during the warrantless search of his apartment, arguing the search violated the Fourth Amendment. *See id.* at 116, 122 S. Ct. at 590, 151 L. Ed. 2d at 503. The district court found law enforcement had " 'reasonable

suspicion' to believe that Knights was involved with incendiary materials," but "nonetheless granted the motion to suppress on the ground that the search was for 'investigatory' rather than 'probationary' purposes." *See id.* The Court of Appeals for the Ninth Circuit affirmed, relying on its earlier decisions to hold the search condition in Knights's probation order " 'must be seen as limited to probation searches, and must stop short of investigation searches.' " *See id.* (quoting *United States v. Knights*, 219 F.3d 1138, 1142–43 (9th Cir. 2000)).

A unanimous Supreme Court reversed the ruling of the court of appeals. *See id.* at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 507 (reversing and remanding for further proceedings). The Supreme Court first noted that the Supreme Court of California had already upheld searches pursuant to this California probation condition " 'whether the purpose of the search is to monitor the probationer or to serve some other law enforcement purpose.' " *See id.* at 116, 122 S. Ct. at 590, 151 L. Ed. 2d at 503 (quoting *People v. Woods*, 981 P.2d 1019, 1027 (Cal. 1999), *cert. denied*, 529 U.S. 1023, 120 S. Ct. 1429, 146 L. Ed. 2d 319 (2000)).

The Supreme Court declined to base its holding on the "consent" rationale argued by the Government in cases such as *Zap v. United States*, 328 U.S. 624, 66 S. Ct. 1277, 90 L. Ed. 1477 (1946), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). *See Knights*, 534 U.S. at 118, 112 S. Ct. at 591, 151 L. Ed. 2d at 504–05. The Supreme Court found it did not need to decide whether acceptance of the search condition constituted consent in the *Schneckloth* sense of a complete waiver of Fourth Amendment rights. *See id.* at 118, 122 S. Ct. at 591, 151 L. Ed. 2d at 505. Instead, it concluded that the search of Knights's apartment was reasonable under its "general

Fourth Amendment approach of 'examining the totality of the circumstances,' " considering the probation search condition as being a salient circumstance. *Id.* (quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 347, 354 (1996)).

In rejecting Knights's argument, the Supreme Court focused on the balance of the individual's privacy interest and the government's legitimate interests. *See id.* at 119, 122 S. Ct. at 591, 151 L. Ed. 2d at 505. According to the Supreme Court, a probationer has a diminished expectation of privacy because probation is a criminal sanction that reasonably deprives an individual of freedoms ordinarily enjoyed by law-abiding citizens. *See id.* Further, the Court reasoned the government has a legitimate interest in supervising probationers, given their high probability of reoffending. *See id.* at 120–21, 122 S. Ct. at 592, 151 L. Ed. 2d at 506. After weighing the interests, the Supreme Court unanimously upheld the police detective's warrantless search of the probationer's apartment "supported by reasonable suspicion and authorized by a condition of probation." *Id.* at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 507.

The balancing approach the Supreme Court employed in *Knights* evaluates a search's reasonableness, "[t]he touchstone of the Fourth Amendment." *See id.* at 118–19, 122 S. Ct. at 591, 151 L. Ed. 2d at 505 (explaining how the Court tests for reasonableness); *see also Samson*, 547 U.S. at 848, 126 S. Ct. at 2197, 165 L. Ed. 2d at 256 (explaining the balancing test). The Supreme Court thus held that in its balancing of these various considerations, no more than reasonable suspicion is necessary to conduct a search of a probationer's house. *See Knights*, 534 U.S. at 121, 122 S. Ct. at 592, 151 L. Ed. 2d at 506 ("We hold that the balance of these considerations requires no more than reasonable

suspicion to conduct a search of this probationer's house."). Expressed another way, the Supreme Court held that "law-enforcement searches of probationers who have been informed of a search condition are permissible upon individualized suspicion of criminal behavior committed during the probationary period." *See id.* at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 507 (Souter, J., concurring).

There can be no reasonable dispute that *Knights* controls the determination whether the search of Short was constitutional under the Fourth Amendment to the Federal Constitution. Short was, like Knights, on probation, and he thus had a diminished expectation of privacy. *See id.* at 119, 122 S. Ct. at 591, 151 L. Ed. 2d at 505. Like the government in *Knights*, law enforcement in this case had a legitimate interest in supervising Short, as it does all probationers. *See id.* at 120, 122 S. Ct. at 592, 151 L. Ed. 2d at 506. Although the search in *Knights* was supported by reasonable suspicion, the search of Short was supported by probable cause, a higher level of suspicion. *See id.* at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 507. Given the relevant factual similarities and the higher level of suspicion that supported the search in this case, this search was incontestably reasonable and therefore permissible under the Fourth Amendment.

Of course, the conclusion reached by the United States Supreme Court under the Fourth Amendment does not resolve the question of the constitutionality of the search under article I, section 8 of the Iowa Constitution. As the majority notes, this court has resisted reasonableness as the measure of the constitutionality of a search under the Iowa Constitution. This, even though article I, section 8 mirrors the Federal Constitution regarding *unreasonable* seizures and searches, and this court's own statement that "[t]here is of course little doubt that, in

light of the nearly identical language in article I, section 8 and the Fourth Amendment, they were generally designed with the same scope, import, and purpose." *See Ochoa*, 792 N.W.2d at 267. This is also in spite of this court in *Cullison* explicitly looking to the factual situation in that case to determine the reasonableness of the extended search. *Cullison*, 173 N.W.2d at 539 ("We must look now to the factual situation here involved to determine *reasonableness* of the extended search . . . ." (Emphasis added.)). Completely diverging from this reasonableness approach we utilized in *Cullison* and emphasizing this court's traditional "warrant preference rule," we explained in *Ochoa* that the reasonableness clause of the Iowa Constitution "cannot be used to override the Warrant Clause" of the Iowa Constitution, lest the warrant clause be rendered surplusage. 792 N.W.2d at 269, 291; *see also id.* at 289 (criticizing the reasonableness test as "based not on the particular facts of a case but on larger policies bolstered by the purported needs of law enforcement"). The majority in this case wants to rely on *Cullison* and its analysis of the Fourth Amendment for determining the reasonableness of a search, but then disregards it in *Ochoa* and in this case. Instead, the majority utilizes *Cullison* for a broad holding for the necessity of search warrants under all circumstances when this really had nothing to do with the holding of the case. While I acknowledge in deciding whether to follow the Supreme Court's lead down any constitutional path this court is not bound to use the same analytic vehicle, there should at least be some analytical consistency.

Even our own authority leaves open the clear possibility of an exception to the warrant requirement under certain circumstances. *See Ochoa*, 792 N.W.2d at 287 (positing one way of resolving the issue in the case would be to accept a new exception to the warrant requirement).

We have repeatedly counseled that a warrantless search is unconstitutional unless it falls within an exception to the warrant requirement. *See, e.g.*, *State v. Lowe*, 812 N.W.2d 554, 568 (Iowa 2012) (explaining a warrantless search is unreasonable if it does not fall within a recognized exception); *Cline*, 617 N.W.2d at 282 ("A warrantless search . . . is per se unreasonable unless it falls within a recognized exception."). Our recognized exceptions to the warrant requirement include: (1) searches founded on probable cause coupled with exigent circumstances; (2) consent searches; (3) searches incident to arrest; (4) plain view searches; and (5) community-caretaking searches. *See Kern*, 831 N.W.2d at 172–73 (explaining the community-caretaking exception); *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011) (mentioning four exceptions to the warrant requirement); *State v. Naujoks*, 637 N.W.2d 101, 107 (Iowa 2001) (listing four "well-recognized exceptions to the warrant requirement"). The majority has expressed the opinion that the United States Supreme Court has "reconstructed," "reengineered," and "reconfigured" our search and seizure law resulting in the erosion of the protections afforded to individuals under the Fourth Amendment, and expressed an unwillingness to consider expanding any such exceptions under our Iowa Constitution. I think the failure to even consider well-recognized jurisprudence providing exceptions to the warrant requirement is wrong, and fails to uphold our duty to the citizens of Iowa.

As previously noted, one recognized exception to the warrant requirement under our constitution is consent. *State v. Reinier*, 628 N.W.2d 460, 464–65 (Iowa 2001). "Under this exception, the reasonableness requirement of the Search and Seizure Clause is satisfied when an individual consents to a search." *Baldon*, 829 N.W.2d at 791.

The consent waives an individual's rights under the Search and Seizure Clause.[33] *Id.*

In *Baldon,* we held a search provision contained in a parole agreement did not constitute consent to search under the Iowa Constitution. *See id.* at 803. But, it is important to understand the reasoning we relied on in reaching this conclusion. First, we set aside from consideration the cases dealing with probation agreements like those we are dealing with here. *See id.* at 795. We said probation agreements were of limited value in analyzing the consent issue because probationers "maintain a vastly superior bargaining power than parolees." *See id.* We noted with approval that many courts find that this vastly superior bargaining power of probationers "renders probation agreements consensual." *See id.*

Second, we noted that courts in other states had rejected consent derived from parole agreements as a theory for upholding searches of parolees because such a condition of parole was coercive and therefore involuntary. *See id.* at 796. It was this lack of free will or "no 'choice' " if a person wanted to be released from prison, which determined our decision on consent. *See id.* (quoting *Samson,* 547 U.S. at 863 n.4, 126 S. Ct. at 2206 n.4, 165 L. Ed. 2d at 267 n.4 (Stevens, J., dissenting)).

Finally, in *Baldon,* we surveyed the academic community and noted it had also recognized weaknesses in treating consent searches as voluntary searches in the context of a parole agreement. *See id.* at 797–800. We, therefore, decided *Baldon* based on the vastly unequal

---

[33]*Baldon* dealt with a consent provision in a parole agreement. *See* 829 N.W.2d at 789. As properly noted by the majority in that case, "[t]he United States Supreme Court has not addressed the specific question whether a parole agreement executed by a parolee constitutes valid consent to support a waiver of Fourth Amendment rights." *Id.* at 792.

bargaining power of the parolee, the coercive atmosphere of parole, and "no choice" concerning the search condition. We concluded "consent under these circumstances [was] not real," and we held Baldon's acceptance of the parole agreement did not constitute voluntary consent. *Id.* at 802–03.

Of course, there is no similarity between the search of Baldon and the search of Short. Here, we are dealing with a probation agreement. A majority of the courts across the nation that have considered the issue have concluded that "consent-search provisions in probation agreements constitute a waiver of search-and-seizure rights." *Id.* at 792–93 (citing cases); *see also, e.g., United States v. Barnett,* 415 F.3d 690, 691 (7th Cir. 2005) ("Constitutional rights like other rights can be waived, provided that the waiver is knowing and intelligent, as it was here."); *State v. Gawron,* 736 P.2d 1295, 1297 (Idaho 1987) (upholding warrantless search of probationer based on consent contained in probation agreement); *People v. Absher,* 950 N.E.2d 659, 668 (Ill. 2011) (upholding suspicionless search based on consent to a warrantless search). In contrast, only a few jurisdictions that have considered the issue have concluded probationers do not voluntarily consent to these search provisions. *See Baldon,* 829 N.W.2d at 793–94 (citing cases); *see also, e.g., Grubbs v. State,* 373 So. 2d 905, 910 (Fla. 1979) (holding a provision in probation agreement did not establish consent, but stating that "probationary status may be used as a factor to establish probable cause"). Clearly, as these cases show, consent or waiver provisions in probation agreements do not suffer from the same constitutional infirmities as found in *Baldon* in the parole context. Again, the majority avoids analyzing the consent issue, despite it being raised and argued by the parties.

While a majority of courts have upheld the waiver provisions against constitutional attack in the probation context, the analysis does not end on consent alone. The surrounding circumstances of the search itself must also be considered. In our leading parole search case of *Ochoa*, a police officer searched a parolee's motel room without any particularized suspicion and without a warrant. 792 N.W.2d at 262. Though we explicitly considered its possibility, we declined to create a new exception to the warrant requirement in the parole context. *See id.* at 287 ("We would, in essence, find that the facts of this case do not establish one of the . . . exceptions to the warrant requirement."). Instead, we held warrantless, suspicionless searches of parolees invalid "even under a reasonableness analysis." *Id.* In doing so, we noted our holding did not reach a few questions, including "whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search" by general law enforcement. *Id.* at 291. We also did not reach the question whether a warrant would even be necessary to limit law enforcement's authority to search offenders. *See id.* In other words, *Ochoa* left open the question whether a warrantless search of a parolee, supported by individualized suspicion, may be constitutionally valid, even when no other recognized warrant exception applied.

We set forth in *Ochoa* the primary considerations we used to resolve the issue in that case, intending that those considerations guide future cases. We traced events back to the English Crown's use of "general warrants," which were "open-ended as to time, place, and duration," but warrants nonetheless. *See id.* at 269. In one Eighteenth Century English case challenging a general warrant, an esteemed jurist "rejected arguments that general warrants were necessary to advance the

ends of government." *Id.* at 270. The judge quipped, "[I]f suspicion at large should be a ground of search, . . . whose home would be safe?" *Id.* (internal quotation marks omitted). This resistance to unrestrained, suspicionless warrants, expressed in English caselaw, was "well-known in the American colonies." *Id.*

The experience in the American colonies was similar, but the warrants issued under a different moniker. *See id.* at 271 (explaining writs of assistance "allowed general searches for customs violations"). "[W]rits of assistance" were broader than general warrants issued in England. *Id.* The writs "were not returnable after execution," continuing instead "to authorize general searches during the life of the sovereign." *Id.* Officials to whom the writs were issued possessed unlimited discretion. *See id.* Like their counterparts across the Atlantic, the colonists strongly opposed the open-ended authority conferred by the writs. *See id.*

We reasoned this historical background of the Fourth Amendment, and "by implication" article I, section 8 of the Iowa Constitution, indicated an intent to limit arbitrary searches and seizures. *See id.* at 272. In addition, a review of the circumstances surrounding the adoption of the Federal and Iowa Constitutions confirmed the framers sought to protect against the government abusing its power. *See id.* at 274. Despite ongoing current debate over whether the framers accepted warrantless searches, the historical review suggested the framers did not intend to allow law enforcement to perform "broad, unlimited" warrantless searches. *Id.* at 273.

We also traced the development of the United States Supreme Court's Fourth Amendment jurisprudence. *See id.* at 275–83 (discussing relevant precedents). After noting that exceptions for automobile

searches, searches incident to arrest, and exigent circumstances still required a showing of probable cause, we described the Supreme Court's relaxation in other contexts of the probable-cause requirement. *See id.* at 279. For instance, the Supreme Court has carved out an exception for "special needs" not related to law enforcement when a warrant and individualized suspicion are unnecessary. *See id.* (explaining the development of the special-needs exception); *see also, e.g., Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 666, 109 S. Ct. 1384, 1391, 103 L. Ed. 2d 685, 702 (1989) (holding the U.S. Customs Service's drug-testing program presented a special need justifying a departure from the warrant and probable-cause requirements); *Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S. Ct. 1391, 1396–97, 59 L. Ed. 2d 660, 668 (1979) ("In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field . . . .' " (Footnotes omitted.) (quoting *Camara*, 387 U.S. at 532, 87 S. Ct. at 1733, 18 L. Ed. 2d at 937). In cases with criminal implications, however, a view remained that some restraint on law enforcement's discretion was necessary. *See Ochoa*, 792 N.W.2d at 280 (describing application of special-needs exception in cases with criminal implications); *see also, e.g., City of Indianapolis v. Edmond*, 531 U.S. 32, 44, 121 S. Ct. 447, 455, 148 L. Ed. 2d 333, 345 (2000) (holding individualized suspicion necessary at narcotics checkpoints when general interest was crime control). Whatever the implications of the search, we reasoned protection against unrestrained government intrusion depended on some form of individualized suspicion, particularity, or "preestablished neutral criteria," not on a warrant. *See*

*Ochoa*, 792 N.W.2d at 280; *cf. Von Raab*, 489 U.S. at 667, 109 S. Ct. at 1391, 103 L. Ed. 2d at 703 (explaining one primary purpose a warrant serves is merely to advise a citizen that a search is legally authorized). None of those limits on law enforcement was present in *Ochoa*.

Turning to the closely related United States Supreme Court cases, we reviewed *Griffin, Knights,* and *Samson.  See Ochoa*, 792 N.W.2d at 280–83 (describing the Supreme Court's application of Fourth Amendment principles to probationers and parolees).  In discussing *Samson,* in which the Supreme Court upheld a warrantless, suspicionless search of a parolee, we focused primarily on the dissent authored by Justice Stevens and joined by Justices Souter and Breyer. *See Ochoa*, 792 N.W.2d at 282–83 (noting the "vigorous dissent").  Some discussion of the dissent is therefore necessary.

In the *Samson* dissent, Justice Stevens inveighed against the majority for upholding "an entirely suspicionless search unsupported by any special need."  547 U.S. at 860, 126 S. Ct. at 2204, 165 L. Ed. 2d at 264 (Stevens, J., dissenting).  According to the three Justices, the majority "jettisoned" individualized suspicion without substituting any standards by which to "rein in officers and furnish a bulwark against the arbitrary exercise of discretion."  *Id.* at 860–61, 126 S. Ct. at 2204, 165 L. Ed. 2d at 265.  The dissent never hinted or suggested, however, that the bulwark against arbitrary government action was under all circumstances a search warrant.  On the contrary, in all the dissenters' indignation for the majority's approach, even they would have dispensed with a search warrant under the circumstances.  *See id.* at 857, 126 S. Ct. at 2202, 165 L. Ed. 2d at 263 (arguing *Knights* and *Griffin* do not support "suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards").  And the

framers of the Federal Constitution would have done so as well, according to the three dissenters. *See id.* at 858, 126 S. Ct. at 2203, 165 L. Ed. 2d at 263 ("The suspicionless search is the very evil the Fourth Amendment was intended to stamp out."). The dissenters declared, "The requirement of individualized suspicion, in all its iterations, is the shield the Framers selected to guard against the evils of arbitrary action, caprice, and harassment." *Id.* at 866, 126 S. Ct. at 2207, 165 L. Ed. 2d at 268. Law enforcement here had this individualized suspicion; in fact, probable cause existed to support the search of Short's residence. Even the *Samson* dissenters, in all likelihood, would have upheld the search under these circumstances. The majority chooses to ignore this analysis.

*Ochoa*'s survey did not end at the *Samson* dissent; however, our rejection of warrantless, suspicionless searches of parolees flowed largely from it and the historical narrative. We reasoned that law enforcement having the power to search "a parolee at any time, for anything, anywhere, including the home, without any suspicion of any kind" resembled too closely the general warrant "despised" by our forebears. *See Ochoa*, 792 N.W.2d at 287. Further, without some level of suspicion, even if only reasonable suspicion, there was no limit on whether a search could be conducted or on the search's scope. *See id.* at 288. Our constitution, we inferred from the federal experience, aimed to prohibit "[s]uch unbridled discretion." *See id.* After flaying the *Samson* majority's dubious reasoning, we concluded "a parolee may not be subjected to broad, warrantless searches by a general law enforcement officer without any particularized suspicion or limitations to the scope of the search." *See id.* at 291.

The takeaway from *Ochoa* was that the search of the parolee was unconstitutional because there was no limitation whatsoever on the

police officer's discretion. *See id.* (taking no position regarding whether some "means other than a warrant" that limited law enforcement's power might pass constitutional muster). In *Ochoa,* the police officer lacked even a hunch on which to base the search. *See id.* at 288. This sought-after search power was "stunningly broad," enabling law enforcement to search any parolee's "books, records, diaries, invoices, and intimate surroundings" without limitation. *See id.* at 287–88. A power so broad could not be reconciled with a constitutional limitation on governmental search authority.

The search conducted in this case, in comparison to the searches conducted in *Ochoa* and *Baldon,* is clearly distinguishable. The search in this case "met the most stringent" Fourth Amendment search standard, "probable cause." *See United States v. Flynn,* 664 F.2d 1296, 1300 n.8 (5th Cir. 1982) (declining to consider whether airplanes should be given the same constitutional treatment as cars because probable cause existed). Moreover, the scope was narrow, enabling officers to search only for evidence of the crime that Short was suspected of committing. Had these circumstances been present in *Ochoa,* this court might have joined with the nine Justices of the United States Supreme Court willing to discard the search-warrant requirement in *Samson.* Our search of cases involving parolees following *Ochoa* has indicated nothing to the contrary. *See Kern,* 831 N.W.2d at 176 (concluding officers lacked probable cause to perform exigent-circumstances search of parolee's home); *Baldon,* 829 N.W.2d at 789 (noting the state never argued that it had even reasonable suspicion to search parolee).

As noted above, our constitutional independence frees this court from applying the reasoning the United States Supreme Court used to uphold the warrantless search of the probationer in *Knights.* That

reasoning, which rests on judgments about a probationer's privacy expectations and which was similarly applied to parolees in *Samson*, has been criticized as "totally circular." *See* 5 LaFave, *Search and Seizure* § 10.10(c), at 544 (explaining the circularity of the Court's logic in *Knights*); *Samson*, 547 U.S. at 857–58, 126 S. Ct. at 2202–03, 165 L. Ed. 2d at 263 (Stevens, J., dissenting) (chastising the majority's combination of "faulty syllogism" and "circular reasoning"). Even so, it is undeniable that "by virtue of their status alone, probationers ' "do not enjoy the absolute liberty to which every citizen is entitled." ' " *Samson*, 547 U.S. at 848–49, 126 S. Ct. at 2197, 165 L. Ed. 2d at 257 (quoting *Knights*, 534 U.S. at 119, 122 S. Ct. at 587, 151 L. Ed. 2d at 505). This commonsense observation provides initial support for differential treatment of probationers and law-abiding citizens under article I, section 8 of the Iowa Constitution.

In Iowa, the lowest level probationers do not enjoy the liberty to which law-abiding citizens are entitled. Iowa Code chapter 901B sets forth a "corrections continuum." *See* Iowa Code § 901B.1(1) (2013). Probation, like parole, falls on "Level Two" of the corrections continuum, *see id.* § 901B.1(1)(*b*), sandwiched between "Level One," "[n]oncommunity based corrections sanctions," *see id.* § 901B.1(1)(*a*), and "Level Three," "[q]uasi-incarceration sanctions," *see id.* § 901B.1(1)(*c*). Level two is further divided into three levels of sanctions, all of which contemplate at least supervision by corrections authorities. *See id.* § 901B.1(1)(*b*)(1)–(3). Probationers subject to monitored sanctions "are monitored for compliance" with "administrative supervision sanctions" by corrections authorities. *See id.* § 901B.1(1)(*b*)(1). Supervised sanctions, the middle level, are regular probation supervision and any conditions in the probation agreement or court order. *See id.* § 901B.1(1)(*b*)(2). Finally,

intensive supervision sanctions, in addition to subjecting a probationer to intense monitoring, provide for "electronic monitoring, day reporting, day programming, live-out programs for persons on work release or who have violated chapter 321J, and institutional work release under section 904.910." *Id.* § 901B.1(1)(*b*)(3). As may readily be seen, this legislative scheme envisions subjecting all probationers to governmental scrutiny to which no ordinary citizen is subject, thus depriving even the lowest level probationers of some degree of liberty.

Probation conditions may further abridge a probationer's liberty. Iowa Code section 907.6 grants broad authority for doing so:

> Probationers are subject to the conditions established by the judicial district department of correctional services subject to the approval of the court, and any additional reasonable conditions which the court or district department may impose to promote rehabilitation of the defendant or protection of the community. Conditions may include but are not limited to adherence to regulations generally applicable to persons released on parole and including requiring unpaid community service as allowed pursuant to section 907.13.

Among the parole regulations to which a probationer may be subject is the requirement that the probationer "secure and maintain employment." Iowa Admin. Code r. 201—45.2(1)(*c*) (2013). Another regulation prohibits a probationer from travelling outside his or her county of residence without permission. *See id.* r. 201—45.2(1)(*d*). Before leaving the state, a probationer must "secure advance written permission." *Id.* A probationer may not change residences without permission. *Id.* r. 201—45.2(1)(*e*). A probationer may also be compelled to "cooperate in any treatment/rehabilitation/monitoring program" specified by corrections authorities. *Id.* r. 201—45.2(1)(*i*). These restrictions are strong and significantly limit a probationer's freedom, but as the statute makes

plain, these are additional conditions to which a probationer might be subjected.

Iowa Code section 907.6 also authorizes courts to impose probation conditions. Courts may not impose unreasonable or arbitrary conditions. *State v. Rogers*, 251 N.W.2d 239, 243 (Iowa 1977). Otherwise, courts' authority under this provision is broad. *State v. Valin*, 724 N.W.2d 440, 445 (Iowa 2006). We have approved a court's order that a probationer spend six months in a residential treatment facility, even when it meant displacing the probationer's child. *See State v. Ogle*, 430 N.W.2d 382, 383 (Iowa 1988) (finding district court did not abuse its discretion when imposing the probation condition). For its holding that a court is within its discretion even to tell a probationer where and with whom to live, *Ogle* exemplifies the impressive loss of freedom to which probationers are subject. *See id.* Such deprivation is necessary to promote the probationer's rehabilitation and to protect the community. *See id.* at 384 (upholding probation condition); *see also* Iowa Code § 907.6 (providing conditions may be imposed "to promote rehabilitation of the defendant or protection of the community").

Our caselaw, our statutes, and our regulations are evidence of a fundamental notion in our law. They show that deeply embedded in our system of law is the notion individuals sentenced for crimes, including those who remain outside a prison's walls, do not enjoy the same complement of liberties as those of law-abiding citizens. Probationers, unlike ordinary citizens, must comply with stringent conditions under the watchful supervision of courts and corrections authorities. That our law permits this treatment differential is undeniable. It follows from this fundamental notion that probationers may be accorded different

treatment under some constitutional provisions, provided governmental authority is adequately constrained.

Besides our jurisprudence on consent, one additional constraint on governmental authority is individualized suspicion. As we said in *Cullison,* "the basic purpose of [the search and seizure protection], as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against *arbitrary* invasions by government officials." *See* 173 N.W.2d at 538 (emphasis added). As all of the cases that have addressed searches of this nature confirm, it is this arbitrary and suspicionless search that is the crucial distinction between this case and the similar cases that have come before this court. *See Kern,* 831 N.W.2d at 176 (concluding officers lacked probable cause); *Baldon,* 829 N.W.2d at 789 (noting the State never argued that it had individualized suspicion to search parolee); *Ochoa,* 792 N.W.2d at 288 (noting police officer performed search without any individualized suspicion); *Cullison,* 173 N.W.2d at 540 (finding there was no "reasonable or probable cause" to support search). That the officers here had probable cause to search Lorenzen's apartment negates a comparison between the search performed in this case and "the despised general warrant." *See Ochoa,* 792 N.W.2d at 287. It was the general warrant's conferral of unrestrained discretion upon law enforcement that was an impetus for the Fourth Amendment. *See id.*

The officers who searched Short operated under no such unrestrained or arbitrary discretion. Rather, having established through diligent investigation probable cause to believe Short committed a burglary, law enforcement applied for a search warrant. While the search warrant issued was ultimately determined to be invalid, the probable-cause finding by the independent judicial officer was never

challenged. Not surprisingly, the stolen property was found at the apartment.

The probable-cause requirement significantly restrains law enforcement discretion. This standard is considerably more protective of probationers' rights than the reasonable-suspicion standard upon which the search in *Knights* was upheld. *See* 534 U.S. at 122, 122 S. Ct. at 593, 151 L. Ed. 2d at 507 (upholding warrantless search of a probationer supported by reasonable suspicion); *see also Alabama v. White*, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301, 309 (1990) (explaining that "[r]easonable suspicion is a less demanding standard than probable cause"); *State v. Lewis*, 675 N.W.2d 516, 525 (Iowa 2004) ("The reasonable and articulable suspicion standard . . . is less than probable cause."). To satisfy the reasonable-suspicion requirement, an officer need only have specific, articulable facts. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968). In *Griffin*, for instance, the United States Supreme Court found an unauthenticated tip that a probationer " 'had or might have' " guns adequate to supply reasonable suspicion. 483 U.S. at 878, 107 S. Ct. at 3171, 97 L. Ed. 2d at 720. The Supreme Court determined, however, the same tip would not supply probable cause. *See id.*

In Iowa, "[t]he standard for probable cause is whether a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched." *Naujoks*, 637 N.W.2d at 108. Probable cause demands from law enforcement facts suggesting that the items sought in the search are linked to criminal activity and that those items will be found in the place to be searched. *See State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997); *see also State v. Thomas*, 540 N.W.2d 658, 662–63 (Iowa 1995) ("The facts

and information presented to establish this finding need not rise to the level of absolute certainty, rather, it must supply sufficient facts to constitute a fair probability that contraband or evidence will be found on the person or in the place to be searched."). Applying the probable cause standard, we have invalidated searches on numerous occasions. *See, e.g., Kern*, 831 N.W.2d at 176 (holding officers lacked probable cause to search parolee's home); *Lewis*, 675 N.W.2d at 525 (concluding officers lacked probable cause to make a warrantless entry into a backyard); *State v. Myers*, 570 N.W.2d 70, 75 (Iowa 1997) (concluding that "there was not probable cause for issuance of the search warrant"); *Thomas*, 540 N.W.2d at 666 (holding no probable cause existed to search all persons in a bar). The probable cause requirement's insistence on sufficient facts provides a strong protection against arbitrary searches by law enforcement officers.

In addition, the concept of probable cause encompasses a number of legal rules designed to limit officers' discretion and therefore to protect individuals' rights. In *Kern*, for example, we rejected the argument an individual's invocation of constitutional rights could be used by officers to establish probable cause. *See* 831 N.W.2d at 176. We also held a "defensive posture by an occupant of a home in response to an intrusion by police is not indicative of probable cause of a crime." *Id.* These legal rules further restrain officers' discretion to perform searches.

A strict requirement that officers have individualized suspicion before searching a probationer therefore alleviates our predominant concern in *Ochoa*—that unrestrained general law enforcement could intrude on a probationer's privacy and rifle through the probationer's possessions anytime, anywhere, without a warrant, to find evidence of a crime. *See* 732 N.W.2d at 287–88. Consistent with current Fourth

Amendment jurisprudence and our own precedents, I would require that law enforcement must have at least individualized suspicion before law enforcement officers can search a probationer or the residence.

Here, deputies established probable cause for the search by applying for a search warrant. To do so, Deputy Bartolozzi carefully set forth "facts, information, and circumstances," including a police report and officer statements describing the burglary. *See* Iowa Code § 808.3 (describing the necessary contents of an application for a search warrant). The exhibits attached to the application described in detail the items taken in the burglary that deputies expected to find in the residence. Deputy Bartolozzi also described in detail the place to be searched, going so far as to include a picture and description of the residence, which was only later determined to be incorrect. An independent review by a judicial officer determined there was probable cause for the search and granted the search warrant based on Deputy Bartolozzi's scrupulous and earnest efforts. Though the search warrant was later invalidated due to an incorrect address, probable cause was undisputedly established, and the correct address was subject to the search.

In addition to the finding of probable cause by an independent judicial officer, there were other forms of restraint on law enforcement's discretion in this case. The greatest concern with granting officers the authority to perform suspicionless searches of parolees in *Ochoa* was that the authority was neither "minimal and highly-defined," nor "closely linked to an identified special need." *See* 792 N.W.2d at 288. The search executed by the deputies in this case, however, was narrow and defined. Consistent with the warrant application, deputies searched for, and found, televisions, jewelry, shoes, and other items they believed would be

found in the apartment based on their investigation. Unlike the search in *Ochoa*, the search here was not "contrary to the common-sense notion that 'the scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.'" *See* 792 N.W.2d at 288 (quoting *Terry*, 392 U.S. at 19, 88 S. Ct. at 1878, 20 L. Ed. 2d at 904). Rather, the search of Short was consistent with that notion. The limited scope of the search further controlled officer discretion.

The officers' knowledge Short was on probation also restrained law enforcement discretion. This is not a situation like that of *In re Tyrell J.,* in which the California Supreme Court upheld a police officer's warrantless search of a juvenile probationer, even though the officer was unaware the juvenile was on probation. *See* 876 P.2d 519, 530 (Cal. 1994), *overruled by In re Jaime P.*, 146 P.3d 965, 972 (Cal. 2006). In requiring law enforcement to first ascertain whether an individual is on probation, we avoid the possibility officers will search an individual "in the bare hope" the individual is on probation. *See Jaime P.*, 146 P.3d at 969. To adequately restrain law enforcement discretion, officers must not only establish individualized suspicion, but also ascertain whether the individual to be searched is on probation. *See Ochoa*, 792 N.W.2d at 291 (explaining one reason for rejecting the warrantless, suspicionless search was that there was no available means of controlling arbitrary searches). Both requirements are integral to the prevention of arbitrary searches, and both requirements are present and have been met in this case.

Finally, in his probation agreement, Short consented to the warrantless search. At the time of the search, Short was on probation for third-degree theft, an aggravated misdemeanor. *See* Iowa Code

§ 714.2(3) ("Theft in the third degree is an aggravated misdemeanor."). Short could have been sentenced to prison for up to two years. *See id.* § 903.1(2) ("When a person is convicted of an aggravated misdemeanor . . . the maximum penalty shall be imprisonment not to exceed two years."). Rather than being sentenced to serve a prison sentence, Short requested a suspended sentence and received a suspended sentence and probation. As part of that bargain, Short voluntarily agreed to subject himself to warrantless searches by law enforcement and corrections authorities alike. The consent provision is not alone a basis to uphold the search, but Short's consent in the probation agreement should be a critical factor in upholding the search in this case. The lack-of-bargaining rationale we utilized in *Baldon* to conclude there was no voluntary consent to the search, is not applicable in the present case.

We would not be alone in holding law enforcement may search probationers without a warrant. Numerous state courts have upheld warrantless searches of probationers and parolees, some supported by individualized suspicion and some requiring probable cause. *See State v. Montgomery*, 566 P.2d 1329, 1331 (Ariz. 1977) (upholding constitutionality of a probation condition that permitted warrantless searches by law enforcement); *State v. Fields*, 686 P.2d 1379, 1390 (Haw. 1984) (holding a warrantless search of a probationer must be supported by reasonable suspicion); *Gawron*, 736 P.2d at 1297 (upholding a warrantless search of a probationer); *State v. Schlechty*, 926 N.E.2d 1, 8 (Ind. 2010) (upholding warrantless search of a probationer supported by reasonable suspicion); *State v. Bennett*, 200 P.3d 455, 463 (Kan. 2009) (rejecting a suspicionless search of a probationer on grounds that the search must "be based on a reasonable suspicion"); *Parks v. Commonwealth,* 192 S.W.3d 318, 330 (Ky. 2006) (upholding a probation

condition allowing law enforcement, on reasonable suspicion, to search a probationer without a warrant); *State v. Malone*, 403 So. 2d 1234, 1239 (La. 1981) (holding a warrantless probation search need only be supported by reasonable suspicion); *State v. Burke*, 766 P.2d 254, 257 (Mont. 1988) (holding permissible a warrantless search of a probationer supported by reasonable cause); *People v. Hale*, 714 N.E.2d 861, 862, 865 (N.Y. 1999) (upholding search of a probationer's home under a court-ordered probation condition); *State v. Schlosser*, 202 N.W.2d 136, 139 (N.D. 1972) (upholding a warrantless search of a probationer); *State v. Turner*, 297 S.W.3d 155, 169 (Tenn. 2009) (upholding under the Tennessee Constitution a warrantless, suspicionless search of a parolee); *State v. Winterstein*, 220 P.3d 1226, 1230 (Wash. 2009) (holding probation officers must have probable cause before performing a warrantless search). Though of diverse reasoning, these cases set forth the principle that probationers and parolees may be searched upon a different set of circumstances than law-abiding citizens. I would decide this case according to those well-established principles.

Consent-to-search provisions in probation agreements advance the interests of both offender rehabilitation and societal protection. Probationers who have agreed to warrantless searches are more likely to abide by the law:

> The condition of probation that defendant consent to a search of his person by a law enforcement officer without a search warrant is a supervisorial procedure related to his reformation and rehabilitation in light of the offense of which he was convicted. With knowledge he may be subject to a search by law enforcement officers at any time, he will be less inclined to [violate the law].

*People v. Kern*, 264 Cal. App. 2d 962, 965 (Ct. App. 1968); *accord People v. Bravo*, 738 P.2d 336, 342 (Cal. 1987); *Himmage v. State*, 496 P.2d 763,

765 (Nev. 1972); *State v. Benton*, 695 N.E.2d 757, 761–62 (Ohio 1998); *see also Hale*, 714 N.E.2d at 865 ("[O]ne way to encourage [the probationer to comply with the law] was to hold out the possibility that he would be checked up on, and stood to be incarcerated if he betrayed the terms of his negotiated probationary status."). Of course, a probationer who is more likely to abide by the law is also less likely to harm others. *See Owens v. Kelley*, 681 F.2d 1362, 1367 (11th Cir. 1982) (recognizing that probationary searches protect society "by the deterrent effect of the condition"). Consent-to-search agreements also "enhanc[e] the ability of law enforcement officers to detect any unlawful . . . activities." *Id.* "[I]f a defendant considers the conditions of probation too harsh, he has the right to refuse probation and undergo the sentence." *Gawron*, 736 P.2d at 1297. Despite these obvious benefits, the majority fails even to discuss these widely used consent-to-search agreements as part of its analysis of this case and blindly follows the Fourth Amendment precedent found in *Cullison*.

Based on all of the above considerations, I would hold the search of Short and his residence was permissible under not only the Fourth Amendment, but also under article I, section 8 of the Iowa Constitution. Such a conclusion is consistent with our precedents and the national consensus. After a diligent investigation, deputies established probable cause to believe evidence of the burglary was in Leya Lorenzen's apartment, where Short was residing. Even knowing Short was on probation and subject to the consent-to-search provision of his probation agreement, law enforcement officers still established probable cause for the search and executed the narrow search for evidence. Upon doing so, they discovered the evidence they sought. Even without a warrant, the consent provided by the probation agreement, combined with the

existence of probable cause and the narrow scope of the search, adequately restrained officer discretion.

The majority blindly elects to adhere to an absolute search warrant requirement as set forth in *Cullison* without considering the changing analysis of Fourth Amendment jurisprudence, and the jurisprudence found in other nationwide authority.  Such adherence to the past, based on an underlying belief that the United States Supreme Court has eroded and diluted the rights of ordinary citizens to the protections under the Fourth Amendment, and that only a warrant will suffice, is unsound and illogical.  The search in this case was constitutionally permissible under article I, section 8 of our Iowa Constitution and our precedents.

I would affirm.

Waterman, J., joins this dissent in part, and Mansfield, J., joins this dissent.